UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JOSH FEIERSTEIN, Individually and On     :
Behalf of All Others Similarly Situated,     :

    :

                  Plaintiff,     :

    :

      v.     :       19 Civ. 11361 (VEC)

    :

CORREVIO PHARMA CORP., MARK H.N.     :
CORRIGAN, WILLIAM HUNTER,     :
JUSTIN A. RENZ, and SHEILA M. GRANT,     :

    :

                  Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Jay B. Kasner
Scott D. Musoff
Ashley P. Grolig
Michael D. Moritz
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
ashley.grolig@skadden.com
michael.moritz@skadden.com

*Attorneys for Correvio Pharma Corp.,*
    *Mark H.N. Corrigan, William Hunter,*
    *Justin A. Renz and Sheila M. Grant*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................... 1

STATEMENT OF FACTS ........................................................................................................ 5

      A.      The Parties ......................................................................................................... 5

      B.      The History of the Brinavess Program In the U.S. ................................................ 6

      C.      Brinavess Collects Safety Data From the SPECTRUM Study and Its Ten Years' of Approved Use in Other Countries ............................................................. 7

      D.      The SPECTRUM Study Is Completed ................................................................. 8

      E.      The FDA Permits Correvio To Resubmit the Brinavess NDA Without Conducting Additional Studies Based on Ten Years of Real World Evidence ............................................................................................................... 9

      F.      The FDA Disagrees With Correvio's Safety Findings and Does Not Approve the Resubmitted Brinavess NDA .............................................................. 10

      G.      Correvio Repeatedly Warned Investors of Risks in Seeking FDA Approval ........ 11

ARGUMENT ........................................................................................................................... 12

I.      THE FIRST CLAIM FOR RELIEF SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE (A) ANY ACTIONABLE MATERIAL MISSTATEMENT OR OMISSION OR (B) SCIENTER ................................................ 12

      A.      Plaintiffs Fail To Allege Any Material Misstatement or Omission ....................... 13

                  1.      Statements Regarding the Regulatory Path Forward and Likelihood for FDA Approval Are Protected or Are Otherwise Nonactionable .......... 13

                        (a)      Correvio's Forward-Looking Statements Regarding Any Regulatory Path Forward and Likelihood For Approval Are Protected Under the PSLRA Safe Harbor ...................................... 14

                                  (i)      Correvio's Forward-Looking Statements Were Accompanied by Meaningful Cautionary Language ......... 15

                                  (ii)      Correvio's Forward-Looking Statements Are Not Actionable Under the "Known Falsity" Safe Harbor ......... 16

                        (b)      Plaintiffs Failed to Plead That Statements Regarding the Likelihood For FDA Approval Were False or Misleading ........... 17

(c)     Correvio's Statements Regarding the FDA's Actions Are Nonactionable Recitations of Historical Fact ................................19

2.     Statements Regarding the Results of the SPECTRUM Study Are Nonactionable Statements Of Opinion ......................................20

3.     The Challenged Statements Were Not False or Misleading Because All Material Information Was Disclosed to Investors ..............................24

(a)     Correvio Disclosed Limitations of the SPECTRUM Study ..........25

(b)     Plaintiff's Other Alleged "Omissions" Are Not Particularized Allegations of Omitted Fact...................................27

B.     Plaintiffs Fail To Plead a Strong Inference of Scienter ........................................28

1.     Plaintiffs Fail To Plead Motive or Opportunity........................................28

2.     Plaintiffs' Claims Do Not Raise a Strong Inference of Conscious Disregard or Recklessness ...........................................................................29

(a)     Plaintiffs Fail To Plead Recklessness ..............................................29

(b)     The Allegations Regarding the Individual Defendants Likewise Fail to Raise a Strong Inference of Scienter...................33

(c)     The Confidential Witness Allegations Do Not Cure Plaintiffs' Pleading Shortcomings..................................................35

II.     THIS COURT LACKS PERSONAL JURISDICTION OVER INDIVIDUAL DEFENDANT GRANT..................................................................................................39

III.     THE SECOND CLAIM FOR RELIEF SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM .............................40

CONCLUSION..................................................................................................................40

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Amidax Trading Group v. S.W.I.F.T. SCRL*,
    671 F.3d 140 (2d Cir. 2011)......................................................................................4, 27, 28

*In re Aratana Therapeutics Inc. Securities Litigation*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018).............................................................................32, 38

*In re AstraZeneca Securities Litigation*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008), *aff'd sub nom. State Universities
    Retirement System of Illinois v. Astrazeneca PLC*, 334 F. App'x 404 (2d Cir.
    2009) ..............................................................................................................29, 30, 31

*Axar Master Fund, Ltd. v. Bedford*,
    308 F. Supp. 3d 743 (S.D.N.Y. 2018), *aff'd*, 806 F. App'x 35 (2d Cir. 2020)...................21

*Barrett v. PJT Partners Inc.*,
    16-CV-2841 (VEC), 2017 WL 3995606 (S.D.N.Y. Sept. 8, 2017)........................4, 18, 40

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)...........................................................................................5, 39

*Chapman v. Mueller Water Products, Inc.*,
    No. 19-cv-3260 (LJL), 2020 WL 3100243 (S.D.N.Y. June 11, 2020) ..............................34

*City of Livonia Employees' Retirement System v. Wyeth*,
    No. 07 Civ. 10329RJS, 2010 WL 3910265 (S.D.N.Y. Sept. 29, 2010)..............................14

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014)...........................................................................................................39

*Das v. Rio Tinto PLC*,
    332 F. Supp. 3d 786 (S.D.N.Y. 2018)................................................................................39

*In re DDAVP Direct Purchaser Antitrust Litigation*,
    585 F.3d 677 (2d Cir. 2009).....................................................................................4, 12, 28

*In re Delcath Systems, Inc. Securities Litigation*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014).............................................................................14, 16

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................................4, 28, 32

iii

*In re EDAP TMS S.A. Securities Litigation*,
No. 14 Civ. 6069(LGS), 2015 WL 5326166 (S.D.N.Y. Sept. 14, 2015)...............19, 33, 35

*Fadem v. Ford Motor Co.*,
352 F. Supp. 2d 501 (S.D.N.Y.), *aff'd*, 157 F. App'x 398 (2d Cir. 2005).........................36

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*,
615 F. Supp. 2d 218 (S.D.N.Y. 2009)...............................................................................16

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016).................................................................19, 22, 32

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011).........................................................................5, 35

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)...........................32

*Harris v. AmTrust Financial Services, Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015), *aff'd*, 649 F. App'x (2d Cir. 2016).......................21

*Hou Liu v. Intercept Pharmaceuticals, Inc.*,
No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020)......................29, 34

*Intel Corp. Investment Policy Committee v. Sulyma*,
140 S. Ct. 768 (2020)......................................................................................................16

*Jackson v. Abernathy*,
960 F.3d 94 (2d Cir. 2020)........................................................................................14, 18

*Janus Capital Group, Inc. v. First Derivative Traders*,
564 U.S. 135 (2011)...................................................................................................13, 14

*Jones v. Perez*,
550 F. App'x 24 (2d Cir. 2013).........................................................................................35

*In re Keryx Biopharmaceuticals, Inc. Securities Litigation*,
Nos. 13 Civ. 755(KBF), 13 Civ. 1307(KBF), 2014 WL 585658 (S.D.N.Y. Feb.
14, 2014) ...................................................................................................................23, 35

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013)......................................................................................17, 22

*Lehmann v. Ohr Pharmaceutical Inc.*,
No. 18 CIV. 1284 (LAP), 2019 WL 4572765 (S.D.N.Y. Sept. 20, 2019).........2, 21, 23, 32

*In re MELA Sciences, Inc. Securities Litigation*,
No. 10 CV 8774(VB), 2012 WL 4466604 (S.D.N.Y. Sept. 19, 2012).................19, 24, 33

*Neurotrope, Inc. Securities Litigation*,
   315 F. Supp. 3d 721 (S.D.N.Y. 2018)................................................................21

*Nguyen v. Endologix, Inc.*,
   No. 18-56322, 2020 WL 3069776 (9th Cir. June 10, 2020)...................................2, 19, 32

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015)..........................................................................3, 20, 21, 22

*P. Stolz Family Partnership L.P. v. Daum*,
   355 F.3d 92 (2d Cir. 2004).......................................................................3, 15

*Patel v. L-3 Communications Holdings Inc.*,
   No. 14-CV-6038 (VEC) et al., 2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)..................40

*Purjes v. Plausteiner*,
   15-CV-2515 (VEC), 2016 WL 552959 (S.D.N.Y. Feb. 10, 2016)......................................7

*In re Rockwell Medical, Inc. Securities Litigation*,
   No. 16 Civ. 1691 (RJS), 2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) .....................28, 33

*Rubinstein v. Credit Suisse Group AG*,
   No. 19-CV-1069 (VEC), 2020 WL 2036850 (S.D.N.Y. Apr. 28, 2020)..........................25

*In re Sanofi Securities Litigation*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d
   199 (2d Cir. 2016)................................................................................ passim

*Schaeffer v. Nabriva Therapeutics PLC*,
   No. 1:2019-cv-04183 (VM) (S.D.N.Y. Apr. 28, 2020) ................................................3, 17

*Schiro v. Cemex, S.A.B. de C.V.*,
   18-CV-2352 (VEC), 2020 WL 635705 (S.D.N.Y. Feb. 10, 2020)..................................12

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................ passim

*Slayton v. American Express Co.*,
   604 F.3d 758 (2d Cir. 2010)....................................................................3, 16

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)................................................................ passim

*Wilbush v. Ambac Financial Group, Inc.*,
   271 F. Supp. 3d 473 (S.D.N.Y. 2017)..............................................................36

*Wollman v. Hospitality Investors Trust, Inc.*,
   No. 20-CV-798 (VEC), 2020 WL 3402915 (S.D.N.Y. June 18, 2020)........................4, 33

## STATUTES

15 U.S.C. § 78u-5(c)(1)(B) ................................................................................16

15 U.S.C. § 78u-5(c)(2) ....................................................................................15

15 U.S.C. § 78u-5(c)(3) ....................................................................................15

15 U.S.C. § 78u-5(i)(1)(B)................................................................................14

15 U.S.C. § 78u-5(i)(1)(D) ...............................................................................14

## REGULATIONS

21 CFR § 312.42(a).............................................................................................6

## OTHER AUTHORITIES

See H. Domanovits et al., *Efficacy and safety of vernakalant for cardioversion of recent-onset atrial fibrillation in realworld clinical practice: the SPECTRUM post-approval safety study*, 40 European Heart Journal ehz745.1151 (Oct. 21, 2019), https://academic.oup.com/eurheartj/article-abstract/40/Supplement_1/ehz745.1151/5597232 ...............................................................9

B. Ritz et al., *Rapid Cardioversion of Recent-Onset Atrial Fibrillation in the Emergency Department With Vernakalant: Insights From the Multinational Spectrum Registry*, 140 Circulation A15421 (Nov. 11, 2019), https://www.ahajournals.org/doi/10.1161/circ.140.suppl_1.15421 .....................................9

Correvio Presentation to CRDAC, https://www.fda.gov/media/133640/download (Dec. 10, 2019) ........................................................................................10

Correvio Briefing Document, https://www.fda.gov/media/133299/download (Dec. 10, 2019) ........................................................................................10

Defendants Correvio Pharma Corp. ("Correvio" or the "Company"), Mark H.N. Corrigan, William Hunter, Justin A. Renz and Sheila M. Grant (together, the "Individual Defendants" and with Correvio, the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Amended Class Action Complaint (Dkt. No. 40) ("Amended Complaint" or "AC") with prejudice.

## PRELIMINARY STATEMENT

Correvio is a specialty pharmaceutical company focused on providing innovative, high-quality brands to meet the needs of acute care physicians and patients.  One such brand, Brinavess is approved in over 40 countries worldwide for the treatment of recent onset atrial fibrillation ("AFib"), the most common abnormal heart rhythm (arrhythmia) that affects millions of Americans each year.  If left untreated, AFib can cause abnormalities to the heart and may lead to stroke.

Over the past decade, Brinavess has been used to successfully treat tens of thousands of patients across the European Union ("EU"), Canada and other countries.  In light of that success, Correvio sought approval by the U.S. Food and Drug Administration ("FDA") so that Americans suffering from AFib could receive the same benefit.  Correvio submitted a large amount of data collected from the real-world use of Brinavess in countries around the world which the Company publicly disclosed it believed would aid in the FDA's consideration of its New Drug Application ("NDA").  This information included a post-approval safety study called SPECTRUM.  This study was conducted under the guidance of the European Medicines Agency ("EMA") (the EU's equivalent of the FDA) as part of the approval process in the EU.  Despite the EMA's finding that SPECTRUM further demonstrated Brinavess's safety, in December 2019 an advisory

committee convened by the FDA and, in turn, the FDA, disagreed with the SPECTRUM findings and declined to approve Brinavess.

Like clockwork, following the advisory committee's negative vote (but before the FDA issued its final determination) a Correvio shareholder claimed fraud. Plaintiffs herein allege, essentially, that Defendants knew or should have known that the SPECTRUM results were so unreliable that the FDA would decline to approve Brinavess. But not only had the European counterpart to the FDA already found that the SPECTRUM results presented sufficient evidence of Brinavess's safety, but also the drug had been approved and used in over 40 countries; had been deemed safe for use in Canada and the EU; and had been used to treat tens of thousands of patients. The notion that — given that context — the Company *must have known* that the FDA would disagree is wholly unsupported by any, much less the requisite particularized, factual allegations. Similarly, the notion that Defendants *knew* or even *believed* that Brinavess would not be approved but nevertheless decided to invest significant time and money into the application is illogical and implausible. *See Nguyen v. Endologix, Inc.*, No. 18-56322, 2020 WL 3069776 (9th Cir. June 10, 2020).

Ultimately, Plaintiffs attempt to insulate themselves from the risks involved in scientific inquiry by claiming federal securities fraud based upon a dispute over the proper interpretation of scientific data — an approach the Second Circuit has squarely rejected as a basis for liability. *See Tongue v. Sanofi* ("*Sanofi II*"), 816 F.3d 199, 214 (2d Cir. 2016). As Judge Preska recently noted in a similar case, "[t]his Court will not adopt a rule that discourages free scientific inquiry in the name of shielding investors from risks of failure." *Lehmann v. Ohr Pharm. Inc.*, No. 18 CIV. 1284 (LAP), 2019 WL 4572765, at *5 (S.D.N.Y. Sept. 20, 2019) (citations omitted).

2

Notwithstanding the prolix nature of the Amended Complaint, it fails in multiple respects to meet the stringent pleading requirements applicable to this case. ***First***, Plaintiffs do not adequately allege an actionable misstatement or omission. Many of the challenged statements are forward-looking under 15 U.S.C. §§ 78u-5(c)(2), (3) and were accompanied by meaningful cautionary language warning investors of the risks involved with seeking FDA approval — the very risks of which Plaintiffs now complain. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004). Plaintiffs also fail to plead any facts giving rise to a strong inference that any of the Correvio or any of the Individual Defendants who allegedly made statements had actual knowledge that any forward-looking statements were false when made. *See Slayton v. Am. Exp. Co.*, 604 F.3d 758, 773 (2d Cir. 2010).

Plaintiffs also fail to plead that any statements regarding the likelihood for FDA approval were false or misleading. Plaintiffs do not claim that Correvio or any of the Individual Defendants guaranteed FDA approval, nor can they. In fact, all of the statements regarding the likelihood of approval were, at most, nonactionable corporate optimism. *See Schaeffer v. Nabriva Therapeutics PLC*, No. 19 Civ. 4183 (VM), slip op. (S.D.N.Y. Apr. 28, 2020).

Additionally, all of the challenged statements interpreting the SPECTRUM data are statements of nonactionable opinion under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Plaintiffs do not allege that the makers of these statements did not believe their interpretation of the SPECTRUM study results, much less whether the data was factually inaccurate. Rather, Plaintiffs claim that – based on the opinions of other doctors – there were "reliability" issues. But a difference in opinion amongst doctors does not suggest that Defendants did not honestly hold their beliefs, nor does it imply fraudulent intent. *See Sanofi II*, 816 F.3d at 214.

3

Further, despite Plaintiffs' claims that Correvio omitted various "limitations" to the SPECTRUM study, all of these purported issues were disclosed in the SPECTRUM protocol (which was publicly available and to which Plaintiffs selectively cite in their Amended Complaint) and were reiterated in the Company's public statements. Plaintiffs also misrepresent certain statements made by the FDA during their review of the SPECTRUM study as proof of additional "deficiencies," but the documents to which Plaintiffs refer plainly contradict these claims. *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011).

**_Second_**, Plaintiffs fail to allege facts that raise a strong inference of scienter as to each defendant. *See In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). Rather, Plaintiffs attempt to plead scienter by suggesting that Correvio was motivated to keep the stock price elevated to make certain public offerings. But general profit motives are typical of any business and do not raise a strong inference of scienter. *See Wollman v. Hospitality Investors Trust, Inc.*, No. 20-CV-798 (VEC), 2020 WL 3402915 (S.D.N.Y. June 18, 2020) (Caproni, J.); *see also ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009).

Plaintiffs also fail to plead a strong inference of conscious disregard or recklessness. Plaintiffs allege that the Individual Defendants had access to reports that should have raised red flags that the SPECTRUM study was deficient. Plaintiffs, however, fail to identify these reports and their contents and otherwise fail to allege that the Individual Defendants did not honestly believe that the SPECTRUM results were positive. *See Barrett v. PJT Partners Inc.*, 16-CV-2841 (VEC), 2017 WL 3995606, at *9 (S.D.N.Y. Sept. 8, 2017) (Caproni, J.)

Plaintiffs' attempt to plead scienter through confidential witness ("CW") allegations fares no better. Of the eight confidential witnesses, none had any apparent involvement with the

4

NDA, and only two worked on SPECTRUM.  But those CWs do not reveal any information suggesting that Correvio or any of the Individual Defendants did not honestly hold their beliefs. *See Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011).

**_Third_,** this Court lacks personal jurisdiction over Sheila Grant, one of the Individual Defendants, because Plaintiffs fail to plead facts showing that Ms. Grant purposely availed herself of the privilege of conducting business within the forum such that she should anticipate being haled into this court.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242-43 (2d Cir. 2007).

**_Fourth_,** Plaintiffs' Section 20(a) control person liability claim fails because (i) there is no primary violation of the Exchange Act; (ii) they fail to plead culpable participation as to any Individual Defendant; and (iii) as to Ms. Grant, plead control.  *See Schiro v. Cemex, S.A.B. de C.V.* ("*Cemex I*"), 396 F. Supp. 3d 283, 300 (S.D.N.Y. 2019) (Caproni, J.).

## STATEMENT OF FACTS[1]

### A.    The Parties

Correvio is a Canadian specialty pharmaceutical company (AC ¶ 2; Ex. 1 at 29)  that until recently traded on NASDAQ under the symbol "CORV."  (*Id.* ¶ 34.) [2]  Correvio has developed a portfolio of approved and marketed brands, including "Brinavess," a novel treatment for the conversion of recent onset AFib to sinus rhythm in adult patients.  (*Id.* ¶ 45.)

The Individual Defendants were officers at Correvio at times during the putative class period (September 5, 2018 to December 10, 2019).  (*See Id.* ¶¶ 35-38.)

---

[1]    The standards applicable to this motion are well-settled.  *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d at 292 n.1.  All exhibits ("Ex.") cited herein are attached to the concurrently filed Declaration of Ashley P. Grolig.

[2]    On May 27, 2020, Correvio was acquired by, and became a wholly owned subsidiary of, ADVANZ PHARMA Corp. Limited.  (Ex. 2.)

Co-Lead Plaintiffs Clinton Atkinson, Nabil Saad and Iuliaa Mironova allegedly acquired Correvio securities during that period.  (*Id.* ¶¶ 31-33; Dkt. No. 13-4, at ¶¶ 2-4.)[3]

**B.    The History of the Brinavess Program In the U.S.**

In December 2006, the Company's former partner, Astellas Pharma US, Inc. ("Astellas"), filed an NDA for Brinavess with the FDA.  (AC ¶ 7.)  As part of the review process, the FDA convened an advisory committee, which voted six to two in favor of recommending approval.  (*Id.* ¶ 7.)  In August 2008, the FDA informed Astellas that it had completed its review and the application was approvable, but requested additional safety information.  (*Id.* ¶ 7; Ex. 1 at 35.)  Following extended discussions with the FDA to define the best regulatory path forward for Brinavess, the Company and Astellas jointly announced that Astellas would undertake a single confirmatory additional Phase 3 ("ACT 5") clinical trial.  (AC ¶ 8; Ex. 1 at 35.)  The ACT 5 clinical trial commenced in October 2009.  (AC ¶ 8; Ex. 1 at 35.)

In November 2010, however, Brinavess was placed on clinical hold and the ACT 5 study was terminated following the death of one of the patients in the study, halting Correvio's ability to conduct clinical trials on Brinavess within the U.S.[4]  (AC ¶ 8; Ex. 1 at 36.)  Despite ongoing discussion between the Company and the FDA regarding the regulatory path forward, the FDA-mandated clinical hold on Brinavess remains in effect to this day.  (AC ¶ 9; Ex. 1 at 36.)

---

[3]    Although this Court denied Plainttifs' motion to appoint two co-lead counsel (Dkt. No. 29 at 4), counsel for the firm not appointed then moved and was permitted to appear *pro hac vice* as "counsel for Co-Lead Plaintiffs." (Dkt. Nos. 34, 35, 36, 37.)  However, they appear on the Amended Complaint as "Co-Lead Counsel for Plaintiffs."  (Dkt. No. 40 at 97.)

[4]    A clinical hold is an order issued by the FDA to the trial "sponsor to delay a proposed clinical investigation or to suspend an ongoing investigation."  21 CFR § 312.42(a).  "When an ongoing study is placed on clinical hold, no new subjects may be recruited to the study and placed on the investigational drug; patients already in the study should be taken off therapy involving the investigational drug unless specifically permitted by FDA in the interest of patient safety."  *Id.*

### C.     Brinavess Collects Safety Data From the SPECTRUM Study and Its Ten Years' of Approved Use in Other Countries

Brinavess has been extremely successful in other parts of the world.  In fact, Brinavess was approved for use in the EU in 2010 and is registered and approved *in over 40 countries*. (AC ¶ 48.)  As part of the approval process in the EU, the EMA asked the Company to conduct a post-approval safety study — SPECTRUM.  (*Id.* ¶ 65.)  The SPECTRUM protocol specified that the study was to be conducted in compliance with all local and national regulations.  (Ex. 3 at 11.)[5]  The study commenced in August 2011 and was carried out in Austria, Denmark, Finland, Germany, Sweden and Spain.  (AC ¶¶ 64-65.)

Correvio disclosed that SPECTRUM was an observational registry designed to provide robust, supportive data on the safety and effectiveness of Brinavess and to evaluate how treating physicians use the drug in real-world clinical practice.  (Ex. 4; AC ¶ 65; Ex. 3 at 9.)  At the outset, the study enrolled only prospective patients (*i.e.*, patients who enrolled in the study at the time they received Brinavess), but the Protocol was amended in 2016 (with the approval of the EMA) to also include retrospective patients (*i.e.*, patients who previously received Brinavess without enrolling in the study).  (AC ¶ 68; Ex. 3 at 28-29.)  The Protocol explained that the study did not use randomization to select the sample; patients were instead enrolled in the study if (i) they were prescribed and used Brinavess independently of the study and (ii) they provided informed consent.  (Ex. 3 at 29-30.)  It further explained that data was collected from observing the patient after the Brinavess infusion and from information routinely recorded in the medical record.  (AC ¶ 65; Ex. 3 at 17, 21.)

---

[5]     Plaintiffs cite and rely on the 2016 SPECTRUM Study Protocol (the "Protocol") in the Amended Complaint (*see, e.g.*, AC ¶ 22 n.13) and may therefore be judicially noticed on this motion.  *See Purjes v. Plausteiner*, No. 15-CV-2515 (VEC), 2016 WL 552959, at *4 (S.D.N.Y. Feb. 10, 2016).  The Protocol was publicly available during the SPECTRUM study and the entire putative class period.

Contrary to Plaintiffs' allegations (*see, e.g.*, AC ¶¶ 22, 163), the Protocol acknowledged that there were biases inherent in the study and a risk of missing data, both of which were increased by the inclusion of retrospective patients. (Ex. 3 at 29-30.) The Protocol, however, set forth the measures that were taken to decrease bias and minimize the risk of missing data and further stated that, in the Company's opinion, these methods would adequately address these issues. (*Id.*) Among other things, the Protocol stated:

- "[B]oth retrospectively and prospectively included patients will have to fulfill the same inclusion and exclusion criteria, neither group of patients would be selected randomly, thus this approach is not expected to yield selection bias. In addition, results will be reported overall and stratified by method of enrollment." (*Id.* at 29.)

- "SPECTRUM is an observational study that does not use randomization to select the sample. Treated patients are sequentially enrolled, based on provision of informed consent. Inclusion of patients retrospectively will also not use randomization as the goal is to enroll all patients, at the selected sites, who were treated with Brinavess and provided their informed consent. This will ensure that patients selected retrospectively and prospectively are selected in the same manner. This will minimize the risk of any potential selection bias." (*Id.* at 29-30.)

- "Missing data is always a concern; and including patients retrospectively could increase the amount of missing data. However the impact of missing data on the evaluation of the [Health Outcomes of Interest] and other rare events is not anticipated to be a concern as this information is routinely collected in the patient's hospital record. Therefore these event rates at the completion of the study would not be biased downward. Further, any possible observer bias by selecting patients retrospectively will be minimised by only including patients with the key data variables as stipulated in section 7.2.1 and the assessment of whether an event is characterized as an HOI is adjudicated by an independent Safety Review Committee (SRC)." (*Id.* at 30.)

### D.    The SPECTRUM Study Is Completed

The SPECTRUM study was completed on May 8, 2018. (AC ¶ 73.) On September 5, 2018, Correvio announced the completion of the full clinical study report for SPECTRUM and released the primary results. (*Id.* ¶ 75; Ex. 5.) The announcement explained the parameters of the study and relayed the data and statistics underlying the safety and efficacy results, including that: (i) there were a total of 19 health outcomes of interest (defined as significant hypotension,

8

ventricular arrhythmia, atrial flutter, or bradycardia); (ii) 28 serious adverse events reported for 26 patients; and (iii) no deaths.  (AC ¶ 162; Ex. 5.)

Correvio subsequently disclosed that it would present data from SPECTRUM at scientific conferences, including at the European Society of Cardiology 2019 Congress (AC ¶ 193) and the American Heart Association 2019 Annual Meeting (*Id.* ¶ 202.)[6]

### E.    The FDA Permits Correvio To Resubmit the Brinavess NDA Without Conducting Additional Studies Based on Ten Years of Real World Evidence

In 2017, the Company proposed resubmitting the Brinavess NDA based on six years of accumulated safety data from sales of Brinavess in 33 countries and augmented by interim results from the SPECTRUM study.  (*Id.* ¶ 11; Ex. 6.)  As Correvio disclosed, the FDA responded, however, that they did not agree that the data supported a resubmission of the NDA at that time.  (AC ¶ 12; Ex. 6.)

In June 2018, the FDA informed Correvio that it would be permissible to resubmit the Brinavess NDA without conducting additional studies and scheduled a pre-NDA meeting for October 2018 to discuss the content and format of the NDA resubmission.  (Ex. 7.)

On June 24, 2019, Correvio resubmitted the NDA (the "Resubmitted NDA") and on July 25, 2019, the FDA accepted it for review.  (Ex. 8; Ex. 9.)  The FDA assigned a target action date of December 24, 2019, and stated that it planned to hold an advisory committee ("AdComm") meeting to discuss the application.  (Ex. 9.)  Correvio publicly disclosed that the Resubmitted NDA was supported by evidence from the SPECTRUM study, as well as three additional clinical

---

[6]    The presentation reports were published in peer-reviewed journals and are publicly available online.  *See* H. Domanovits et al., *Efficacy and safety of vernakalant for cardioversion of recent-onset atrial fibrillation in real-world clinical practice: the SPECTRUM post-approval safety study*, 40 European Heart Journal ehz745.1151 (Oct. 21, 2019), https://academic.oup.com/eurheartj/article-abstract/40/Supplement_1/ehz745.1151/5597232; B. Ritz et al., *Rapid Cardioversion of Recent-Onset Atrial Fibrillation in the Emergency Department With Vernakalant: Insights From the Multinational Spectrum Registry*, 140 Circulation A15421 (Nov. 11, 2019), https://www.ahajournals.org/doi/10.1161/circ.140.suppl_1.15421.

trials conducted in countries outside of the U.S. and real-world data collected from the over 50,000 patients treated with Brinavess worldwide. (*Id.*)

Correvio also completed two public offerings in 2019 which it disclosed it believed would fund operations through the NDA resubmission. (AC ¶¶ 84, 92; Ex. 10; Ex. 11.)

### F.    The FDA Disagrees With Correvio's Safety Findings and Does Not Approve the Resubmitted Brinavess NDA

On December 6, 2019, in advance of the AdComm meeting, the FDA released a package for AdComm panel members containing a preliminary assessment of the Brinavess NDA assembled by individual FDA reviewers (the "FDA Briefing Document"). (AC ¶ 25.) While the FDA Briefing Document outlined its disagreement with Correvio's interpretation that the SPECTRUM study demonstrated adequate safety data, it explicitly stated that the report did not necessarily represent the final position of the FDA, stating:

> The attached package contains background information prepared by the Food and Drug Administration (FDA) for the panel members of the advisory committee. The FDA background package often contains assessments and/or conclusions and recommendations written by individual FDA reviewers. ***Such conclusions and recommendations do not necessarily represent the final position of the individual reviewers, nor do they necessarily represent the final position of the Review Division or Office***. . . . The background package may not include all issues relevant to the final regulatory recommendation, and the final determination may be affected by issues not discussed at the advisory committee meeting. The FDA will not issue a final determination on the issues at hand until input from the advisory committee process has been considered and all reviews have been finalized. (Ex. 12 at 1.)[7]

The AdComm met on December 10, 2019. At the meeting, Correvio presented its argument in favor of approval and proposed a risk mitigation plan to ensure the safe use of Brinavess if approved.[8] The AdComm voted 11 to 2 against recommending approval. (Ex. 1 at

---

[7]    All emphasis is added unless otherwise noted.

[8]    Correvio Presentation to CRDAC, https://www.fda.gov/media/133640/download, at CI10 (Dec. 10, 2019); Correvio Briefing Document, https://www.fda.gov/media/133299/download, at 134-135 (Dec. 10, 2019).

36.) On December 24, 2019, the FDA issued a Complete Response Letter explaining why it would not approve the Resubmitted NDA. (*Id.*) The FDA concluded that although the Resubmitted NDA provided substantial evidence of Brinavess's effectiveness, the data did not provide reassuring evidence of its safety. (*Id.*)

### G.    Correvio Repeatedly Warned Investors of Risks in Seeking FDA Approval

Throughout this entire period, Correvio adequately disclosed information and repeatedly warned investors of the risks involved in Brinavess. For example, Correvio's 2018 Form 40-F and its public offering documents disclosed the following risk factors, among others:

- Clinical trials for our product candidates are expensive and time-consuming, and their outcome is uncertain and the vernakalant (IV) [another name for Brinavess] program has been on full clinical hold in the United States since November 2010.

   o "Clinical trials are very expensive and difficult to design and implement. The clinical trial process is also time-consuming. The ACT 5 trial for [Brinavess] . . . is currently on clinical hold in the United States. In June 2019, we resubmitted a BRINAVESS NDA to the FDA. The FDA accepted the BRINAVESS NDA resubmission for review and assigned a target action date on the application of December 24, 2019. Even if we choose to and are able to restart the development program, there can be no assurance that the trials will be feasible or successful. Clinical trials, including any post-authorization safety studies for our products, may be subject to significant delays and their outcome may be negatively affected due to various causes . . . ." (Ex. 13 at 32; Ex. 14 at S-23.)

- Our product candidates are subject to extensive regulation, which can be costly and time consuming, cause unanticipated delays, or prevent the receipt of the required approvals to commercialize products.

   o "Following several widely publicized issues in recent years, the FDA and similar regulatory authorities in other jurisdictions have become increasingly focused on product safety. This development has led to requests for more clinical trial data, for the inclusion of a significantly higher number of patients in clinical trials and for more detailed analysis of trial results. Consequently, the process of obtaining regulatory approvals, particularly from the FDA, has become more costly, time consuming and challenging than in the past. Any product developed by us or our current or future collaborative partners, if any, must receive all relevant regulatory approvals or clearances from the

---

Plaintiffs rely on the proposed risk mitigation strategy disclosed within the documents (which are publicly available on the FDA website) in bringing their suit. (*See, e.g.*, AC ¶¶ 57, 151.)

applicable regulatory authorities before it may be marketed and sold in a particular country."  (Ex. 13 at 37; Ex. 14 at S-29.)

- o "In connection with our pre-clinical studies and clinical trials for [Brinavess] and other product candidates, we are required to adhere to extensive regulations established by the applicable regulatory authorities.  In general, these regulatory authorities and the regulatory process require us to conduct extensive pre-clinical studies and clinical trials of each of our product candidates in order to establish its safety and efficacy.  These pre-clinical studies and clinical trials can take many years, are highly uncertain, and require the expenditure of substantial resources."  (*Id.*)

- Obtaining regulatory approval in the European Union does not ensure we will obtain regulatory approval in other countries.

- o "To obtain regulatory approval to market any FDA or EMA approved products outside of the United States or European Union, as the case may be, we must comply with numerous and varying regulatory requirements in other countries regarding safety and efficacy.  Approval procedures vary among countries and can involve additional product testing and additional administrative review periods.  The time required to obtain approval in other countries might differ from that required to obtain FDA or EMA approval. . . .  Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others."  (Ex. 13 at 39; Ex. 14 at S-31-32.)

Correvio also repeatedly referenced these risk factors in public statements and included

disclaimers, warning investors of uncertainties and potential risks.  *See, e.g.*, Exs. 13, 14.

## **ARGUMENT**

I.    **THE FIRST CLAIM FOR RELIEF SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE (A) ANY ACTIONABLE MATERIAL MISSTATEMENT OR OMISSION OR (B) SCIENTER**

The pleading standards applicable to claims under Section 10(b) of the Exchange Act and

Rule 10b-5 are well-settled.  *See Schiro v. Cemex, S.A.B. de C.V.* ("*Cemex II*"), 18-CV-2352

(VEC), 2020 WL 635705, at *2 (S.D.N.Y. Feb. 10, 2020) (Caproni, J.).  These standards must be

satisfied separately as to each defendant.  *See DDAVP*, 585 F.3d at 695.

12

### A.        Plaintiffs Fail To Allege Any Material Misstatement or Omission

The first claim for relief should be dismissed because Plaintiffs fail to allege any actionable misrepresentation or omission.[9]  Although Plaintiffs fail to identify the specific language of each statement with which they take issue, the statements fall generally into two categories: (i) statements relating to the regulatory path for Brinavess and (ii) statements regarding SPECTRUM's results.[10]  None of the statements are actionable.

#### 1.        Statements Regarding the Regulatory Path Forward and Likelihood for FDA Approval Are Protected or Are Otherwise Nonactionable

Plaintiffs allege that statements regarding the regulatory path forward for Brinavess and likelihood for FDA approval without the need for additional studies were false and misleading because of a failure to disclose (i) purported "issues" with SPECTRUM (*see, e.g.*, AC ¶ 198) and (ii) that the Resubmitted NDA also required an adequate risk mitigation strategy (*Id.* ¶¶ 169, 181).  According to Plaintiffs, Defendants "knowingly or extremely recklessly misrepresented Brinavess's prospects for FDA approval" because Dr. Corrigan, one of the Individual Defendants, allegedly stated in an internal sales meeting in January 2019 (three months before he became a Correvio officer and more than six months before the Brinavess NDA was resubmitted) that he thought Brinavess had a "50/50 chance of approval." (*Id.* ¶¶ 178, 192, 198, 205).  For the reasons described below, however, these claims fail.[11]

---

[9]     Although Plaintiffs suggest that Defendants made false and misleading statements to elevate Correvio's stock price in advance of two public offerings, they do not allege that any of the statements made in the offering documents themselves were false or misleading.

[10]    Statements relating to the regulatory path for Brinavess appear in the following paragraphs: AC ¶¶ 164, 166, 168, 170, 174, 176, 177, 179, 180, 182, 183, 185, 190, 191, 197, 199, 200 and 204.  Statements relating to the results of the SPECTRUM study appear in the following paragraphs: AC ¶¶ 162, 166, 170, 172, 176, 179, 180, 182, 183, 185, 187, 189, 191, 193, 195, 199, 202 and 204.

[11]    The Individual Defendants are not liable to the extent that they did not make a challenged statement, as required by *Janus Capital Group, Inc. v. First Derivative Traders,* 564 U.S. 135 (2011).  Here, Ms. Grant is only alleged to have spoken falsely at a single earnings call.  (AC ¶ 168.)  Plaintiffs plead no facts connecting Ms. Grant, for

13

(a)     Correvio's Forward-Looking Statements Regarding Any
        Regulatory Path Forward and Likelihood For Approval Are
        Protected Under the PSLRA Safe Harbor

The PSLRA protects "forward-looking" statements related to the "plans and objectives of

management for future operations, including plans or objectives relating to the products of the

issuer" and the "assumptions underlying" those future plans or objectives.  15 U.S.C. §§ 78u-

5(i)(1)(B), (D).  Courts routinely hold that statements concerning predictions and expectations

about FDA actions are classic forward-looking statements.  *See, e.g.*, *In re Sanofi Sec. Litig.*

("*Sanofi I*"), 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d

199 (2d Cir. 2016); *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014);

*City of Livonia Emps.' Ret. Sys. v. Wyeth*, No. 07 Civ. 10329 RJS, 2010 WL 3910265, at *5

(S.D.N.Y. Sept. 29, 2010).  Under the safe harbor, a forward-looking statement is nonactionable

if it "is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the

plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."

*Sanofi I*, 87 F. Supp. 3d at 529 (emphasis in original).

Here, the majority of Correvio's statements regarding the regulatory path for Brinavess

are forward-looking.  (*See, e.g.*, AC ¶¶ 164 (Correvio "plans to resubmit the Brinavess [NDA]");

166 (Correvio "outline[d] a path forward that could and probably should lead to resubmission");

168 (remaining steps for NDA resubmission); 170 (on track to submit NDA); 176 ("Looking

forward, the most important thing this company will do is file that NDA, have that NDA

accepted and ideally move on to approval before the end of the year."); 177 ("I think once that

---

*Janus* purposes, to any of the alleged misstatements and omissions drawn from Correvio's SEC filings.
Moreover, to the extent any of the Individual Defendants were not sufficiently senior in the Company, their
knowledge cannot be imputed to the Company.  *See Jackson v. Abernathy*, 960 F.3d at 99.  And, to the extent
any of the Individual Defendants were not employed by Correvio at the time any of the alleged misstatements
were made, they cannot be responsible for such statements.  Here, Dr. Corrigan did not become a Correvio
officer until March 2019, at which point Dr. Hunter ceased being a Correvio officer.

14

NDA is filed, I think once that NDA is accepted, and now you're into final stretch of review, that will derisk the asset an awful lot."); *accord id.* ¶¶ 179, 183, 190, 191, 197, 200, 204.)  All of Correvio's forward-looking statements are nonactionable for two independent reasons: (i) they were accompanied by meaningful cautionary language; and (ii) Plaintiffs do not allege facts giving rise to a strong inference that Defendants had actual knowledge of their purported falsity.

(i)     Correvio's Forward-Looking Statements Were
Accompanied by Meaningful Cautionary Language

Correvio's forward-looking statements were identified as such and were accompanied by meaningful and specific cautionary language that either expressly, or by reference to publicly available documents, described the risks that may materialize.  *See* 15 U.S.C. §§ 78u-5(c)(2), (3). Rather than boilerplate, as Plaintiffs suggest, Correvio's warnings were tailored, specific cautionary statements that disclosed real risks, including the ones of which Plaintiffs now complain.  *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004).  For example, before the FDA accepted the Resubmitted NDA, Correvio consistently cautioned of the uncertainty of "any possible regulatory path forward with respect to Brinavess, including, specifically, resubmission of an NDA for Brinavess and the timing of such resubmission and any related review by or correspondence with the FDA."  (*See* Ex. 15.)  Once the Resubmitted NDA was accepted, Correvio expanded its cautionary language to ensure that investors were aware of the risks of FDA review.  For example, in its June 24, 2019 press release announcing it had resubmitted the Brinavess NDA, Correvio expressly warned of the risk that the FDA may not approve Brinavess or may require more information, stating:

> In particular, no statement herein should be understood to mean that: (i) the FDA will accept our resubmission of the NDA; (ii) our resubmission will be deemed to be complete by the FDA; (iii) *that the FDA will find our underlying clinical trial data to be acceptable;* (iv) that the FDA will find our manufacturing sites acceptable and validate them; *or (v) that our NDA will ultimately be approved by the FDA.*  Furthermore, *the timing of any action by the FDA and possible*

15

> ***regulatory paths forward cannot be guaranteed, in that, for example***: (i) the FDA plans to hold an Advisory Committee meeting; (ii) the FDA may miss its own required deadlines (including for example, the [Prescription Drug User Fee Act] date); and (iii) ***the FDA may require further information or additional clinical studies.*** (Ex. 8.)

Correvio reiterated similar warnings, either expressly or by reference, in subsequent public statements that Plaintiffs allege are misleading. (*See, e.g.*, Ex. 9.) These cautionary statements are similar to those found to satisfy the PSLRA safe harbor in other cases concerning FDA action. *E.g.*, *Sanofi II*, 816 F.3d at 209 (affirming district court's holding that cautionary statements identifying uncertainty of FDA approval were meaningful); *Fort Worth Emp'rs' Ret. Fund v. Biovail Corp.*, 615 F. Supp. 2d 218, 233 (S.D.N.Y. 2009) (cautionary language warning of risk of FDA non-approval "indisputably" satisfies safe harbor); *Delcath*, 36 F. Supp. 3d at 334 (cautionary language warning that the FDA may find clinical data insufficient or disagree with interpretation satisfies PSLRA safe harbor).

(ii)     Correvio's Forward-Looking Statements Are Not
Actionable Under the "Known Falsity" Safe Harbor

Further, Correvio's forward-looking statements are not actionable for the independent and equally dispositive reason that Plaintiffs do not allege facts giving rise to a strong inference that any Defendant had actual knowledge that the forward-looking statements were false when made. 15 U.S.C. § 78u-5(c)(1)(B). "[T]he scienter requirement for forward-looking statements — actual knowledge — is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity." *Slayton*, 604 F.3d at 773 (citation omitted).[12]

---

[12]  The Supreme Court recently observed that a legal dictionary definition of "actual knowledge" is "[r]eal knowledge as distinguished from presumed knowledge or knowledge imputed to one." *Intel Corp. Inv. Policy Comm. v. Sulyma*, _ U.S._, 140 S. Ct. 768, 776 (2020) (alteration in original) (citation omitted).

Plaintiffs do not plead that any of the Defendants had *actual* knowledge that any statements for which they could be legally responsible were false or misleading. *First*, Plaintiffs do not plead that any Defendant *knew* that the AdComm or FDA would deem SPECTRUM and the other studies insufficient. *Second*, Plaintiffs do not plead that any Defendant *knew* that the FDA would not approve the NDA, nor that there would be a need for additional studies. *Third*, even if, *arguendo*, Plaintiffs pleaded that Correvio or the Individual Defendants knew of shortcomings in the study — which they have not — Plaintiffs nonetheless fail to plead that any Defendant knew that these alleged shortcomings would result in non-approval of the NDA.

(b)     Plaintiffs Failed to Plead That Statements Regarding the Likelihood For FDA Approval Were False or Misleading

Plaintiffs also do not plead that Correvio or any Individual Defendant guaranteed FDA approval; nor can they. In fact, all of the statements on the likelihood for approval cited by Plaintiffs were measured. (*See* AC ¶¶ 176 ("[T]he most important next step in the business, which, of course, is the filing and acceptance, and hopefully, approval of that NDA."); 183 ("Defendant Corrigan also touted that, '*[i]f* approved, Defendants believe that Brinavess will be an attractive addition . . .'"); 185 ("[Defendants] believe that Brinavess, *if approved*, will be an attractive addition to the AF treatment landscape."); *accord id.* ¶¶ 191, 197, 204.) At most, these statements are nonactionable expressions of corporate optimism or puffery. *Biovail*, 615 F. Supp. 2d at 230-231 (defendants statements that they "hope" for approval are nonactionable); *Schaeffer*, slip op. at 29 (statements expressing belief that drug will win FDA approval and be significant addition to industry are "the sort of rosy affirmation that courts consider puffery").[13]

---

[13]   The Second Circuit has similarly held that statements expressing positive opinions on the results of clinical trials are "the type of 'expressions of puffery and corporate optimism' that do not generally 'give rise to securities violations.'" *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (citing *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004)).

17

Plaintiffs further claim that Defendants "knowingly or extremely recklessly misrepresented Brinavess's prospects for FDA approval" because Dr. Corrigan "internally acknowledged in January 2019 that the Resubmitted NDA only had about a 50/50 chance of approval." (AC ¶¶ 178, 192, 198, 205.)  As an initial matter, this alleged opinion statement was made more than *three months before* Dr. Corrigan became an officer of Correvio and thus cannot be imputed to the Company or to any of the other Individual Defendants. *See Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020); *Barrett*, 2017 WL 3995606, at *8.  Regardless, none of the statements on the likelihood for approval to which plaintiffs point are inconsistent with Dr. Corrigan's alleged statement that Brinavess had a "50/50 chance of approval." *See Sanofi I*, 87 F. Supp. 3d at 533 ("There is no inconsistency between a pharmaceutical company executive's concern about adverse events and the possibility of a negative FDA reaction to a proposed drug, and his sincere optimism that the FDA was likely to approve the drug."), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).  Indeed, nothing about the statement "50/50 chance of approval" suggests that Dr. Corrigan or any other Defendant knew or believed that the FDA would not approve Brinavess. *See id.* at 532 (statement that drug had a 90% chance of FDA approval is not inconsistent with statement that lack of approval was not a "total surprise").

Even assuming, *arguendo*, the statement that Brinavess had a "50/50 chance of approval" meant that Dr. Corrigan did not actually believe the drug would be approved, Plaintiffs fail to plead that Dr. Corrigan held that belief *at the time* the alleged misleading statements were made. *See Sanofi II*, 816 F.3d at 212 ("Defendants were only tasked with making statements that fairly align[ed] with the information in the issuer's possession at the time." (citation omitted)). Plaintiffs point to *one* statement made more than *six months* before the Resubmitted NDA was accepted by the FDA as evidence that any subsequent statements made by any of the Defendants

18

regarding the mere specter of FDA approval were "knowingly or extremely recklessly" misleading. But this argument fails to consider that, after nearly a decade of being stalled with the FDA (AC ¶ 9) and prohibited from resubmitting an NDA (*id.* ¶¶ 11-12), Dr. Corrigan's beliefs regarding the likelihood of FDA approval would change once the NDA was resubmitted and accepted.

Moreover, Correvio's continued investment of resources in Brinavess, including completing two market offerings to raise capital sufficient to fund the Resubmitted NDA (Ex. 10; Ex. 11), undermine the allegation that Correvio or any of the other Individual Defendants did not honestly believe their statements. *See Nguyen*, 2020 WL 3069776, at *8; *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589, 595 (S.D.N.Y. 2016) (investment of time and resources into NDA made allegation that defendants secretly believed FDA approval was unlikely or impossible "implausible").

(c)    Correvio's Statements Regarding the FDA's Actions Are <u>Nonactionable Recitations of Historical Fact</u>

Plaintiffs also take issue with Correvio's statements that the FDA (i) outlined a path forward for resubmission (AC ¶¶ 166-67, 176-77) and (ii) agreed that no additional studies would be required for the resubmission of Brinavess (*Id.* ¶¶ 170, 174-76, 178-80). But Plaintiffs fail to allege any facts to suggest that these statements were false when made or are anything other than a recitation of historical fact. Either way, they are in no way misleading and thus not actionable. *See In re EDAP TMS S.A. Sec. Litig.*, No. 14 Civ. 6069(LGS), 2015 WL 5326166, at *10 (S.D.N.Y. Sept. 14, 2015) (statements on the status of FDA application are not actionable to the extent they merely recite historical fact); *In re MELA Scis. Inc. Sec. Litig.*, No. 10 CV 8774(VB) 2012 WL 4466604, at *12 (S.D.N.Y. Sept. 19, 2012) (statements regarding the timing of FDA approval which appear to be accurate statements of fact are "in no way misleading").

19

### 2.    Statements Regarding the Results of the SPECTRUM Study Are Nonactionable Statements Of Opinion

Eighteen of the twenty-four statements (*see supra* note 10) that Plaintiffs allege are false or misleading relate directly to the SPECTRUM results and the Company's belief that the results support the safety of Brinavess.  (*See, e.g.*, AC ¶¶ 162 (announcing SPECTRUM results and stating that it "provides important data on the safety" of Brinavess); 166 (relaying safety results and describing them as "positive"); 180 (SPECTRUM and other data "speak to the safety and efficacy" of Brinavess); 195 ("The SPECTRUM key safety observations are very important."); 199 (data supporting Brinavess's safety is "strong")).  All of these, however, are statements of opinion and are nonactionable under the Supreme Court's ruling in *Omnicare*.  In *Omnicare*, the Supreme Court held that a defendant may be liable for a statement of opinion if (1) "the speaker did not hold the belief she professed," (2) "the supporting fact she supplied were untrue," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Sanofi II*, 816 F.3d at 210 (citing *Omnicare*, 575 U.S. at 185, 194).

To satisfy *Omnicare*'s "omissions" prong, plaintiffs must call into question the defendant's "basis for offering the opinion."  *Omnicare*, 575 U.S. at 194.  An opinion statement "is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way."  *Id.* at 189-90.  Instead, "[r]easonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty."  *Id.* at 189-90.

Meeting the *Omnicare* standard is "no small task" for investors: they must identify particular and material facts going to the basis of the issuer's opinion whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  *Id.* at 194.  The statement must be read "in light of all its surrounding text, including

20

hedges, disclaimers, and apparently conflicting information," as well as "customs and practices of the relevant industry." *Sanofi II*, 816 F.3d at 210 (citation omitted).  Thus, "an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.*; *see also Axar Master Fund Ltd. v. Bedford*, 308 F. Supp. 3d 743, 754-55 (S.D.N.Y. 2018) (Kaplan, J.), *aff'd on other grounds*, 806 F. App'x 35 (2d Cir. 2020).

Courts have repeatedly held that publicly stated interpretations of the results of clinical studies are "opinions" to be analyzed under the Supreme Court's ruling in *Omnicare*.  *See, e.g.*, *Sanofi II*, 816 F.3d at 212 (affirming lower court's analysis of interpretation of clinical trial results as statements of opinion under *Omnicare*); *Lehmann*, 2019 WL 4572765, at *3 (analyzing publicly stated interpretation of trial results as statements of opinion under *Omnicare*); *Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 730-31 (S.D.N.Y. 2018) (same).  This is because "[r]easonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions." *Sanofi I*, 87 F. Supp. 3d at 543, *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *cf. Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015) (Caproni, J.) (difference of opinion on reasonableness of actuarial or accounting assumptions nonactionable), *aff'd,* 649 F. App'x 7 (2d Cir. 2016).

Plaintiffs fall far short of meeting their burden here: *First*, Plaintiffs do not plead that Correvio of the Individual Defendants did not hold their beliefs as to the effectiveness and value of SPECTRUM.  For example, Plaintiffs take issue with statements such as SPECTRUM has "extremely impressive data" and showed a "really nice safety profile."  (AC ¶ 81.)  Plaintiffs, however, do not allege facts demonstrating that Defendants did not actually believe that the SPECTRUM data was "impressive."  They merely claim that — based on the opinions of *other*

21

*doctors* at the FDA — the study had "reliability" problems. (*See id.* ¶¶ 162-205.) But those opinions do not suggest that any of the Defendants did not believe the study in fact showed safe results. Rather, "[a]t bottom, Plaintiffs' allegations regarding Defendants' stated opinion about the [clinical] trial results are little more than a dispute about the proper interpretation of data, a dispute this Court rejected as a basis of liability." *Sanofi II*, 816 F.3d at 214.

*Second*, although Plaintiffs claim that SPECTRUM "suffered from a number of glaring deficiencies," (AC ¶ 22), they do not allege that the results were factually inaccurate. For instance, Plaintiffs challenge the statement that SPECTRUM "posed 'no real safety issues,'" (AC ¶ 171), but allege no facts to the contrary, other than mere disagreement among doctors. As the Second Circuit explained in *Sanofi II*, however, statements are "not misleading simply because the FDA disagreed with Defendants' interpretation of the data; an issuer is not liable merely because it 'knows, but fails to disclose, some fact cutting the other way.'" *Id.* (citing *Omnicare*, 575 U.S. at 189); *see also Kleinman*, 706 F.3d at 154 ("[W]here a defendant's competing analysis or interpretation of data is itself reasonable, there is no false statement."). Similarly, in *Gillis*, Judge Engelmayer held that interpretation of clinical results is "a matter on which reasonable minds could differ" and the defendants' subjective assessment was not false or misleading simply because the FDA disagreed. 197 F. Supp. 3d at 598. Judge Engelmayer noted that several FDA committee members voted in favor of moving forward with that drug, "suggest[ing] that defendants' interpretation was neither baseless nor unreasonable." *Id.* at 598 n.29. Here, likewise, two members of the FDA AdComm voted in favor of Brinavess (not to mention the regulators that have approved the drug around the world), demonstrating the reasonableness of Correvio's interpretation. (*See* AC ¶ 48; Ex. 1 at 36.)

22

Plaintiffs also fail to show a relationship between the FDA's criticism of SPECTRUM's methodology and the statements lauding the data about which they complain.  In *Sanofi II*, for example, the plaintiffs alleged that, in light of the FDA's critical feedback on their methodology of studies on a drug named Lemtrada, defendants' statements that the studies demonstrated a "strong and robust effect" and that "the data are nothing short of stunning" were false and misleading.  816 F.3d at 213 (citation omitted).  Among other things, though, Lemtrada had already been approved in 30 countries based on its exceptional clinical results.  *Id.*  Therefore, the *Sanofi* court concluded that statements "lauding the effectiveness of Lemtrada, when taken in the context of a global rollout plan, do not suggest any special approval (or likelihood of approval) from the regulators of a single country."  *Id.* at 213-14.  Here, when taken in context, the statements regarding the results of the study — which was created at the direction of, and conducted under the supervision of, the EMA (AC ¶ 65; Ex. 3 at 17) — do not suggest a special likelihood of approval from the FDA and, in light of the fact that Defendants never guaranteed FDA approval (*see supra* Part I.A.1.b), are not in tension with the FDA's feedback.

*Finally*, Plaintiffs fail to plead that either Correvio or any of the Individual Defendants omitted any material information regarding the basis for their opinions that would mislead a reasonable investor.  Defendants do not have an affirmative duty to disclose any and all material information, and the mere failure to include a fact that might have potentially impacted an optimistic projection "is not actionable in this context."  *See Lehmann*, 2019 WL 4572765, at *4.  For example, in *In re Keryx Biopharmaceuticals, Inc. Securities Litigation*, No. 13 Civ. 1307 (KBF), 2014 WL 585658 (S.D.N.Y. Feb. 14, 2014), plaintiffs alleged that defendants' statements regarding the results of a clinical trial were half-truths because they failed to disclose purported

flaws in the trial methodology that increased the risk of bias and errors. *Id.* at \*10. Judge Forrest

held that plaintiffs' allegations failed as a matter of law, stating:

> [I]f this Court were to determine that the statements defendants made were actionable, it would essentially be the "thin end of the wedge": it would be equivalent to a determination that if a researcher leaves any of its methodology out of its public statements—how it did what it did or was planning to do—it could amount to an actionable false statement or omission. This is not what the law anticipates or requires. "The Second Circuit has emphasized that in scrutinizing a section 10(b) claim, a court does not judge the methodology of a drug trial, but whether a defendant's statements about that study were false and misleading."

*Id.* (citations omitted). Here, likewise, neither Correvio nor any of the Individual Defendants

were required to disclose every aspect of SPECTRUM's methodology.

Moreover, Plaintiffs' allegations that SPECTRUM had "deficiencies" is an *opinion* about

the study's methodology, not *fact*, and thus do not require additional disclosures. In *In re MELA*,

Judge Briccetti rejected similar allegations that defendants' publicly stated interpretation of

clinical data were false and misleading due to purported deficiencies in the methodology. 2012

WL 4466604, at \*12. There, plaintiffs alleged that defendants failed to disclose that their clinical

studies were tainted by, among other things, "utilization of an unsound statistical analysis" and

"false enhancement of the reported accuracy rate." *Id.* at \*13. Judge Briccetti explained that the

supposed "flaws" were "essentially no different than opinions" and the defendants were not

obligated to disclose them. *Id.* at \*13-14. So too here: the alleged "deficiencies" are merely the

opinions of other scientists, not material facts requiring disclosure.

### 3. The Challenged Statements Were Not False or Misleading Because All Material Information Was Disclosed to Investors

Plaintiffs also allege that each of the challenged statements was false and misleading

because Correvio failed to disclose that there were "significant problems undermining the

reliability of the SPECTRUM data." (*See, e.g.*, AC ¶ 163.) Specifically, Plaintiffs allege that

Correvio failed to disclose that "(i) SPECTRUM'S data was insufficient as [serious adverse

24

effects ("SAEs")] and [adverse effects ("AEs")] were underreported; (ii) SPECTRUM suffered from a selection bias; and (iii) the SPECTRUM study failed to consistently collect and record critical required information, such as heart rate and blood pressure readings, in violation of the SPECTRUM protocol" and that these "deficiencies were so severe as to require Correvio to conduct additional studies to support a resubmitted NDA." (*Id.*) Plaintiffs further allege that Correvio failed to disclose that the Resubmitted NDA also had to be supported by "an adequate risk mitigation plan ("REM") to mitigate risks caused by Brinavess." (AC ¶ 169.) Contrary to Plaintiffs' allegations, the allegedly omitted information was either (i) disclosed or (ii) contrary to the public record of disclosures relied upon in the Amended Complaint.

(a)      Correvio Disclosed Limitations of the SPECTRUM Study

Plaintiffs assert that the FDA Briefing Document "revealed" certain limitations of the SPECTRUM study (AC ¶¶ 99-101), including biases in the selection of patients and missing data. However, contrary to Plaintiffs allegations, these limitations were publicly disclosed at the outset of the study in the SPECTRUM Protocol. *See Rubinstein v. Credit Suisse Grp. AG*, No. 19-CV-1069 (VEC), 2020 WL 2036850, at *6 (S.D.N.Y. Apr. 28, 2020) (Caproni, J.) (no omission where information was publicly available). For example, the Protocol explicitly stated that "SPECTRUM is an observational study that does not use randomization to select the sample" and discussed measures that would be taken to minimize the resulting biases. (Ex. 3 at 29-30.) Moreover, the FDA Briefing Document explains that biases are inherent in the design of studies done by registries like SPECTRUM and "[have] been documented in the literature." (Ex. 12 at 36.) Correvio did not hide this information: public statements about SPECTRUM routinely described it as a "prospective and retrospective, ***observational registry***" (AC ¶ 162; Ex. 4) and stated that it presented "real-world data," not randomized and controlled data (*see* AC ¶ 190 (citing Correvio's August 14, 2019 Earnings Call ("And we think [SPECTRUM] has value as an

25

observational study because it not only speaks to the safety of the product, it also speaks to the physician's familiarity with how to use it safely in a real-world situation, ***which is different, obviously, from a randomized, controlled clinical trial***.")).)

In *Sanofi I*, Judge Engelmayer concluded that investors are on notice that trials departing from the FDA's preferred double-blind study methodology may be insufficient for approval. 87 F. Supp. 3d at 539-41, *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016). There, plaintiffs alleged that defendants' statements touting the results of a clinical trial were false and misleading because defendants failed to disclose that the FDA had expressed reservations about the trials' single-blind methodology and the heightened showing of efficacy the company would need to secure approval. *Id.* at 539. Judge Engelmayer stated that because the FDA publicly stated its preference for double-blind studies, including in federal regulations, and defendants publicly disclosed that the trials were single-blind studies, "a reasonable investor had reason to know that the design of the Lemtrada clinical trials fell short of the FDA's gold standard." *Id.* at 539-41. The same result follows here: investors were on notice at the outset of SPECTRUM that the FDA may find the observational study below its standards for approval.

Plaintiffs also claim that the FDA Briefing Document "revealed" that the safety data was "limited and incomplete" because "required information, such as patients' heart rate and blood pressure data, was not consistently ***collected***." (AC ¶¶ 100-101.) They further allege that this was a "violation of the SPECTRUM protocol" (*id.* ¶ 163), which required "***monitoring*** of the patient for the duration of the infusion for at least 15 minutes after the completion of the infusion for signs and symptoms of a sudden decrease in blood pressure or heart rate" (*id.* ¶ 100). As an initial matter, Plaintiffs' suggestion that the purportedly inconsistent data collection violated the Protocol is misplaced. Plaintiffs do not allege that SPECTRUM investigators failed to ***monitor***

patients' blood pressure and heart rate (as Plaintiffs assert was required by the Protocol), and a purported failure to *collect* data does not equate to a failure to *monitor* patients.  Regardless, Plaintiffs fail to acknowledge that the Protocol disclosed that "[m]issing data is always a concern; and ***including patients retrospectively could increase the amount of missing data***." (Ex. 3 at 30.)  Indeed, as noted above, Correvio repeatedly disclosed that SPECTRUM was a "prospective and *retrospective*, observational registry" (AC ¶ 162; Ex. 4); thus, Plaintiffs were likewise on notice that there may be missing data and could "reasonably infer that the study design might impede or delay FDA approval."  *Sanofi I*, 87 F. Supp. 3d at 540, *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

> (b)      Plaintiff's Other Alleged "Omissions" Are Not
>          Particularized Allegations of Omitted Fact

Plaintiffs further claim that the FDA Briefing Document revealed that Correvio failed to disclose that the "incidence of serious adverse events (SAEs) and adverse events (AEs) <u>were</u> underreported," (AC ¶ 101), but the FDA Briefing Document made no such revelation.  Rather, the FDA Briefing Document stated that "***[i]t is not clear whether SAEs were reported in a consistent manner in SPECTRUM***, particularly among retrospectively enrolled subjects." (Ex. 12 at 37.)  Absent this mischaracterization, Plaintiffs fail to plead any particularized allegation of fact supporting their claim that the SAEs and AEs were underreported.  Accordingly, this claim must fail.  *See Amidax*, 671 F.3d at 147 ("[W]here a conclusory allegation in the complaint is contradicted by a document attached to the complaint, the document controls and the allegation is not accepted as true.").

Plaintiffs also fail to allege any particularized facts to support their conclusory claim that Correvio's proposed risk mitigation plan was "grossly insufficient to support the NDA and approval" (AC ¶ 102) and that "developing an adequate REM in fact was extremely problematic

27

because Brinavess's mechanism was unknown to Correvio." (*Id.* ¶ 181.)  Again, Plaintiffs mischaracterize the FDA Briefing Document to suit their needs: the document states that in 2011, the FDA did not "believe" Correvio had identified the mechanism or root cause of SAEs (Ex. 12 at 18) and that there was "insufficient evidence" to show that Correvio's proposed REM will "sufficiently mitigate the risk of SAE." (*Id.* at 39).  Plaintiffs fail to explain how these statements support their allegation that Correvio did not know in 2019 "how the drug worked on a molecular level" (AC ¶ 102) or that developing an adequate REM was "extremely problematic" (*id.* ¶ 181) and thus fail to meet their pleading burden.  *Amidax*, 671 F.3d 140, 147.

### B.      Plaintiffs Fail To Plead a Strong Inference of Scienter

The standards to adequately plead scienter are well-settled.  *See Cemex I*, 396 F. Supp. 3d at 300.  Scienter must be pled as to each defendant, *see DDAVP*, 585 F.3d at 695, and may be met by alleging "motive and opportunity to commit the fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Cemex I*, 396 F. Supp. 3d at 300 (citation omitted).  As to corporate knowledge, the pleaded facts must "give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Abernathy*, 960 F.3d at 98 (citation omitted).

### 1.      Plaintiffs Fail To Plead Motive or Opportunity

Plaintiffs seemingly attempt to plead scienter by alleging that Defendants were motivated to make misstatements by a purported desire to keep the stock price elevated and by making certain public offerings of Correvio common stock.  (AC ¶¶ 21, 81, 84, 86, 92.)  Courts have routinely held that general motivations of earning profits do *not* raise a strong inference of scienter.  *See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) (generalized desire to achieve a lucrative acquisition proposal fails to establish scienter); *In re Rockwell Med., Inc. Sec. Litig.*, No. 16 Civ. 1691 (RJS), 2018

28

WL 1725553, at *12 (S.D.N.Y. Mar. 30, 2018) ("[M]aintaining a high stock price and exuding an image of profitability are goals shared by all corporate insiders, and therefore insufficient to establish scienter.").  Likewise, raising capital during the class period on its own does not raise any inference of fraudulent motive.  *See In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008) ("Any potential motive to keep the share price high in order to have a more successful placement is just an example of a generalized motive that any officer or director who desires to operate a successful company will have."), *aff'd sub nom. State Univs. Ret. Sys. of Ill. v. AstraZeneca PLC*, 334 F. App'x 404 (2d Cir. 2009).  The implausibility of Plaintiffs' argument is further belied by the fact that Correvio turned down an offer to enter into a merger agreement shortly before the FDA decision, at a time when the stock price was high.  (Ex. 16 at 39-43.)

### 2. Plaintiffs' Claims Do Not Raise a Strong Inference of Conscious Disregard or Recklessness

#### (a)    Plaintiffs Fail To Plead Recklessness

Plaintiffs also fail to adequately plead a strong inference of conscious disregard or recklessness.  "'[R]ecklessness' is conduct that is 'highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.  Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater.'"  *Cemex I*, 396 F. Supp. 3d at 300 (citations omitted).  "The non-disclosure of known, relevant information alone does not demonstrate *scienter*; the alleged conduct must be more egregious."  *Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *14 (S.D.N.Y. Mar. 26, 2020); *accord Sanofi I*, 87 F. Supp. 3d at 534.

The mere fact that the AdComm and FDA concluded that there were shortcomings in SPECTRUM does not imply that Correvio or any of the Individual Defendants who made

statements regarding SPECTRUM were reckless in doing so.  To adequately plead scienter on the basis that defendants knew facts or had access to information suggesting that their public statements were not accurate, plaintiffs must "'specifically identify the reports or statements that are contradictory to the statements made' or 'provide specific instances in which Defendants received information that was contrary to their public declarations.'"  *Cemex I*, 396 F. Supp. 3d at 308 (citation omitted).  Here, Plaintiffs allege that Defendants "had access to and reviewed reports and information about Correvio's safety data, including its SPECTRUM data, as well as the Company's NDA preparation" (AC ¶ 211) and would have known about the alleged problems with the SPECTRUM data (AC ¶ 218).  But such alleged "access" in no way suggests that any of the Defendants were reckless in making statements regarding SPECTRUM.  As Judge Griesa explained in *AstraZeneca*:

> The cases recognize that, particularly in the testing and development stage, the possible beneficial effects of a drug may be accompanied by adverse side effects, and there may be uncertainty as to how the risk-benefit balance ultimately turns out, and how it will be viewed by regulators.  But if the management of the company releases positive reports about the drug to the public along the way which the management honestly believes to be true, and where there is no reckless disregard for truth, then that is not securities fraud, even though at a later point some event occurs which prevents the marketing of the drug or makes it necessary to take the drug off the market.

559 F. Supp. 2d at 470.

In *AstraZeneca*, the plaintiffs alleged that the defendants knew that the drug "was sufficiently dangerous that it was not likely to be approved by the FDA," and the "most serious part of the complaint on this subject" was the briefing document by the FDA, which purportedly "recited facts about the dangers of Exanta, which defendants knew . . . but failed to disclose." *Id.* at 470.  Judge Griesa reviewed briefing documents provided by both the FDA and

30

AstraZeneca.[14]  In part, he noted that the FDA briefing document, which was more than 300 pages long, had a "massive amount of technical analysis," "contain[ed] detailed conclusions reached by the FDA staff concerning various criteria regarding the safety and efficacy of Exanta," and while the "points in the complaint . . . constitute a tiny fraction . . . , it [was] surely fair to say that the document as a whole is unfavorable to Exanta." *Id.* at 470-71.  Judge Griesa then also reviewed the 150-page briefing document by AstraZeneca for the advisory committee, and noted that "[l]ike the FDA staff document, it contains a truly huge amount of technical information.  But its analysis is favorable to Exanta on the risk-benefit issue, and its conclusions are backed up by a large body of details from AstraZeneca's research." *Id.* at 471.  From this information, the court's conclusion is telling: "It is impossible to read the FDA document and the AstraZeneca document without concluding that both present the honest analysis and conclusions of their authors." *Id.* at 471.  Based on this and other available public information, the court opined that "[n]othing appears in the complaint showing that there was a consensus of the management that the risks of Exanta made the drug unlikely to be approved." *Id.*[15]

Further, the mere fact that Correvio remained positive about Brinavess's chances of

---

14   Because the "most serious part of the complaint on this subject deals with the [FDA] Briefing Document," which the court deemed "so important to the complaint," Judge Griesa requested a copy for review.  The FDA Briefing Document appended AstraZeneca's Briefing Document to the FDA advisory committee.  *AstraZeneca*, 559 F. Supp. 2d at 470-71.

15   The holding in *AstraZeneca* was compounded by additional facts similar to those here, "such as the approval of Exanta in Europe for some uses," which "made it not unreasonable for defendants to believe in their product." 559 F. Supp. 2d at 471.  In this regard, the court concluded: "As to the FDA Briefing Document . . . , it is the view of the Court that this document does not in fact have the significance attributed to it by plaintiffs.  It does not demonstrate that there were certain dangers, known all along to defendants, which would prevent the approval and marketing of Exanta.  This is particularly true when the entire FDA compilation, which included AstraZeneca's presentation, is examined.  As of the time when the FDA Advisory Committee met on September 10, AstraZeneca had its side of the case and the FDA staff had its side.  The FDA staff view prevailed before the Advisory Committee.  This does not mean that AstraZeneca was not conscientious in advocating the drug Exanta before the FDA, nor does it mean that the information issued publicly over the course of more than a year was dishonest or recklessly disseminated." *Id.* at 471.  Identically here, both sides submitted their briefing documents to the FDA (Plaintiffs wholly ignore Defendants') (*see supra* note 8), and the detailed amount of competing information in both suggests a good faith difference of opinion, not an inference of scienter.

31

approval suggests a reasonable inference that it *believed* in the value of the study and thought

Brinavess could be approved.  That is especially true here given how positive the results were —

numbers that Plaintiffs do not contest.  *See Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp.

3d 372, 417 (S.D.N.Y.), *aff'd,* 757 F. App'x 35 (2d Cir. 2018) (efficacy evidence from trial that

85% of patients had positive results "suggests that [the individual defendant] had at least some

factual basis for his expressed optimism and undermined any circumstantial claim of

recklessness").  In fact, it should come as no surprise — especially in the medical context — that

doctors can disagree about treatments or safety; just because the FDA disagreed does not mean

that Defendants could not have been reasonably hopeful.  *See Gillis*, 197 F. Supp. 3d at 603 n.36

("That the FDA ultimately held that QRX's data did not satisfy the Superiority Requirement does

not mean that QRX's contrary view was wrong or recklessly held."); *see also Lehmann*, 2019

WL 4572765, at *6 ("Had the MAKO Trial succeeded, which Plaintiffs do not allege was out of

the realm of possibility as envisioned by Defendants, then there clearly would have been no

scienter.  It cannot be the case that <u>ex ante</u> intent is based on <u>ex post</u> results.").

Other indicators likewise undermine the allegations of recklessness.  For instance, the

notion that Defendants would have continued to spend significant time and effort on Brinavess

and SPECTRUM when they *knew* none of it would be approved is illogical and implausible.

*See, e.g.*, *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co*., 553 F.3d

187, 203 (2d Cir. 2009) (upholding dismissal of complaint where scienter allegations "suffer[ed]

from a basic problem concerning plausibility").[16]  In *Nguyen v. Endologix*, "Plaintiff's central

---

[16]    *See also Gillis*, 197 F. Supp. 3d at 600 (allegations that a company continued to invest substantial time and
resources in clinical studies and NDA submissions that they "knew were doomed to fail, all the while
misrepresenting to the public that approval was likely" is "implausible."); *In re Aratana Therapeutics Inc. Sec.
Litig*., 315 F. Supp. 3d 737, 765 (S.D.N.Y. 2018) (hiring of sales team and spending millions of dollars
developing inventory in anticipation of commercial launch tends to suggest the *absence* of fraudulent intent).

[scienter] theory [was] that company executives knew [a medical] device had encountered problems in Europe that would manifest again in U.S. clinical trials, which would in turn lead to the FDA to deny premarket approval." 2020 WL 3069776, at *1. Earlier this month, the Ninth Circuit forcefully rejected this theory:

> Allegations that are implausible do not create a strong inference of scienter. Under the facts alleged, plaintiff's core theory—that the company invested in a U.S. clinical trial and made promising statements about FDA approval, yet knew from its experience in Europe that the FDA would eventually reject the product—has no basis in logic or common experience. Based on plaintiff's complaint, the more plausible inference is that the company made optimistic statements about its prospects for FDA approval because its U.S. testing looked promising, not because the company was quixotically seeking FDA approval for a medical device application it knew was destined for defeat. *Id.*

Finally, Correvio worked with the FDA throughout the entire NDA process (*see* AC ¶¶ 49-53, 58, 62-64), which negates any inference of scienter. *See In re MELA*, 2012 WL 4466604, at *8 (inference of scienter diminished where defendants worked to timely address the FDA's concerns); *In re EDAP*, 2015 WL 5326166, at *14 (defendants' rigorous work to submit NDA supported inference that they "honestly believed that their diligence would lead to approval").

(b)    The Allegations Regarding the Individual Defendants
Likewise Fail to Raise a Strong Inference of Scienter

Plaintiffs claim that the Individual Defendants must have known of the false or misleading nature of their statements due to their positions in the Company, but such allegations have been roundly rejected by this Court and others. *See, e.g.*, *Wollman*, 2020 WL 3402915, at *7 (common law fraud claim) (defendant's executive position does not establish scienter); *Rockwell*, 2018 WL 1725553, at *14 ("practically hornbook law" that allegations "founded on nothing more than a defendant's corporate position[] are entitled to no weight"). Plaintiffs further allege that Brinavess was "crucial" and the NDA was "Defendants' key focus" and part of their "core operations," implying that "the fraud may therefore be imputed to the Individual

33

Defendants." (AC ¶ 209.) That, however, is not the law. *See Abernathy*, 960 F.3d at 99 (rejecting argument that "key product" was of "such core importance to the Corporate Defendants that their senior officers must have known that the challenged statements were false" without more as "plainly insufficient to raise a strong inference of collective corporate scienter").

Next, Plaintiffs allege that Defendants "would have known about problems with the underreported SAEs and AEs, and the missing heart rate and blood pressure data from the SPECTRUM study," (AC ¶ 218) because they "had access to and reviewed reports and information about Correvio's safety data" (*id.* ¶ 211) and were updated about the study (*id.* ¶¶ 212-17). But Plaintiffs do not explain how and why Defendants did know, or could have or should have known, such information. *See Chapman v. Mueller Water Prods., Inc.*, No. 19-cv-3260 (LJL), 2020 WL 3100243, at *10 (S.D.N.Y. June 11, 2020) (plaintiffs must "specifically identify the reports or statements that are contradictory to the statements made" or "provide specific instances in which Defendants received information that was contrary to their public declarations" to rebut defendants' "honest belief"); *ProNAi Therapeutics*, 297 F. Supp. 3d at 416 (plaintiffs must identify the reports or statements containing alleged contradictory information).

Plaintiffs note that the "quality control teams should have flagged problematic or missing data for Defendants," (AC ¶ 218) but *those were third parties*. Similarly, Plaintiffs note how blood pressure and heart rate were monitored (*id.* ¶ 219), but such monitoring was the job of on-site doctors; there is no allegation that Defendants should have known what each doctor was doing every time Brinavess was prescribed. *See Intercept*, 2020 WL 1489831, at *10 ("This argument ignores the fact that physicians — not pharmaceutical companies — prescribe prescription drugs."); *In re Keryx*, 2014 WL 585658, at *12 ("Failure to follow industry standards — without more — is not itself sufficient to support scienter. Even accepting that such

34

a failure occurred (which the Court must on this motion), it might as easily be due to mismanagement than conscious or reckless disregard of the truth."); *see id.* at *13 ("[I]t is one thing to suggest that scientists and analysts did their job poorly; it is another to suggest that the Company knew that they had done their job poorly, and nonetheless (either consciously or recklessly) made statements to hide those errors.").  And even if, *arguendo*, certain data was not collected (*see* AC ¶ 220), that would not necessarily undermine the value of SPECTRUM, make its conclusions unreliable or raise doubts regarding the NDA's chances of approval.  *See In re EDAP*, 2015 WL 5326166, at *14 ("Despite Plaintiffs' arguments, a more compelling inference to the contrary exists — that the company could have known of problems in the testing procedures, planned to remedy those deficiencies, and still thought it would achieve FDA approval.").  Likewise, merely having experience with the FDA and its practices (*see* AC ¶ 223) does not suggest that any of the Defendants in any way knew that what the Company considered good data would be insufficient to the FDA.

(c)     The Confidential Witness Allegations Do<br>Not Cure Plaintiffs' Pleading Shortcomings

Plaintiffs otherwise attempt to plead scienter through the allegations of eight unnamed confidential witnesses, but these allegations likewise fail to raise a strong inference of scienter. There is a high burden to "credit" confidential witness allegations:

> First, as is obvious, confidential sources cannot be used to "merely parrot [] . . . conclusory allegations contained in the complaint."  Second, as with all allegations going to scienter, confidential source allegations must show that the individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants "were aware" of certain information, and mere allegations that defendants "would have" or "should have" had such knowledge is insufficient.

*Glaser*, 772 F. Supp. 2d at 590-91 (citations omitted); *see also Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) (no inference of scienter where "none of the confidential witnesses assert direct

35

knowledge that [a certain] view was held by defendants"); *Cemex I*, 396 F. Supp. 3d at 305 (no inference of scienter where no allegation that "information was relayed to [] senior management or any other person whose scienter could be imputed to the Company"); *Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 497 (S.D.N.Y. 2017) (law is "abundantly clear" that allegations made by confidential witnesses who have not spoken to the defendants "are insufficient to support scienter"). Courts have concluded that the alleged existence of an internal channel of communication — without particularized allegations about "what information was actually passed through these channels" — is not enough to support a finding of scienter. *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 522-23 (S.D.N.Y.), *aff'd,* 157 F. App'x 398 (2d Cir. 2005).

Plaintiffs emphasize how certain of the CWs allegedly heard Dr. Corrigan say at a sales meeting in *January 2019* that the Brinavess NDA's likelihood of success was only "50-50." (AC ¶¶ 125, 129, 130.) Even if*, arguendo*, that statement were true, it does not raise a strong inference of scienter. Scienter relates to the state of mind of an individual *when that individual made the statement*. (*Id.*) As noted above, *supra* pp. 18-19, Dr. Corrigan purportedly spoke regarding Brinavess's chance of success in *January 2019*, which was before he became CEO. (*Id.* ¶35.) Plaintiffs utterly fail to relate that statement to any other time when Dr. Corrigan spoke and simply assume that his beliefs remained the same about Brinavess at all times — including after continued discussions with the FDA and acceptance of the Resubmitted NDA.

The CW allegations otherwise suffer from numerous shortcomings. Among other things, of the eight CWs, it appears that only two were in any way even involved with SPECTRUM (*see id.* ¶¶ 108-110, 219), while *none* of them appear to have been involved in the Company's FDA resubmission process. *See Cemex I*, 396 F. Supp. 3d at 305 (CW allegations "must be 'described in the complaint with sufficient particularity to support the probability that a person in the

36

position occupied by the source would possess the information alleged'").  Even those who worked on SPECTRUM do not reveal any knowledge on the part of the Individual Defendants regarding false or misleading statements.  *See id.* (CW allegations were too vague, speculative, and conclusory to contribute to an inference of scienter).  For instance, CW1, who allegedly was involved with the study, "recalled that adverse events were reported . . . and input into the safety and clinical databases," "received progress reports," and provided updates on the study.  (AC ¶¶ 108-10.)  CW1 also alleged that "the SPECTRUM study was running an interim safety report that was produced and sent to EMA for review," which "contained all the safety data collected to that date."  (*Id.* ¶ 114.)  These allegations demonstrate only that the Company was indeed *following protocol*.  Nothing alleged suggests that there was anything unsafe or untoward about the study and, thus, these allegations actually negate any inference of scienter.

The remaining CWs similarly fail to support a strong inference of scienter, as *none* alleged any communications with the Individual Defendants about the allegations at issue in this case.  Nor do any of the CWs suggest that the Individual Defendants did not believe any statements that they made:

- CW2 was a "key account manager in Ireland" that was responsible for "product sales in Ireland."  (*Id.* ¶ 116.)  This CW merely added that SPECTRUM was important and that the executives were involved.  (*Id.* ¶ 118).  Plaintiffs claim CW2 "believed that there was potentially reliability bias" in the SPECTRUM study, but it is unclear why the opinion of a regional sales manager — not a scientist or doctor — has any relevance to whether the Company's executives knew their statements were misleading.

- The same conclusion should be drawn from CW3, a "key account manager in Spain."  (*Id.* ¶ 122.)  While CW3 purportedly claimed that he believed the Company's decision to stop promoting Brinavess in Spain was because the Company was "anticipating that the Resubmitted NDA would be rejected," it is unclear how and why a sales agent in Spain would have such insight, or why this sales agent would have known or believed that the NDA would not be approved, let alone that such was communicated with the Individual Defendants.

- CW4 was a "Country Director" who reported to the "chief commercial officer" and "ran a sales force."  (*Id.* ¶ 126.)  CW4 — another sales agent — claims that Brinavess "posed

37

serious risks and safety concerns," (*id.* ¶ 131), but that comes from *a sales agent* who merely cited "warnings and safety elements to the use of drug," just like the warning labels that might appear on any drug.  Similarly, the mere allegation that Correvio's leadership apparently said to "restrict promotions of Brinavess in the UK" (*id.* ¶ 132) could have had countless rationales; there is no indication that such directive was in any way tied to SPECTRUM or to the FDA's decision-making process on a separate continent.

- CW5 was likewise a European "sales and market access" employee in Spain who merely addressed the sales of the drug in Spain.  (*Id.* ¶¶ 135-36.)  That again in no way affects scienter, for the reasons described above.

- CW6 only worked at the Company until *2014* but allegedly "kept in close contact" with a colleague about Brinavess.  (*Id.* ¶ 137.)  CW6 only offers multiple levels of hearsay in alleging that the Company "knew" there were alternatives and that they were "obsessed" with approval.  (*Id.* ¶ 141.)  Meanwhile, CW6's "theory" for why, in CW6's own belief, the Company did not appeal a decision does not carry any credible weight, particularly without any suggestion that CW6 spoke with any of the decision makers.  (*Id.* ¶ 143.)

- CW7, allegedly Grant's "executive assistant," merely offers that Grant "met with Defendant Corrigan" and certain other individuals.  (*Id.* ¶ 213.)  It should come as no surprise that senior leadership would have meetings during the entire period of the SPECTRUM study.  That does not, however, suggest any wrongful intent.

- CW8, an apparent "lead investigator physician for the SPECTRUM trial conducted in Sweden" merely added that SPECTRUM Protcol asked to monitor heart rate and blood pressure.  (*Id.* ¶ 219.)  This in no way addresses whether anyone at the Company knew whether any statement made was false or misleading.

Meanwhile, many of the CW allegations affirmatively *negate* any inference of scienter. For instance, the CWs explain that adverse events and serious health outcomes of interest were reported (*id.* ¶¶ 108-09), executives were provided with safety reports (*id.* ¶¶ 113-14), management was involved in "talking to the FDA or preparing documents for the FDA" (*id.* ¶ 118), and Correvio "spent a lot of money on consulting companies and on getting the dossier submitted to the FDA" (*id.* ¶ 139).  These CW allegations actually *bolster* the fact that Defendants believed in their product, spent significant time, energy and resources to develop it, and hoped that it would get approved, all of which undermine any inference of scienter.  *See Aratana*, 315 F. Supp. 3d at 766 (pleaded facts led to "far more compelling inference" that defendants "believed in good faith that they would obtain regulatory approval").

38

## II.    THIS COURT LACKS PERSONAL JURISDICTION OVER INDIVIDUAL DEFENDANT GRANT

Plaintiffs fail to plead the domicile of any of the Individual Defendants and thus fail to demonstrate this Court has general jurisdiction over any of them. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). Plaintiffs also fail to make a prima facie showing that, for purposes of specific jurisdiction, the "quality and nature" of Ms. Grant's contacts with the forum show she "purposely avail[ed] herself of the privilege of conducting activities with the forum State . . . such that she should reasonably anticipate being haled into court there." *Best Van*, 490 F.3d at 242-43. Ms. Grant's alleged role in SPECTRUM and the NDA submission as Correvio's Chief Operating Officer is not enough. Unlike in *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, No. 13-CV-5586 VEC, 2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014), where the patent inventor was alleged to be at the center of false and misleading patent descriptions (at the heart of the alleged wrongdoing), here there is nothing inherently wrongful about SPECTRUM or the NDA. Rather, Plaintiffs challenge statements made by others that are allegedly overly optimistic about the study and the NDA, all of which, as described above, are nonactionable. The only statement attributed to Ms. Grant is one statement made on an earnings call about the "remaining steps" to complete the NDA resubmission.[17] Replying to a request to describe the factual next steps is not sufficient to show that Ms. Grant conducted activities such that she should reasonably expect to be haled into court in the United States for securities fraud, especially when there is no challenge to her description of the remaining steps. *See Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 801-02 (S.D.N.Y. 2018) (statement in 6-K discussing years of collaboration insufficient to establish personal jurisdiction).

---

[17]    At most, this Court has jurisdiction over Ms. Grant as to the one statement for which she is alleged to be liable.

**III.    THE SECOND CLAIM FOR RELIEF SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO STATE A "CONTROL PERSON" CLAIM**

"[T]o state a claim under Section 20(a) a plaintiff must allege '(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Barrett*, 2017 WL 3995606, at *10 (citation omitted).  Plaintiffs have failed to adequately plead a primary violation and, as a result, their "control person" claim must be dismissed.  *Cemex I*, 396 F. Supp. 3d at 308.  Moreover, Plaintiffs fail to allege that Ms. Grant was at any time in control of Correvio, *see Barrett*, 2017 WL 3995606, at *4 n.4, or that any of the Individual Defendants were culpable participants.  *See Patel v. L-3 Commc'ns Holdings Inc.*, No. 14-CV-6038 (VEC), 2016 WL 1629325, at *17 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.).

<u>CONCLUSION</u>

For the foregoing reasons, the Amended Complaint should be dismissed with prejudice.

Dated:  New York, New York
        June 30, 2020

Respectfully submitted,

/s/ Jay B. Kasner
Jay B. Kasner
Scott D. Musoff
Ashley P. Grolig
Michael D. Moritz
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001
Phone: (212) 735-3000
Fax: (212) 735-2000
jay.kasner@skadden.com
scott.musoff@skadden.com
ashley.grolig@skadden.com
michael.moritz@skadden.com

*Attorneys for Defendants*

40