# Exhibit 1

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 20-F

---

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2019**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**OR**

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Date of event requiring this shell company report** _____

**For the transition period from** _____ **to** _____

**Commission file number: 000-29338**

---

# CORREVIO PHARMA CORP.
**(Exact name of Registrant as specified in its charter)**

---

**Not Applicable**
**(Translation of Registrant's name into English)**

**Canada**
**(Jurisdiction of incorporation or organization)**

**1441 Creekside Drive, 6th Floor,**
**Vancouver, British Columbia,**
**Canada, V6J 4S7**
**(Address of principal executive offices)**

**Justin Renz, President and Chief Financial Officer**
**Tel: (604) 677-6905**
**1441 Creekside Drive, 6th Floor,**
**Vancouver, British Columbia,**
**Canada, V6J 4S7**
**(Name, Telephone, Email, and/or Facsimile number and Address of Company Contact Person)**

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares | CORV | Nasdaq Stock Market |

**Securities registered or to be registered pursuant to Section 12(g) of the Act: None**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act: None**

―――――――――――――

Indicate the number of outstanding shares of each of the issuer's classes of capital or common stock as of the close of the period covered by the annual report:

The Registrant had 55,382,228 Common Shares outstanding as at December 31, 2019.

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act    Yes ☐    No ☒

If this report is an annual or transition report, indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934.    Yes ☐    No ☒

Note – Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 from their obligations under those Sections.

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Sections 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.    Yes ☒    No ☐

Indicate by check mark whether the Registrant has submitted every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).    Yes ☒    No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated Filer ☐        Accelerated Filer ☒        Non-accelerated Filer ☐        Emerging Growth Company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the Registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☒        International Financial Reporting Standards as issued by the International Accounting Standards Board ☐        Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the Registrant has elected to follow:    Item 17 ☐    Item 18 ☐

If this is an annual report, indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).    Yes ☐    No ☒

**Table of Contents**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| GENERAL MATTERS | | 2 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | | 2 |
| PART I | | 7 |
| ITEM 1. | IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISORS | 7 |

| ITEM 2. | OFFER STATISTICS AND EXPECTED TIMETABLE | 7 |
| ITEM 3. | KEY INFORMATION | 7 |
| ITEM 4. | INFORMATION ON THE COMPANY | 29 |
| ITEM 4A | UNRESOLVED STAFF COMMENTS | 45 |
| ITEM 5. | OPERATING AND FINANCIAL REVIEW AND PROSPECTS | 45 |
| ITEM 6. | DIRECTORS, SENIOR MANAGEMENT AND EMPLOYEES | 57 |
| ITEM 7. | MAJOR SHAREHOLDERS AND RELATED PARTY TRANSACTIONS | 88 |
| ITEM 8. | FINANCIAL INFORMATION | 89 |
| ITEM 9. | THE OFFER AND LISTING | 90 |
| ITEM 10. | ADDITIONAL INFORMATION | 92 |
| ITEM 11. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 101 |
| ITEM 12. | DESCRIPTION OF SECURITIES OTHER THAN EQUITY SECURITIES | 102 |

**PART II** — 103

| ITEM 13. | DEFAULTS, DIVIDEND ARREARAGES AND DELINQUENCIES | 103 |
| ITEM 14. | MATERIAL MODIFICATIONS TO THE RIGHTS OF SECURITY HOLDERS AND USE OF PROCEEDS | 103 |
| ITEM 15. | CONTROLS AND PROCEDURES | 103 |
| ITEM 16A | AUDIT COMMITTEE FINANCIAL EXPERT | 104 |
| ITEM 16B | CODE OF ETHICS | 104 |
| ITEM 16C | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 104 |
| ITEM 16D | EXEMPTIONS FROM LISTING STANDARDS FOR AUDIT COMMITTEES | 105 |
| ITEM 16E | PURCHASES OF EQUITY SECURITIES BY THE ISSUER AND AFFILIATED PURCHASERS | 105 |
| ITEM 16F | CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 105 |
| ITEM 16G | CORPORATE GOVERNANCE | 105 |
| ITEM 16H | MINE SAFETY DISCLOSURE | 105 |

**PART III** — 105

| ITEM 17. | FINANCIAL STATEMENTS | 105 |
| ITEM 18. | FINANCIAL STATEMENTS | 105 |
| ITEM 19. | EXHIBITS | 106 |

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS — F-1

1

Table of Contents

## GENERAL MATTERS

In this Annual Report on Form 20-F (the "Annual Report"), a reference to the "Corporation," "Company," "Correvio," "we," "us," "our" and similar words refer to Correvio Pharma Corp. and its subsidiaries, or any one of them, as the context requires.

All references herein to "dollars" and "$" are to U.S. dollars, unless otherwise indicated. All references to "Cdn.$" are to Canadian dollars. On April 28, 2020, the exchange rate for conversion of U.S. dollars into Canadian dollars was $1.00 = Cdn.$1.39 based upon the Bank of Canada daily exchange rate.

Unless otherwise stated, the information set forth in this Annual Report is as of December 31, 2019.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements and information in this Annual Report are not based on historical facts and constitute forward-looking statements or forward-looking information within the meaning of the U.S. Private Securities Litigation Reform Act of 1995 and applicable Canadian securities legislation ("forward-looking statements"), including, without limitation, statements containing the words "believe," "may," "plan," "will," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions.

Forward-looking statements are necessarily based on estimates and assumptions made by us in light of our experience and perception of historical trends, current conditions and expected future developments, as well as other factors we believe are appropriate. Forward-looking statements in this Annual Report include but are not limited to statements relating to:

• our possible regulatory path forward with respect to BRINAVESS® ("BRINAVESS") with the U.S. Food and Drug Administration ("FDA");

• our plans to obtain the maximum possible extension of patent term that might be available covering the use of BRINAVESS;

• our intention to expand the indications for which we may market AGGRASTAT® ("AGGRASTAT");

• our expected commercialization of XYDALBA™ ("XYDALBA") in certain European countries and select countries in the Middle East;

• our plans to develop and commercialize product candidates and the timing of these development programs;

• whether we will receive, and the timing and costs of obtaining, regulatory approvals in the United States, Europe and other countries;

- our intended use of proceeds raised from equity and debt financings;

- the cost of post-authorization commitments if we receive necessary regulatory approvals;

- our ability to meet certain revenue milestones under the CRG Term Loan (as defined below);

- our belief regarding the merit of the ongoing class action lawsuit and our intention to vigorously defend such lawsuit;

- our plans to regain compliance with the Nasdaq Stock Market (the "Nasdaq") minimum bid price and minimum market value requirements within the prescribed grace periods;

- our possible eligibility for additional time to regain compliance with such requirements upon expiration of the prescribed compliance periods;

Table of Contents

- our expectation that our common shares will continue to be listed and trade on the Nasdaq during the prescribed compliance periods;

- the proposed acquisition by ADVANZ PHARMA (as defined herein) of all of our issued and outstanding common shares pursuant to the Proposed Arrangement (as defined herein) and the expected terms, timing and closing of the Proposed Arrangement;

- our expectations for the receipt of the necessary securityholder and court approvals and satisfaction of other customary closing conditions in connection with the Proposed Arrangement;

- the intended delisting of our common shares from the Toronto Stock Exchange (the "TSX") and the Nasdaq and ceasing of our status as a reporting issuer in connection with the completion of the Proposed Arrangement;

- our planned and current clinical development of product candidates, including the results of current and future clinical trials and publication of such results;

- our ability to enroll patients in our clinical trials and complete enrollment in registries being performed as part of regulatory agency follow-up measures;

- the benefits and risks of our product candidates as compared to others;

- our maintenance and establishment of intellectual property rights in our commercial products and product candidates;

- our need for additional financing and our estimates regarding our capital requirements and future revenues and profitability;

- payments and royalties expected upon the achievement of certain sales milestones;

- our estimates of the size of the potential markets for our products;

- our selection and licensing of commercial products and/or product candidates;

- our potential relationships with distributors and collaborators with acceptable development, regulatory, manufacturing and commercialization expertise and the benefits to be derived from such collaborative efforts;

- our distributors' and licensees' compliance with the terms of their agreements and with relevant regulations and licenses;

- sources of revenues and anticipated revenues, including contributions from distributors and collaborators, product sales, license agreements and other collaborative efforts for the development and commercialization of product candidates;

- our creation and maintenance of an effective direct sales and marketing infrastructure for approved products we elect to market and sell directly;

- our creation and maintenance of an effective logistics infrastructure for supply and delivery of our approved products;

- the rate and degree of market acceptance of our products;

- the pricing of our products;

- whether we will receive and the timing and amount of reimbursement for our products;

- the success and pricing of other competing therapies that may become available;

Table of Contents

- our retention and hiring of qualified employees in the future;

- the manufacturing capabilities of third-party manufacturers for our products;

- our ability to negotiate and maintain third-party manufacturing and supply contracts and the party's performance under contract;

- our ability to maintain or reduce third-party manufacturing costs;

- the competition we face from other companies, research organizations, academic institutions and government agencies, and the risks such competition pose to our products;

- the confidential information we possess about patients, customers and core business functions, and the information technologies we use to protect it;

- our intention to continue directing a significant portion of our resources into international sales expansion;

- our business strategy and potential acquisitions of additional companies, products or technologies related or complimentary to our current operations;

- our ability to get our products approved for use in hospitals; and

- government legislation in all countries in which we already, or hope to, sell our products, and its effect on our ability to set prices, enforce patents and obtain product approvals or reimbursements.

Such forward-looking statements reflect our current views with respect to future events and are subject to risks and uncertainties and are necessarily based upon a number of estimates and assumptions that, while considered reasonable by us, are inherently subject to significant business, economic, competitive, political and social uncertainties and contingencies, many of which, with respect to future events, are subject to change. The factors and assumptions used by us to develop such forward-looking statements include, but are not limited to, the assumption that the meeting held for Correvio securityholders to consider and, if deemed advisable, approve the Proposed Arrangement will proceed as planned, the assumption that the Supreme Court of British Columbia will hear our applications for the final order required in connection with the Proposed Arrangement, the assumption that we will be able to reach agreements with regulatory agencies on executable development programs, the assumption that recruitment to clinical trials will continue at rates similar to our completed trials, the assumption that the regulatory requirements, including patient exposure, for approval of marketing authorization applications/new drug approvals will be maintained, the assumption that genericization of markets for AGGRASTAT will proceed according to estimates, the assumption that the time required to analyze and report the results of our clinical studies will be consistent with past timing, the assumption that market data and reports reviewed by us are accurate, the assumption that our current good relationships with our suppliers and service providers will be maintained, the assumptions relating to the availability of capital on terms that are favorable to us, the assumption that our partners/distributors will continue to operate in the same manner and order products at similar levels and the assumption that public payors and hospitals will continue to pay monies owed consistent with historical timelines.

By their very nature, forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, events or developments, or industry results, to be materially different from any future results, events or developments expressed or implied by such forward-looking statements or information. In evaluating these forward-looking statements, prospective purchasers should specifically consider various risk factors, including the risks outlined under the heading "Risk Factors" in this Annual Report. Specifically, certain risks and uncertainties that could cause such actual events or results expressed or implied by such forward-looking statements and information to differ materially from any future events or results expressed or implied by such statements and information include, but are not limited to, the risks and uncertainties related to the fact that:

- we will have significant additional future capital needs and there are uncertainties as to our ability to raise additional funding;

- we have a history of significant losses and a significant accumulated deficit;

4

---

**Table of Contents**

- we have a history of negative operating cash flow and may continue to experience negative operating cash flow;

- worldwide pandemics, such as the recent outbreak of the novel coronavirus known as COVID-19, may adversely impact multiple aspects of our business;

- we may not realize the anticipated benefits of past or future acquisitions or product licenses and integration of these acquisitions and any products acquired or licensed may disrupt our business and management;

- if we are unable to make our regularly scheduled payments under the CRG Term Loan or are unable to meet minimum annual revenue and liquidity covenants, we could have a covenant violation;

- we are subject to certain restrictive covenants;

- we are dependent on four products for substantially all of our current revenues;

- we are exposed to generic product risk which may result in a decline in sales of AGGRASTAT;

- we have substantial competition in the life sciences industry and with respect to our products;

- we are subject to the risks associated with product liability claims, insurance and recalls;

- we rely on third parties for the supply and manufacture of our products, which can be unpredictable in terms of quality, cost and availability;

- third parties may be unable to produce products at a price that has been agreed upon, or which is commercially viable;

- we rely on collaborative partners for the licensing and supply of certain products;

- we rely on our supply chain and the supply chain of third parties to provide our products, and supply chains may fail due to inadequacies in their systems and processes, in execution and for unforeseen reasons;

- we rely on third parties for the execution of a significant portion of our clinical, regulatory, pharmacovigilance, medical information and logistical responsibilities and such third parties may fail to meet their obligations as a result of inadequacies in their systems and processes, execution failure or unforeseen reasons;

- we rely on third-party distributors in many markets to sell our products and such third parties may fail to meet their quality, regulatory, licensing, commercialization or general distributor obligations;

- government legislation could adversely impact our ability to obtain product reimbursement and economically price our products and may be difficult to interpret or comply with, resulting in additional costs to conduct our business in certain countries;

- compulsory licensing and/or generic competition may affect our business in certain countries;

- if we are not able to convince public payors and hospitals to include our products on their approved formulary lists, our revenues may not meet expectations and our business, results of operations and financial condition may be adversely affected;

- our hospital customers may be late in their payments and in some cases may not pay monies owed;

- our business may be materially adversely affected by new legislation, new regulatory requirements, and the continuing efforts of governmental and third-party payors to contain or reduce the costs of healthcare through various means;

5

**Table of Contents**

- we rely on proprietary technology, the protection of which can be unpredictable and costly;

- there may be an unauthorized disclosure of confidential information under our control;

- clinical trials for our product candidates are expensive and time-consuming, and their outcome is uncertain and the vernakalant IV program has been on full clinical hold in the United States since November 9, 2010;

- the results of pre-clinical studies and initial clinical trials are not necessarily predictive of future results, and our current product candidates may not have favorable results in later trials or in the commercial setting;

- our industry is subject to health and safety risks;

- our approved products may not achieve or maintain expected levels of market acceptance;

- we are dependent upon our key personnel to achieve our business objectives;

- we are exposed to concentration of credit risk relating to major distribution relationships and customers in certain geographic regions;

- our policies and estimates regarding returns, allowances and chargebacks may reduce revenue in future periods;

- our inventory has a limited shelf life and may require write-downs;

- sales of certain products may be unpredictable and we may not be able to meet the demand or supply requirements, violating our distribution agreements, bid and tender agreements and/or governmental requirements to guarantee supply;

- we are exposed to risks relating to the write-down of intangible assets, which comprises a significant portion of our total assets;

- our common shares may be delisted from the Nasdaq, which could affect their market price and liquidity. If our common shares were to be delisted, investors may have difficulty in disposing of their shares;

- we may face exposure to adverse movements in foreign currency exchange rates;

- if we were to lose our foreign private issuer status under United States federal securities laws, we would likely incur additional expenses associated with compliance with the United States securities laws;

- we are subject to risks inherent in foreign operations;

- there is an increased focus on privacy and data protection issues in countries around the world, including regions and countries where we operate (e.g., Europe and Switzerland);

- failure to comply with the United States *Foreign Corrupt Practices Act* (the "FCPA"), as well as the anti-bribery laws of the nations in which we conduct business (such as the United Kingdom's *Bribery Act* or the *Corruption of Foreign Public Officials Act of Canada*) (the "CFPOA") could subject us to penalties and other adverse consequences;

- legislative actions, potential new accounting pronouncements, and higher insurance costs are likely to impact our future financial position or results of operations;

- our product candidates are subject to extensive regulation, which can be costly and time consuming, cause unanticipated delays, or prevent the receipt of the required approvals to commercialize products;

- any of our product candidates that receive regulatory approval could be subject to extensive post-authorization obligations that can affect sales, marketing and profitability;

- obtaining regulatory approval in the European Union does not ensure we will obtain regulatory approval in other countries;

6

---

Table of Contents

- our business depends heavily on the use of information technologies;

- the United Kingdom's exit from the European Union may result in regulatory, supply chain and operational costs and challenges that could have a material adverse impact on our business;

- the conditions precedent to the Proposed Arrangement may not be satisfied;

- we may face continuing risks if the Proposed Arrangement is not completed;

- management time and attention may be diverted from the existing business of Correvio;

- completion of the Proposed Arrangement is subject to the condition that a material adverse effect has not occurred; and

- failure to complete the Proposed Arrangement could negatively impact our future business, operations and the price of common shares.

Other factors are described in detail in this Annual Report and our filings with the United States Securities and Exchange Commission (the "SEC") (available through the SEC's Electronic Document Gathering and Retrieval System at http://www.sec.gov) and the Canadian securities regulatory authorities (available on the Canadian Securities Administrators System for Electronic Document Analysis and Retrieval ("SEDAR") at http://www.sedar.com).

Should one or more of these risks or uncertainties or a risk that is not currently known to us materialize, or should assumptions underlying those forward-looking statements prove incorrect, actual results may vary materially from those described herein. These forward-looking statements are made as of the date of this Annual Report and we do not intend, and do not assume any obligation, to update these forward-looking statements, except as required by law. Investors are cautioned that forward-looking statements are not guarantees of future performance and accordingly investors are cautioned not to put undue reliance on forward-looking statements due to their inherent uncertainty.

## PART I

**ITEM 1.        IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISORS**

**A.  Directors and Senior Management**

Not applicable.

**B.  Advisors**

Not applicable.

**C.  Auditors**

Not applicable.

**ITEM 2.        OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3.        KEY INFORMATION**

**A.  Selected Financial Data**

The following table sets forth selected consolidated financial information for the periods indicated, prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP"). The selected consolidated financial information as at and for the years ended December 31, 2019, December 31, 2018, December 31, 2017, December 31, 2016 and December 31, 2015 has been derived from our audited financial statements and accompanying notes.

7

---

Table of Contents

The selected consolidated financial information set forth below should be read in conjunction with the consolidated financial statements and notes thereto included in Part III, Item 18 "*Financial Statements*" and discussions in Part I, Item 5 "*Operating and Financial Review and Prospects*" included in this Annual Report. The selected consolidated financial information set out below may not be indicative of our future performance.

Summary Financial Information
Under U.S. GAAP
(in thousands, except share and per share amounts)

| | | Year Ended December 31, | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| **Statement of Operations Data** | | | | | |
| Revenue | $ 32,634 | $ 28,674 | $ 24,008 | $ 25,256 | $ 20,910 |
| Operating loss | (27,453) | (26,341) | (22,979) | (14,551) | (22,081) |
| Net loss | (35,184) | (16,579) | (29,811) | (19,619) | (24,462) |
| Basic loss per common share | (0.79) | (0.47) | (0.90) | (0.78) | (1.34) |
| Diluted loss per common share | (0.79) | (0.47) | (0.90) | (0.79) | (1.34) |
| **Balance Sheet Data** | | | | | |
| Total assets | $ 58,893 | $ 59,637 | $ 66,812 | $ 67,057 | $ 48,228 |
| Net assets | (834) | 6,910 | 16,190 | 34,024 | 19,936 |
| Long-term debt | 44,926 | 41,517 | 40,000 | 19,391 | 9,598 |
| Deferred consideration | — | — | — | 2,815 | 5,097 |
| Common stock | 385,057 | 359,295 | 353,483 | 344,928 | 312,019 |
| Authorized – unlimited number without par value issued and outstanding | 55,382,228 | 36,233,162 | 34,637,312 | 31,884,420 | 20,147,337 |
| Dividends | — | — | — | — | — |

**B.    Capitalization and Indebtedness**

Not applicable.

**C.    Reasons for the Offer and Use of Proceeds**

Not applicable.

**D.    Risk Factors**

*Investing in our securities involves a high degree of risk. You should carefully consider the following risks in addition to the other information included in this Annual Report and our historical consolidated financial statements and related notes, before you decide to purchase our common shares. If any of the following risks actually occur, our business, financial condition and results of operations could materially suffer. As a result, the trading price of our common shares could decline and you could lose part or all of your investment. The risks set out below are not the only risks we face; risks and uncertainties not currently known to us or that we currently deem to be immaterial may also materially and adversely affect our business, financial condition and results of operations.*

**We will have significant additional future capital needs and there are uncertainties as to our ability to raise additional funding.**

We will require significant additional capital resources to expand the commercialization and sales of our products and to further develop vernakalant (IV) in the United States (and elsewhere). Advancing our product candidates, market expansion of our currently marketed products or acquisition and development of any new products or product candidates will require considerable resources and additional access to capital markets. In addition, our future cash requirements may vary materially from those now expected. For example, our future capital requirements may increase if:

- we experience more generic competition for AGGRASTAT from other life sciences companies or in more markets than anticipated;

8

**Table of Contents**

- we experience delays or unexpected increases in costs in connection with obtaining regulatory approvals or commercializing our products in the various markets where we hope to sell our products;

- we experience unexpected or increased manufacturing or other supply chain costs;

- we experience unexpected or increased costs relating to preparing, filing, prosecuting, maintaining, defending and enforcing patent claims, or other lawsuits, brought by either us or our competition;

- we are required to perform additional pre-clinical studies and/or clinical trials;

- we consummate suitable business development opportunities;

- we elect to develop, acquire or license new technologies, products or businesses;

- we are required to conduct pharmacoeconomic studies for reimbursement and/or post-authorization studies for assessment of real-world use and safety; or

- we do not obtain as favorable pricing as expected from the national market access agencies.

Case 1:19-cv-11361-VEC    Document 50-1    Filed 06/30/20    Page 10 of 31

We have a history of incurring operating losses and negative cash flows from operations. Based on current projections, we may not have sufficient capital to fund our current planned operations during the next twelve-month period. We are dependent on our ability to raise additional debt or equity financing or monetize intellectual property rights through strategic partnerships or sublicensing arrangements and to meet annual revenue and liquidity covenants under our CRG Term Loan in order to meet our current planned operations during the next twelve-month period. There can be no assurance that we will be able to raise such additional financing. These factors raise substantial doubt about our ability to continue as a going concern within one year from the financial statements' issuance date.

**We have a history of significant losses and a significant accumulated deficit.**

Although we have been involved in the life sciences industry since 1992, we had, prior to the launch of BRINAVESS and the acquisition of AGGRASTAT, XYDALBA, TREVYENT, and ZEVTERA®/MABELIO® ("ZEVTERA/MABELIO") only been engaged in research and development. Before Merck, Sharpe & Dohme ("Merck") obtained marketing approval for BRINAVESS in the European Union, Iceland and Norway in September 2010, and launched BRINAVESS in a number of European countries in 2010, none of our product candidates had been approved for marketing or commercialized. Accordingly, we have only recently begun to generate revenue from product sales and have incurred significant operating losses. There can be no assurance that we will generate sufficient revenues in the future or achieve profitable operations.

**We have a history of negative operating cash flow and may continue to experience negative operating cash flow.**

We had negative operating cash flow for the financial years ended December 31, 2019 and December 31, 2018. We anticipate that we will continue to have negative cash flow unless our product sales are able to generate a positive cash flow. To the extent that we have negative operating cash flow in future periods, we may need to allocate a portion of our cash reserves to fund such negative cash flow. We may also be required to raise additional funds through the issuance of equity or debt securities or through the monetization of intellectual property rights through strategic partnerships or sublicensing arrangements. There can be no assurance that we will be able to generate a positive cash flow from our operations, that additional capital or other types of financing will be available when needed or that these financings will be on terms favorable to us.

9

Table of Contents

**Worldwide pandemics, such as the recent outbreak of the novel coronavirus COVID-19, may adversely impact multiple aspects of our business.**

Pandemics such as COVID-19 can have a significant impact on our business and our current plans, such as delaying or preventing the completion of the Proposed Arrangement. Such pandemics have the potential to disrupt our global supply chain, including our ability to manufacture, supply and/or distribute our products. We may no longer have the ability to source active pharmaceutical ingredients or excipients necessary to manufacture products. In addition, our third-party manufacturers, fillers, and/or labelers may no longer be able to perform their services. Similarly, our logistics providers may no longer be able to effectively service our customers. We may also see a slowdown, temporary suspension, or complete stoppage of operations in certain geographic locations impacted by an outbreak. Such an event may require us to entirely cease operations in a given location for a period of time.

Pandemics may prevent or delay the distribution of products and/or activities that are required for the proper distribution to our customers (e.g., quality and or regulatory reviews), and hence result in us incurring penalties and/or sanctions from regulatory authorities, contracting parties, or in the cancellation of contracts. Any prolonged restrictive measures put in place by governments, non-governmental organizations, or local authorities in any of the jurisdictions in which we operate, hold assets, or do business may have a material and adverse effect on our financial and/or operating performance. In addition, a pandemic may result in our distributors, suppliers, and/or partners no longer being able to do business with us based upon a *force majeure*.

Pandemics can also impact our employees, including their mobility, health and/or safety. For example, our employees typically visit numerous hospitals on a regular basis. To the extent employee mobility is limited, or to the extent such visits represent a safety risk to the employee, we may no longer call on such hospitals during a pandemic. Failure to call on such hospitals may result in a reduction in the sales of our products.

Pandemics can also impact the global financial markets, limiting our ability to get financing, loans and/or debt, or trade credits.

We may also see an increase of sales of certain products due to a pandemic (e.g., antibiotics). If there is a substantial increase in sales we may not be able to meet the demand or supply requirements, violating our distribution agreements, bid and tender agreements and/or governmental requirements to guarantee supply.

**We may not realize the anticipated benefits of past or future acquisitions or product licenses and integration of these acquisitions and any products acquired or licensed may disrupt our business and management.**

As part of our business strategy, we may also continue to acquire additional companies, products or technologies principally related to, or complementary to, our current operations. At any given time, we may be evaluating new acquisitions of companies, products or technologies or may be exploring new licensing opportunities, and may have entered into confidentiality agreements, non-binding letters of intent or may be in the process of conducting due diligence with respect to such opportunities. Any such acquisitions will be accompanied by certain risks, including, but not limited to:

- exposure to unknown liabilities of acquired companies and the unknown issues with any associated technologies or research;

- we experience delays or unexpected increases in costs in connection with obtaining regulatory approvals or commercializing any acquired products in the various markets where we hope to commercial those products;

- higher than anticipated acquisition costs and expenses;

- the difficulty and expense of integrating operations, systems, and personnel of acquired companies, products or technologies;

- disruption of our ongoing business;

- inability to retain key customers, distributors, vendors and other business partners of the acquired company, products or technologies;

- diversion of management's time and attention; and

- possible dilution to shareholders.

10

Table of Contents

We may not be able to successfully overcome these risks and other problems associated with acquisitions and this may adversely affect our business, financial condition or results of operations.

**If we are unable to make our regularly scheduled payments under the CRG Term Loan or are unable to meet minimum annual revenue or liquidity covenants, we could have a covenant violation.**

Under the CRG Term Loan, we are required to make regular quarterly payments and meet minimum annual revenue and liquidity covenants. To the extent that we are unable to generate sufficient cash flow to make our regularly scheduled payments or meet our minimum annual revenue covenants, this could result in a breach of the facility, which would require us to repay the entire amount of the CRG Term Loan outstanding. This could have a material adverse effect on our business, financial condition and results of operations.

**We are subject to certain restrictive covenants.**

Restrictive covenants in the CRG Term Loan impose financial and other restrictions on us. Under the CRG Term Loan, we must meet specified financial covenants, including carrying a minimum balance of unrestricted cash and cash equivalents or meeting certain annual revenue targets. To the extent that we are not able to satisfy the requirements in the CRG Term Loan or if we are not in compliance with the specified financial covenants, as adjusted by the second amendment, including meeting certain annual revenue covenants, we may be in breach of the facility which would require us to exercise a cure right by issuing additional common shares in exchange for cash or by borrowing subordinated debt in an amount equal to two times the difference between the minimum required revenue and our revenue for the year or repay outstanding amounts. Exercising the cure right or repaying the entire amount of the CRG Term Loan outstanding could have a material adverse effect on our business, financial condition and results of operations.

**We are dependent on four products for substantially all of our current revenues.**

Sales of a limited number of our products represent substantially all of our current revenues. If the volume or pricing of our products decline in the future, or our cost to manufacture, distribute or market our products increase in the future, our business, financial condition and results of operations could be materially adversely affected and this could cause the market value of our common shares to decline. In addition, if these products were to become subject to any other issues, such as material adverse changes in prescription growth rates, supply chain interruptions, unexpected side effects, regulatory proceedings, material product liability and/or intellectual property litigation, publicity affecting doctor or patient confidence or pressure from competitive products, the adverse impact on our business, financial condition, results of operations and the market value of our common shares could be significant.

**We are exposed to generic product risk which may result in a decline in sales of AGGRASTAT.**

AGGRASTAT is a mature product which faces generic competition and may experience a decline in product sales in several markets. Competition from generic equivalents that would be sold at a price that is less than the price at which we currently sell AGGRASTAT could have a materially adverse impact on our business, financial condition and operating results.

**We have substantial competition in the life sciences industry and with respect to our products.**

The life sciences industry is highly competitive. Many companies, as well as research organizations, currently engage in, or have in the past engaged in, efforts related to the development of products in the same therapeutic areas as we do. Due to the size of the cardiovascular market and the large unmet medical need for products that treat cardiovascular illnesses, a number of the world's largest pharmaceutical companies are developing, or could potentially develop, products that could compete with ours. GP IIb/IIIa inhibitors that AGGRASTAT competes with include ReoPro from Eli Lilly and Company and Johnson & Johnson/Centocor, Inc., Angiomax from The Medicines Company, and Integrilin from Merck. Antiarrhythmics that BRINAVESS competes with include generic competitors such as flecainide, propafenone, ibutilide and amiodarone. Competitors of XYDALBA include Cubicin from Merck, Tygacil from Pfizer, and generic competitors such as linezolid, vancomycin and teicoplanin. Competitors of ZEVTERA/MABELIO include Zinforo from Pfizer, Cubicin from Merck, and generic competitors such as linezolid, ceftazidime and piperacillin tazobactam.

11

Table of Contents

Many of the companies developing competing technologies and products have significantly greater financial resources and expertise in discovery, research and development, manufacturing, pre-clinical studies and clinical testing, obtaining regulatory approvals, distribution and marketing than we do. Other smaller companies may also prove to be significant competitors, particularly through collaborative arrangements with large and

established companies. Academic institutions, government agencies and other public and private research organizations may also conduct research, seek patent protection and establish collaborative arrangements for discovery, research, clinical development and marketing of products similar to ours. There is a risk that one or more of our competitors may develop more effective or more affordable products than us and that such competitors will commercialize products that will render our product candidates obsolete. We face competition with respect to product efficacy and safety, ease of use and adaptability to various modes of administration, acceptance by physicians, the timing and scope of regulatory approvals, availability of resources, reimbursement coverage, price and patent positions of others. In addition, these companies and institutions also compete with us in recruiting and retaining qualified personnel. If we fail to develop new products or enhance our existing products in the face of such strong competition, such competition could have a material adverse effect on our business, financial condition or results of operations.

**We are subject to the risks associated with product liability claims, insurance and recalls.**

Our pharmaceutical products have undergone extensive clinical testing and have been approved by the applicable regulatory authorities prior to sale in the European Union and other countries or regions. Certain aspects of our clinical trials, including the design of the trials, the manufacture and storage of clinical trial material, the enrollment, dosing and follow-up of patients, the recording of trial data and the analysis of results, have been, and may in the future be, sponsored and conducted by third-party academic investigators who have not been under our supervision or control. We therefore may not have independently verified or audited the data or clinical trial sites and may not do so in the future. Despite all reasonable efforts to ensure safety, it is possible that we, our suppliers or our distribution partners may sell products which are defectively manufactured or labeled, contain defective ingredient components or are misused. Our products may also fail to meet patient expectations or produce harmful side effects. Such unexpected quality, safety or efficacy issues may be caused by a number of factors, including manufacturing defects, harmful side effects, physician experience in prescribing our products, failure to adhere to approved labelling, failure to adhere to good clinical practices, good pharmacovigilance practices and good manufacturing practices, or the non-compliance with clinical protocols by us or our academic investigators, the presence of other harmful conditions in a clinical trial, inadequacies of product-related information conveyed to physicians or patients, or other factors or circumstances unique to the patient. Whether or not scientifically justified, such unexpected safety or efficacy concerns can arise and it may lead to product recalls, loss of or delays in market acceptance, market withdrawals, or declining sales, as well as product liability, consumer fraud and/or other claims. Additionally, we may be exposed to product liability claims as a result of the administration of the drug candidates to subjects in clinical trials. Such liability might result from claims made directly by consumers or by life sciences companies or others selling such products. It is impossible to predict the scope of injury or liability from such defects or unexpected reactions, or the impact on the market for such products of any allegations of these claims, even if unsupported, or the measure of damages which might be imposed as a result of any claims or the cost of defending such claims. Substantial damage awards and/or settlements have been handed down – notably in the United States and other common law jurisdictions – against pharmaceutical companies based on claims for injuries allegedly caused by the use of their products. The expenses of litigation or settlements, or both, in connection with any such injuries or alleged injuries and the amount of any award imposed on us in excess of existing insurance coverage, if any, may have a material adverse impact on us and on the price of our common shares. In addition, we may not be able to avoid significant product liability exposure even if we take appropriate precautions, including maintaining product liability coverage (subject to deductibles and maximum pay-outs) and obtaining indemnification from partners (subject to the terms of each specific agreement). Any liability that we may have as a result could have a material adverse effect on our business, financial condition and results of operations, to the extent insurance coverage for such liability is not available or that our reputation is negatively affected as a result.

12

Table of Contents

**Our operations could be adversely affected by events outside of our control, such as disease outbreaks, health epidemics or pandemics.**

We may be impacted by business interruptions resulting from disease outbreaks, health epidemics or pandemics, such as the recent outbreak of the novel coronavirus known as COVID-19. An outbreak, or fear of an outbreak, of any of the foregoing could adversely impact us by: delaying or preventing the completion of the Proposed Arrangement; causing operating, manufacturing supply chain, clinical trial and project development delays and disruptions; disrupting global financial markets and our ability to obtain financing; causing a decline in global share prices; delaying the completion of services which may require us to incur penalties or sanctions under contracts, incur additional non-compensable costs or result in the cancellation of contracts; causing risks to employee safety; disrupting the mobility of people; causing labor shortages; and causing travel and shipping disruption and shutdowns. It is unknown whether and how we may be affected if such epidemic persists for an extended period of time. Any of the foregoing could have a material adverse impact on our business, operating results and financial condition.

**We rely on third parties for the supply and manufacture of our products, which can be unpredictable in terms of quality, cost and availability.**

All of our products are manufactured by third parties. The production of our products also requires raw materials obtained from third parties, and the sources and quantities of such raw materials are limited. Aside from contractual rights and remedies pertaining to our agreements, there can be no assurance that our manufacturers or raw material providers will supply sufficient quantities of our products, the products supplied will meet our quality standards, or that the products supplied will be on commercially acceptable terms. Any delays or deficiencies in the supply of products will affect the marketing and sales of our products and might expose us to financial costs, penalties, lawsuits, product recalls or reputational harm. If we were to seek alternative sources of supply, we may not be able to find alternative supply arrangements with commercially reasonable terms or at all. Also, we have committed under certain licensing and collaboration arrangements to supply third-party distributors with product. If we are unable to fulfill such obligations, we may be in breach of the respective arrangements and may face financial penalties, lawsuits or other claims, weakened negotiating position in future third-party agreement negotiations or reputational harm.

In addition, our third-party drug, device and chemical manufacturers are subject to various regulatory inspections, including those conducted by the FDA, to ensure strict compliance with good manufacturing practices and other government mandated quality standards regulations. While we are obligated to audit the performance of our third-party contractors, we do not have complete control over their compliance. We could be adversely impacted if our third-party manufacturers do not comply with these standards and regulations. For non-compliance, the regulatory authority may commence enforcement actions, including public warning letters, costly inspections, fines, injunctions, civil penalties, failure of the government to grant review of submissions or market approval of drugs, or cause delays, suspension or withdrawal of approvals, product seizures or recalls, operating restrictions, facility closures and criminal prosecutions. Any of this will have a material adverse impact on our business, financial condition, and results of

**Our third parties may also be unable to produce required amounts of chemical, drug, and/or devices at a price that has been agreed upon, or which is commercially viable.**

Our third parties may elect to discontinue manufacturing our products. As a result, we may need to enter into new arrangements with alternative third parties that may be costly. The time that it takes us to find alternative third parties may cause an interruption in supplies and we may not be able to fulfill existing or new product orders, which could subject us to contractual claims or adversely affect our business, financial condition or results of operations.

**We rely on collaborative partners for the licensing and supply of certain products.**

Our activities require us to enter into various arrangements with corporate collaborators for the licensing and supply of our products. We intend to attract corporate partners and enter into additional collaborations. There can be no assurance, however, that we will be able to establish such additional collaborations on favorable terms, if at all, or that our current or future collaborations will be successful.

The existence or occurrence of one or more of the following circumstances and events, for example, could have a material adverse impact on our operations and financial condition: disagreement with collaborative partners on how to conduct business efficiently; inability of collaborative partners to meet their contractual obligations; or disputes arising between collaborative partners. Should any current or future collaborative partner fail to develop, manufacture, supply or commercialize successfully any product to which it has rights, or any partner's product to which we have rights, or to timely meet its obligations, our business may be adversely affected. Failure of a collaborative partner to continue to participate in any particular program could delay or halt the commercialization of products generated from such program. In addition, there can be no assurance that the collaborative partners will not pursue other technologies or develop alternative products either alone or in collaboration with others, including our competitors, as a means for developing treatments for the diseases targeted by our programs.

13

Table of Contents

**We rely on our supply chain and the supply chain of third parties to provide our products, and such supply chains may fail due to inadequacies in their systems and processes, in execution, and for unforeseen reasons.**

We rely on our supply chain and the supply chain of third parties to provide our products (and ingredients or components thereof). These supply chains are complex, and may fail for a variety of reasons, including for example, failure to provide adequate quality control and/or quality assurance in supply chain systems and processes, a lack of coordination between various aspects of the supply chain, failure of logistics providers, and inadequate inventory management and/or order management.

In addition, our supply and the supply chain of third parties who provide our products (and ingredients or components thereof) are global in nature, and hence subject to unforeseen problems, including for example, local regulatory risks, currency fluctuations, public health emergencies, natural disasters, and economic, social and/or political instability within a particular country or region. If any such supply chain issues occur, we may not be able to fulfill existing or new product orders, which could subject us to contractual claims or adversely affect our business, financial condition or results of operations.

**We rely on third parties for the execution of a significant portion of our clinical, regulatory, pharmacovigilance medical information, and logistical responsibilities and such third parties may fail to meet their obligations as a result of inadequacies in their systems and processes, execution failure or unforeseen reasons.**

We rely on third parties to perform critical services, including preclinical testing, clinical trial management, analysis and reporting, regulatory, pharmacovigilance, medical information and logistical services.

These third parties may not be available on acceptable terms when needed or, if they are available, may not comply with all regulatory and contractual requirements or may not otherwise perform their services in a timely or acceptable manner. This non-compliance may be due to a number of factors, including inadequacies in third-party systems and processes, execution failure public health emergencies, natural disasters, or economic, social and/or political instability. We may also experience unexpected cost increases that are beyond our control. As a result, we may need to enter into new arrangements with alternative third parties that may be costly. The time that it takes us to find alternative third parties may cause a delay, extension or termination of our preclinical studies, clinical trials or the commercialization of our product candidates and we may incur significant costs to replicate data that may be lost. These third parties may also have relationships with other commercial entities, some of which may compete with us. In addition, if such third parties fail to perform their obligations in compliance with regulatory requirements and our protocols, our preclinical studies or clinical trials may not meet regulatory requirements or may need to be repeated and our regulatory filings, such as our marketing authorizations or new drug submissions, may not be completed correctly or within the applicable deadlines. As a result of our dependence on third parties, we may face delays or failures outside of our direct control in our efforts to develop and commercialize product candidates.

**We rely on third-party distributors in many markets to market and sell our products and such third parties may fail to meet their obligations.**

We rely on third-party distributors to market and sell our products in many markets. These distributors may not comply with all regulatory and contractual requirements or may not otherwise perform their services in a timely or acceptable manner. These distributors may not meet the minimum contractual sales requirement or the minimum sales target mutually agreed upon by both parties. The inability to meet minimum sales requirement or sales target may be due to a number of factors, including inadequate resources devoted to sell our products or failure in the distributor's sales efforts. The distributors may be responsible for negotiating reimbursements from third-party payers for the cost of our products. If our distributors cannot achieve

acceptable profit margins on our products, they may reduce or discontinue the sale of our products. As a result of our dependence on third-party distributors, our revenues may not meet expectations and our business, results of operations and financial condition may be adversely affected.

14

Table of Contents

**Government legislation could adversely impact our ability to obtain product reimbursement and economically price our products and may be difficult to interpret or comply with, resulting in additional costs to conduct our business in certain countries.**

In many of the markets we sell to, sales of healthcare products are dependent in part on the availability of reimbursement to the consumer from third-party payors, such as government and private insurance plans. Third-party payors are increasingly challenging the effectiveness of, and prices charged for, medical products and services, and therefore uncertainty exists as to the reimbursement of existing and newly approved healthcare products. The prices of our products are subject to direct price controls by law and to drug reimbursement programs with varying price control mechanisms.

In addition, as drug costs have increased, there have been more cost containment measures taken by government and third-party private payors, including limitations on both the number of products they list for reimbursements, the conditions under which they will reimburse, and the reimbursement drug prices. For example, we are seeking, but have not yet received reimbursement for BRINAVESS in several major European markets. There can be no assurance that we will be reimbursed or receive commercially viable pricing. Also, the current conditions and rules relating to the listing submissions to public and private formulary listings may change or become more onerous in the future. If we fail to achieve the listing of our products, it will affect the physicians' decisions regarding the use of our products.

New and existing government legislation in the markets in which we sell or anticipate selling our products may also be difficult to interpret or comply with. Such difficulties may cause slower product introductions in new countries or the termination of sales of our products in existing countries. Violations of any such legislation may lead to financial penalties, product bans or claims brought by regulatory agencies or local or national governments, all of which would have adverse effects on our business, results of operations and financial condition.

**Compulsory licensing and/or generic competition may affect our business in certain countries.**

In a number of countries, governmental authorities and other groups have suggested that companies which manufacture medical products (e.g., pharmaceuticals) should make products available at a low cost. In some cases, governmental authorities have held that where a pharmaceutical company does not do so, its patents might not be enforceable to prevent generic competition. Alternatively, some governmental authorities could require that we grant compulsory licenses to allow competitors to manufacture and sell their own versions of our products, thereby reducing our sales or the sales of our licensee(s). In all of these situations, the results of our operations in these countries could be adversely affected.

**If we are not able to convince public payors and hospitals to include our products on their approved formulary lists, our revenues may not meet expectations and our business, results of operations and financial condition may be adversely affected.**

Hospitals establish formularies, which are lists of drugs approved for use in the hospital. If a drug is not included on the hospital's formulary, the ability of our distribution partners and key account managers to promote and sell our drugs may be limited or denied. If we fail to secure and maintain formulary inclusion for our drugs on favorable terms or are significantly delayed in doing so, we may have difficulty achieving market acceptance of our drugs and our business, results of operations and financial condition could be materially adversely affected.

**Our hospital customers may be late in their payments and in some cases may not pay monies owed.**

Hospital customers that may purchase our products and product candidates, if approved, generally bill public payors to cover all or a portion of the costs and fees associated with these purchases. Our revenue and financial condition depend on the extent to which our customers are reimbursed for these costs and fees, and the extent to which such payments are made to us according to the timelines required by our contracts or general terms and conditions. Such payments may be delayed or withheld for many reasons, including, but not limited to, regulatory requirements of local and national governments, reimbursement requirements of public payors, the financial condition or access to capital of our customers and public payors or the deterioration of general or local economic conditions. The non-payment or late payment of amounts due from our customers and public payors may impact the timing of receipt of cash, or we may not receive the cash at all which would negatively impact our financial condition. In addition, we may have to increase our allowance for doubtful accounts or write-off accounts receivable, which would also negatively impact our financial position and results of operations. If collectability is not reasonably assured at the time of sale, we may not be able to recognize revenue until cash is collected which would make it difficult to forecast our revenues accurately. We may, as a result, experience significant unanticipated fluctuations in our revenues from period to period. Any failure to achieve anticipated revenues in a period may also cause our stock price to decline.

15

Table of Contents

In addition, many countries have been severely impacted by the widespread economic recession that began in 2008, the effect of which continued until recently, and will be impacted by the widespread economic impact of the COVID-19 pandemic. Conditions such as a tighter credit environment, declining business and consumer confidence, as well as increased unemployment have contributed to the economic volatility in these regions. As a result of the continued turbulence in Europe and around the world, account collection from hospitals in certain regions takes longer now than in the past and may be further delayed. Any delay in collection or an inability to collect could have a material adverse effect on our business, financial condition and results of operations.

**Our business may be materially adversely affected by new legislation, new regulatory requirements, and the continuing efforts of governmental and third-party payors to contain or reduce the costs of healthcare through various means.**

The government and regulatory authorities in the United States, and in Europe and other markets in which we sell our products may propose and adopt new legislation and regulatory requirements relating to pharmaceutical approval criteria and manufacturing requirements. Such legislation or regulatory requirements, or the failure to comply with such, could adversely impact our operations and could have a material adverse effect on our business, financial condition and results of operations.

In recent years, national, federal, provincial, state, and local officials and legislators have proposed, or are reportedly considering proposing, a variety of price based reforms to the healthcare systems in the European Union, the United States and other countries. Some proposals include measures that would limit or eliminate payments for certain medical procedures and treatments or subject the pricing of pharmaceuticals to government control.

Also, there has been heightened governmental scrutiny recently over the manner in which drug manufacturers set prices for their marketed products. For example, in the United States, there have been several Congressional inquiries and proposed bills designed to, among other things, bring more transparency to product pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drug products. In addition, in July 2019, President Trump announced plans to issue an executive order to require pharmaceutical companies to offer lower drug prices to the United States government. Further, in May 2018, President Trump and the Secretary of the U.S. Department of Health and Human Services (HHS) released the "American Patients First Blueprint" and have recently begun implementing certain portions. The initiative includes proposals to increase generic drug and biosimilar competition, enable the Medicare program to negotiate drug prices more directly and improve transparency regarding drug prices and ways to lower consumers' out-of-pocket costs. Many states also have proposed or enacted legislation that seeks to indirectly or directly regulate pharmaceutical drug pricing, such as by requiring biopharmaceutical manufacturers to publicly report proprietary pricing information or to place a maximum price ceiling on pharmaceutical products purchased by state agencies. Such initiatives and legislation may cause added pricing pressures on our products and product candidates.

Furthermore, in certain foreign markets, the pricing or profitability of healthcare products is subject to government controls and other measures that have been prepared by legislators and government officials. While we cannot predict whether any such legislative or regulatory proposals or reforms will be adopted, the adoption of any such proposals or reforms could adversely affect the commercial viability of our existing and potential products. Significant changes in the healthcare system in the European Union and other countries may have a substantial impact on the manner in which we conduct our business. Such changes could also have a material adverse effect on our business, financial condition and results of operations.

**We rely on proprietary technology, the protection of which can be unpredictable and costly.**

Our success depends in part upon our ability to obtain patent protection or patent licenses for our technology and products. Obtaining such patent protection or patent licenses can be costly and the outcome of any such application for patent protection and patent licenses can be unpredictable.

16

Table of Contents

Our patent portfolio related to vernakalant contains issued United States and European patents (as well as other patents issued worldwide) with composition of matter claims specific to vernakalant and/or claims specific to the use of vernakalant to treat arrhythmia. Our patent portfolio related to tirofiban hydrochloride is much more limited, in that most of our patents related to the compound in a formulation have already expired or will be expiring within the next few years. We will not have any patent protection on tirofiban hydrochloride once all of the patents expire.

It is impossible to anticipate the breadth or degree of protection that patents will afford products developed by us or their underlying technology. Further, countries in which we sell our products may not protect our intellectual property to the same extent as the laws of Europe or the United States and may lack rules and procedures required for defending our patents. Third parties may attempt to circumvent our patents by means of alternative designs and processes. Third parties may also independently develop similar products, duplicate any of our products not under patent protection, or design around the inventions we claim in any of our existing patents, existing patent applications or future patents or patent applications. There is a risk that any patents issued relating to our products or any patents licensed to us may be successfully challenged or that the practice of our products might infringe the patents of third parties. If the practice of our products infringes the patents of third parties, we may be required to design around such patents, potentially causing increased costs and delays in product development and introduction or precluding us from developing, manufacturing or selling our planned products. In addition, disputes may arise as to the rights to know-how and inventions among our employees and consultants who use intellectual property owned by others for the work performed for our company. The scope and validity of patents which may be obtained by third parties, the extent to which we may wish or need to obtain patent licenses, and the cost and availability of such licenses are currently unknown. If such licenses are obtained, it is likely they would be royalty bearing, which could reduce our income. If licenses cannot be obtained on an economical basis, delays in market introduction of our planned products could occur or introduction could be prevented, in some cases causing the expenditure of substantial funds. If we defend or contest the validity of patents relating to our products or technology or the products or technology of a third-party, we could incur substantial legal expenses with no assurance of success.

In certain instances, we may elect not to seek patent protection but instead rely on the protection of our technology through confidentiality agreements or trade secrets. The value of our assets could also be reduced to the extent that third parties are able to obtain patent protection with respect to aspects of our technology or products or that confidential measures we have in place to protect our proprietary technology are breached or become unenforceable. However, third parties may independently develop or obtain similar technology and such third parties may be able to market competing products and obtain regulatory approval through a showing of equivalency to one of our products which has obtained regulatory approval, without being required to undertake the same lengthy and expensive clinical studies that we would have already completed.

Litigation may also be necessary to enforce patents issued or licensed to us or to determine the scope and validity of a third-party's

proprietary rights. We could incur substantial costs if we are required to defend ourselves in patent suits brought by third parties, if we participate in patent suits brought against or initiated by our corporate collaborators or if we initiate such suits. We may not have the necessary resources to participate in or defend any such activities or litigation. Even if we did have the resources to vigorously pursue our interests in litigation, because of the complexity of the subject matter, it is impossible to predict whether we would prevail in any such action. An adverse outcome in litigation or an interference to determine priority or other proceeding in a court or patent or selling office could subject us to significant liabilities, require disputed rights to be licensed from third parties or require us to cease using certain technology or products, any of which may have a material adverse effect on our business, financial condition and results of operations.

**There may be an unauthorized disclosure of confidential information under our control.**

We maintain and manage personal information obtained from our customers, as well as confidential information relating to our technology, research and development, production, marketing and business operations and those of our customers and collaborators, in various forms. Although we have implemented controls to protect the confidentiality of such information, there can be no assurance that such controls will be effective. Unauthorized disclosures of such information could subject us to complaints or lawsuits for damages or could otherwise have a negative impact on our business, financial condition, results of operations, reputation and credibility.

17

Table of Contents

**Clinical trials for our product candidates are expensive and time-consuming, and their outcome is uncertain and the vernakalant (IV) program has been on full clinical hold in the United States since November 2010.**

Before we or our partners can obtain regulatory approval for the commercial sale of any product candidate currently under development, we are required to complete extensive clinical trials to demonstrate its safety and efficacy. Clinical trials are very expensive and difficult to design and implement. The clinical trial process is also time-consuming. The ACT 5 trial for vernakalant (IV) was terminated following a single unexpected serious adverse event of cardiogenic shock experienced by a patient in the study and the development program is currently on clinical hold in the United States. If we choose to and are able to restart the development program, there can be no assurance that the trials will be feasible or successful. Clinical trials, including any post-authorization safety studies for our products, may be subject to significant delays and their outcome may be negatively affected due to various causes, including:

- our inability to find collaboration partners;

- our inability to manufacture or obtain sufficient quantities of materials for use in clinical trials;

- delays in obtaining regulatory approvals to commence a study, or government intervention to suspend or terminate a study;

- delays, suspension, or termination of the clinical trials imposed by the institutional review board or independent ethics board responsible for overseeing the study to protect research subjects at a particular study site;

- delays in identifying and reaching agreement on acceptable terms with prospective clinical trial sites;

- slower than expected rates of patient recruitment and enrollment;

- uncertain dosing issues;

- inability or unwillingness of medical investigators to follow our clinical protocols;

- variability in the number and types of subjects available for each study and resulting difficulties in identifying and enrolling subjects who meet trial eligibility criteria;

- delays in enrolling patients in the trial;

- scheduling conflicts with participating clinicians and clinical institutions;

- difficulty in maintaining contact with subjects after treatment, which results in incomplete data;

- unforeseen safety issues or side effects;

- lack of efficacy during the clinical trials;

- our reliance on contract research organizations to conduct clinical trials, which may not conduct those trials with good clinical or laboratory practices; or

- other regulatory delays.

In addition, on May 30, 2018, the federal Right to Try Act was signed into law. The law, among other things, provides a federal framework for patients to access certain investigational new drug products that have completed a Phase 1 clinical trial. Under certain circumstances, eligible patients can seek treatment without enrolling in clinical trials and without obtaining FDA approval under the FDA expanded access program. While there is no obligation to make product candidates available to eligible patients as a result of the Right to Try Act, new and emerging legislation regarding expanded access to unapproved drugs could negatively impact enrollment in our clinical trials and our business in the future.

18

**The results of pre-clinical studies and initial clinical trials are not necessarily predictive of future results, and our current product candidates may not have favorable results in later trials or in the commercial setting.**

Pre-clinical tests and Phase 1 and Phase 2 clinical trials are primarily designed to test safety, to study pharmacokinetics and pharmacodynamics and to understand the side effects of product candidates at various doses and schedules. Success in pre-clinical or animal studies and early clinical trials does not ensure that later large-scale efficacy trials will be successful nor does it predict final results. Favorable results in early trials may not be repeated in later trials.

A number of companies in the life sciences industry, including Correvio, have suffered significant setbacks in advanced clinical trials, even after positive results in earlier trials. Clinical results are frequently susceptible to varying interpretations that may delay, limit or prevent regulatory approvals. Negative or inconclusive results or adverse medical events during a clinical trial could cause a clinical trial to be delayed, repeated or terminated. In addition, failure to construct appropriate clinical trial protocols could result in the test or control group experiencing a disproportionate number of adverse events and could cause a clinical trial to be repeated or terminated. Additionally, sizing of a trial is based on previous experience of response rates in the control group to vernakalant. Failure to accurately predict event rates may lead to a clinical trial being inadequately powered resulting in an insignificant and/or unreliable result. Pre-clinical data and the clinical results we have obtained for vernakalant (IV) and other products may not predict results from studies in larger numbers of subjects drawn from more diverse populations or in a commercial setting, and also may not predict the ability of our products to achieve their intended goals, or to do so safely.

In October 2010, we announced that patient enrollment in the ACT 5 study of vernakalant (IV) had been suspended and the vernakalant (IV) clinical development program had been placed on clinical hold by the FDA following a single unexpected serious adverse event of cardiogenic shock experienced by a patient with atrial fibrillation who received vernakalant (IV). We have had several communications with the FDA since then, as further discussed below in "*Our Products and Product Candidates – BRINAVESS for Atrial Fibrillation.*" The clinical program in the United States remains on full clinical hold.

**Our industry is subject to health and safety risks.**

We produce products for human ingestion. While we take substantial precautions such as laboratory and clinical testing, toxicology studies, quality control and assurance testing and controlled production methods, the associated health and safety risks cannot be eliminated. Products produced by us may be found to be, or to contain substances that are harmful to the health of our patients and customers and which, in extreme cases, may cause serious health conditions or death. This sort of finding may expose us to substantial risk of litigation and liability.

Further, we could be forced to discontinue production of certain products, which would harm our profitability. Correvio maintains product liability insurance coverage; however, there is no guarantee that our current coverage will be sufficient or that we can secure insurance coverage in the future at commercially viable rates or with the appropriate limits and could have a significant adverse effect on our reputation.

**Our approved products may not achieve or maintain expected levels of market acceptance.**

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon achieving and maintaining market acceptance. New product candidates that appear promising in development may fail to reach the market or may have only limited or no commercial success. Levels of market acceptance for our products could be impacted by several factors, many of which are not within our control, including but not limited to:

- safety, efficacy, convenience and cost-effectiveness of our products compared to products of our competitors;

- scope of approved uses and marketing approval;

- restrictive labelling or onerous Risk Evaluation and Mitigation Strategy programs;

- timing of market approvals and market entry;

- difficulty in, or excessive costs to, manufacture;

- infringement or alleged infringement of the patents or intellectual property rights of others;

- availability of alternative products from our competitors;

- acceptance of the price of our products; and

- ability to market our products effectively.

In addition, the success of any new product will depend on our ability to either successfully build our in-house sales capabilities or to secure new, or to realize the benefits of existing, arrangements with third-party marketing or distribution partners. Seeking out, evaluating and negotiating marketing or distribution agreements may involve the commitment of substantial time and effort and may not ultimately result in an agreement. In addition, the third-party marketing or distribution partners may not be as successful in promoting our products as we had anticipated. If we are unable to commercialize new products successfully, whether through a failure to achieve market acceptance, a failure to build our own in-house sales capabilities, a failure to secure new marketing partners or to realize the benefits of our arrangements with existing marketing partners, there may be a material adverse

effect on our business, financial condition and results of operations and it could cause the market value of our common shares to decline.

In addition, by the time any products are ready to be commercialized, what we believe to be the market for these products may have changed. Our estimates of the number of patients who have received or might have been candidates to use a specific product may not accurately reflect the true market or market prices for such products or the extent to which such products, if successfully developed, will actually be used by patients. Our failure to successfully introduce and market our products that are under development would have a material adverse effect on our business, financial condition, and results of operations.

**We are dependent upon our key personnel to achieve our business objectives.**

As a technology-driven company, intellectual input from key management and personnel is critical to achieve our business objectives. Consequently, our ability to retain these individuals and attract other qualified individuals is critical to our success. The loss of the services of key individuals might significantly delay or prevent achievement of our business objectives. In addition, because of a relative scarcity of individuals with the high degree of education and scientific achievement required for our business, competition among life sciences companies for qualified employees is intense and, as a result, we may not be able to attract and retain such individuals on acceptable terms, or at all. In addition, because we do not maintain "key person" life insurance on any of our officers, employees, or consultants, any delay in replacing such persons, or an inability to replace them with persons of similar expertise, would have a material adverse effect on our business, financial condition, and results of operations.

We also have relationships with scientific collaborators at academic and other institutions, some of whom conduct research at our request or assist us in formulating our research and development strategies. These scientific collaborators are not our employees and may have commitments to, or consulting or advisory contracts with, other entities that may limit their availability to us. In addition, even though our collaborators are required to sign confidentiality agreements prior to working with us, they may have arrangements with other companies to assist such other companies in developing technologies that may prove competitive to us.

Incentive provisions for our key executives include the granting of stock options that vest over time, designed to encourage such individuals to stay with us. However, a low share price, whether as a result of disappointing progress in our sales or development programs or as a result of market conditions generally, could render such agreements of little value to our key executives. In such event, our key executives could be susceptible to being hired away by our competitors who could offer a better compensation package. If we are unable to attract and retain key personnel our business, financial conditions and results of operations may be adversely affected.

20

**Table of Contents**

**We are exposed to concentration of credit risk relating to major distribution relationships and customers in certain geographic regions.**

We have distribution contracts with certain third parties that contribute to a significant portion of our revenue. Due to the concentration of sales and receivables in these certain distributors, the credit risk associated with these accounts are of particular significance to us. If one or several of these distributors fails to fulfill its payment obligations or reduces their business with us, there may be a material adverse effect on our business, financial condition and results of operations.

**Our policies and estimates regarding returns, allowances and chargebacks may reduce revenue in future periods.**

Reserves on sales are calculated based on prior experience and best estimates of the impact in subsequent period in accordance with our established policy. We cannot ensure that the adequacy of the reserves or actual product returns, allowances and chargebacks will not exceed the estimates. Inadequate reserves could have a material adverse effect on our business, financial condition, and results of operations.

**Our inventory has a limited shelf life and may require write-downs.**

We value inventory for accounting purposes at the lower of cost determined on a first-in, first-out basis, and net realizable value. For inventory which has reached its expiration or that is close to expiration and not expected to the sold, we establish the associated reserve to reflect such inventory cost as it is not expected to be recoverable. Even though on a regular basis, management reviews the amount of inventory on hand, reviews the remaining shelf life and estimates the time required to manufacture and sell such inventory, write-down of inventory may still be required. Any write-down could have a material adverse effect on our business, financial condition, and results of operations.

**We are exposed to risks relating to the write-down of intangible assets, which comprises of a significant portion of our total assets.**

A significant amount of our total assets relate to our licenses, marketing rights, trade name and patents associated with our product portfolio. As of December 31, 2019, the carrying value of our intangible assets was approximately $22.2 million. In accordance with U.S. generally accepted accounting principles, we are required to review the carrying value of our intangible assets for impairment periodically or when certain triggers occur. In case of events such as generic competition, our inability to manufacture, or our inability to obtain sufficient raw materials, sales of the related product may decline and impairment in the carrying value of the intangible asset may have occurred. Such impairment will result in a write-down of the intangible asset and the write-down is charged to earnings during the period in which the impairment occurs. The write-down of any intangible assets could have a material adverse effect on our business, financial condition, and results of operations.

**Our common shares may be delisted from the Nasdaq, which could affect their market price and liquidity. If our common shares were to be delisted, investors may have difficulty in disposing of their shares.**

Our common shares are currently listed on the Nasdaq and on the TSX under the symbol "CORV." We must meet continuing listing

requirements to maintain the listing of our common shares on the Nasdaq. For example, for continued listing, the Nasdaq requires, among other things, that listed securities maintain a minimum closing bid price of not less than US$1.00 per share. On January 24, 2020, we received a notice from the Nasdaq indicating that the minimum bid price for our common shares had fallen below US$1.00 for 30 consecutive business days, and that, therefore, we were no longer in compliance with Nasdaq Marketplace Rule 5550(a)(2) - bid price. We have 180 calendar days or until July 22, 2020, to regain compliance with the minimum bid price requirement. To regain compliance, the closing bid price of our common shares will need to be at least US$1.00 per share for a minimum of 10 consecutive business days. Due to the impact of the COVID-19 pandemic on the economy, on April 17, 2020, the Nasdaq extended the foregoing time period to regain compliance to October 5, 2020. On April 28, 2020, the closing price of the common shares was US$0.41 on the Nasdaq. On January 27, 2020, we received a notice from the Nasdaq indicating that the market value of our listed securities had fallen below US$35 million for 30 consecutive business days, and that, therefore, we were no longer in compliance with Nasdaq Marketplace Rule 5550(b)(2). We have 180 calendar days or until July 27, 2020, to regain compliance with the minimum bid price requirement. To regain compliance, the market value of our listed securities must exceed US$35 million for a minimum of 10 consecutive business days. Due to the impact of the COVID-19 pandemic on the economy, on April 17, 2020, the Nasdaq extended the foregoing time period to regain compliance to October 5, 2020. On April 28, 2020, the market value of our listed securities was US$27.14 million on the Nasdaq. In addition to the specified criteria for continued listing, the Nasdaq also has broad discretionary public interest authority that it can exercise to apply additional or more stringent criteria for the continued listing of the common shares, or suspend or delist securities even though the securities meet all enumerated criteria for continued listing on the Nasdaq. We cannot assure you that the Nasdaq will not exercise such discretionary authority. There can be no assurance that our common shares will remain listed on the Nasdaq. If we fail to meet any of the Nasdaq's continued listing requirements, our common shares may be delisted. Any delisting of our common shares may adversely affect a shareholder's ability to dispose, or obtain quotations as to the market value, of such shares.

21

Table of Contents

**We may face exposure to adverse movements in foreign currency exchange rates.**

Our loans and a portion of our revenue are denominated in U.S. dollars. However, our business has expanded internationally and, as a result, a significant portion of our revenues and expenses are denominated in Euros, Canadian dollars and other foreign currencies. A decrease in the value of such foreign currencies relative to the U.S. dollar could result in losses from currency exchange rate fluctuations. To date, we have not hedged against risks associated with foreign exchange rate exposure. We cannot be sure that any hedging techniques we may implement in the future will be successful or that our business, financial condition, and results of operations will not be materially adversely affected by exchange rate fluctuations.

**If we were to lose our foreign private issuer status under United States federal securities laws, we would likely incur additional expenses associated with compliance with the United States securities laws.**

As a foreign private issuer, as defined in Rule 3b-4 under the U.S. Securities Exchange Act of 1934, as amended (the "Exchange Act"), we are exempt from certain of the provisions of the United States federal securities laws. Accordingly, there may be less information concerning us publicly available than there is for U.S. public companies. For example, the United States proxy rules and the Section 16 reporting and "short swing" profit rules do not apply to foreign private issuers. However, if we were to lose our status as a foreign private issuer, these regulations would immediately apply and we would also be required to commence reporting on forms required of United States companies, such as Forms 10-K, 10-Q and 8-K.

Compliance with these additional disclosure and timing requirements under U.S. securities laws would likely result in increased expenses and would require our management to devote substantial time and resources to comply with new regulatory requirements. Further, to the extent that we were to offer or sell our securities outside of the United States, we would have to comply with the more restrictive Regulation S requirements under the U.S. Securities Act of 1933, as amended, that apply to U.S. companies or to foreign private issuers not eligible to use the multijurisdictional disclosure system, as applicable, which could limit our ability to access the capital markets in the future.

**We are subject to risks inherent in foreign operations.**

We intend to continue to pursue international market growth opportunities, such that international sales are likely to continue, at least in the near future, to account for a significant portion of our revenue. We have committed, and intend to commit, significant resources to our international sales and marketing activities. We are subject to a number of risks associated with our international business operations and sales and marketing activities that may increase liability, costs, lengthen sales cycles and require significant management attention. These risks include:

- compliance with the laws of the United States, Europe and other countries that apply to our international operations, including import and export legislation;

- increased reliance on third parties to establish and maintain foreign operations;

- the complexities and expenses of administering a business abroad;

- complications in compliance with, and unexpected changes in, foreign regulatory requirements;

- instability in economic or political conditions, including inflation, recession and actual or anticipated military conflicts, social upheaval or political uncertainty;

22

Table of Contents

- foreign currency fluctuations;

- foreign exchange controls and cash repatriation restrictions;

- tariffs and other trade barriers;

- difficulties in collecting accounts receivable;

- differing tax structures and related potential adverse tax consequences;

- uncertainties of laws and enforcement relating to the protection of intellectual property or secured technology;

- litigation in foreign court systems;

- unauthorized copying or use of our intellectual property;

- cultural and language differences;

- difficulty in managing a geographically dispersed workforce in compliance with local laws and customs that vary from country to country; and

- other factors, depending upon the country involved.

There can be no assurance that the policies and procedures we implement to address or mitigate these risks will be successful, that our personnel will comply with them or that we will not experience these factors in the future or that they will not have a material adverse effect on our business, results of operations and financial condition.

We are required to comply with export controls, trade restrictions, and economic sanctions imposed by governments around the world which have jurisdiction over our operations, and which may prohibit or restrict transactions in certain countries and / or with certain designated persons or entities. For example, our operations in the United States and U.S. persons working for us are subject to U.S. economic sanctions administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), which restricts our business dealings with certain countries and parties. Certain of our companies may make sales of pharmaceutical products into a country that is regulated by OFAC (e.g., Iran). While we work to ensure that we are compliant with all international export controls, trade restrictions and economic sanctions (including OFAC), any violation of such laws may result in criminal or civil penalties, and we may be subject to other liabilities, which could materially adversely affect our business, financial condition or results of operations.

**There is an increased focus on privacy and data protection issues in countries around the world, including regions and countries where we operate (e.g., Europe and Switzerland).**

Correvio is subject to a significant number of privacy and data protection laws and regulations globally, many of which place restrictions on Correvio's ability to transfer, access and use personal data across its business. As an example, there has been increased attention to privacy and data protection issues in Europe, where the new EU General Data Protection Regulation 2016/679 ("GDPR") became effective in May 2018. The new regulations require a substantial infrastructure for compliance, and businesses must now report any data breaches within 72 hours if they have an adverse effect on user privacy. Failure to comply with the regulations may subject violators to fines of up to 20 million Euros, or, up to 4% of the annual worldwide turnover of the preceding financial year in the case of an enterprise (whichever is greater). The legislative and regulatory landscape for privacy and data protection continues to evolve, including for example, changes to the Federal Data Protection Act ("DPA") in Switzerland, where Correvio International Sàrl is headquartered. Correvio has adopted a compliance program associated with the requirements of GDPR and DPA. Nevertheless, given the uncertainty associated with the current legal environment for data protection in Europe, it is possible that, despite best efforts, we or any of our third-party distributors, suppliers, manufacturers or regulatory service providers might run afoul of GDPR, DPA, or other currently developing laws associated with data privacy in Europe or elsewhere. Violations of such laws might subject us to lawsuits, fines, penalties or injunctions that could negatively affect our business, financial condition or results of operations.

Table of Contents

**Failure to comply with the FCPA, as well as the anti-bribery laws of the nations in which we conduct business (such as the United Kingdom's Bribery Act or the CFPOA), could subject us to penalties and other adverse consequences.**

Our business is subject to the FCPA which generally prohibits companies and company employees from engaging in bribery or other prohibited payments to foreign officials for the purpose of obtaining or retaining business. The FCPA also requires companies to maintain accurate books and records and internal controls, including at foreign-controlled subsidiaries. In addition, we are subject to other anti-bribery laws of the nations in which we conduct business that apply similar prohibitions as the FCPA (e.g., the United Kingdom's Bribery Act, the CFPOA and the Organization for Economic Co-operation and Development Anti-Bribery Convention). Our employees or other agents may, without our knowledge and despite our efforts, engage in prohibited conduct under our policies and procedures and the FCPA or other anti-bribery laws that we may be subject to for which we may be held responsible. If our employees or other agents are found to have engaged in such practices, we could suffer severe penalties and other consequences that may have a material adverse effect on our business, financial condition and results of operations.

**Legislative actions, potential new accounting pronouncements, and higher insurance costs are likely to impact our future financial position or results of operations.**

Future changes in financial accounting standards may cause adverse, unexpected revenue fluctuations and affect our financial position or results of operations. New pronouncements and varying interpretations of pronouncements have occurred with greater frequency and are expected to occur in the future. Compliance with changing regulations of corporate governance and public disclosure may result in additional expenses. All of these

uncertainties are leading generally toward increasing insurance costs, which may adversely affect our business, results of operations and our ability to purchase any such insurance, at acceptable rates or at all, in the future.

**Our product candidates are subject to extensive regulation, which can be costly and time consuming, cause unanticipated delays, or prevent the receipt of the required approvals to commercialize products.**

The pre-clinical and clinical trials of any products developed by us or our current or future collaborative partners, if any, and the manufacturing, labelling, sale, distribution, export or import, marketing, advertising and promotion of any of those products are subject to regulation by federal, provincial, state and local governmental authorities. Our product candidates are principally regulated in the United States by the FDA, in the European Union by the EMA, and by other similar regulatory authorities in other jurisdictions. Government regulation substantially increases the cost and risk of researching, developing, manufacturing and selling products. Following several widely publicized issues in recent years, the FDA and similar regulatory authorities in other jurisdictions have become increasingly focused on product safety. This development has led to requests for more clinical trial data, for the inclusion of a significantly higher number of patients in clinical trials and for more detailed analysis of trial results. Consequently, the process of obtaining regulatory approvals, particularly from the FDA, has become more costly, time consuming and challenging than in the past. Any product developed by us or our current or future collaborative partners, if any, must receive all relevant regulatory approvals or clearances from the applicable regulatory authorities before it may be marketed and sold in a particular country.

In connection with our pre-clinical studies and clinical trials for vernakalant (IV) and other product candidates, we are required to adhere to extensive regulations established by the applicable regulatory authorities. In general, these regulatory authorities and the regulatory process require us to conduct extensive pre-clinical studies and clinical trials of each of our product candidates in order to establish its safety and efficacy. These pre-clinical studies and clinical trials can take many years, are highly uncertain, and require the expenditure of substantial resources. We, or our future collaborative partner, if any, must obtain and maintain regulatory authorization to conduct clinical trials. For example, in October 2010, we announced that patient enrollment in the ACT 5 study of vernakalant (IV) had been suspended and the vernakalant (IV) clinical development program had been placed on clinical hold by the FDA following a single unexpected serious adverse event of cardiogenic shock experienced by a patient with atrial fibrillation who received vernakalant (IV), and remains on full clinical hold.

Our pre-clinical research is subject to good laboratory practice and other requirements, and our clinical research is subject to good clinical practice and other requirements. Failure to adhere to these requirements could invalidate our data. In addition, the relevant regulatory authority or independent review board may modify, suspend or terminate a clinical trial at any time for various reasons, including a belief that the risks to study subjects outweigh the benefits.

24

Table of Contents

In addition to the risk of unfavorable results of our research, because the data obtained from our pre-clinical and clinical activities are susceptible to varying interpretations, our successful completion of the regulatory process is uncertain. We may encounter delays, such as refusals from regulatory authorities to accept our marketing applications for review. We may have limits imposed on us, or clinical trials or our product candidates. Unfavorable results from our clinical data may require us to limit the indications sought in connection with the product candidate or otherwise limit our ability to obtain the regulatory approval required from the applicable regulatory authorities to commercialize our product candidates. In addition, delays or rejections may be encountered based upon changes in regulatory policy or views during the period of product marketing, product development or the period of review of any application for regulatory approval or clearance for a product. Delays in obtaining regulatory approvals would adversely affect the marketing of any products developed by us, impose significant additional costs on us, diminish any competitive advantages that we may otherwise have attained and adversely affect our ability to receive royalties and generate revenues and profits. Accordingly, despite our expenditures and investment of time and effort, we may be unable to receive required regulatory approvals for product candidates. Obtaining regulatory approvals for our products does not ensure we will be granted renewals of these approvals. There is no guarantee that we will obtain the necessary renewals for any of our current marketing authorizations. Failure to obtain the necessary renewals for our current products and marketing authorizations could have a material adverse effect on our business.

We are also subject to numerous federal, provincial, state and local laws, regulations and recommendations relating to safe working conditions, laboratory and manufacturing practices, the experimental use of animals, the environment and the use and disposal of hazardous substances used in connection with our research and development work. Although we have not yet been required to expend identifiable additional resources to comply with these regulations, the extent of government regulations may change in a manner which could have an adverse effect on the discovery, development, production, manufacturing, sales, marketing and distribution of our products, and we may be required to incur significant additional costs to comply with future laws or regulations. We cannot predict whether or not regulatory approvals will be obtained for the products we develop or, in the case of products that have been approved in one or more jurisdictions, that those products will be approved in other jurisdictions as well. Compounds developed by us, alone or with other parties, may not prove to be safe and effective in clinical trials and may not meet all of the applicable regulatory requirements needed to receive marketing approval.

Administering any of our product candidates to humans may produce undesirable side effects. These side effects could interrupt, delay or halt clinical trials of our product candidates and could result in the applicable regulatory authorities denying approval of our product candidates for any or all of the targeted indications. If regulatory approval for a product is granted, the approval will be limited to those disease states and conditions for which the product is demonstrated through clinical trials to be safe and effective, and any approval granted may be too narrow to be commercially viable.

**Any of our product candidates that receive regulatory approval could be subject to extensive post-authorization obligations that can affect sales, marketing and profitability.**

With respect to any drug candidates for which we obtain regulatory approval, we will be subject to post-marketing regulatory obligations, including the requirements by the FDA, EMA and similar agencies in other jurisdictions to maintain records regarding product safety and to report to regulatory authorities adverse reactions. Any post-approval commitments required by the regulatory agencies as a condition of approval, such as

registration studies, may not be feasible. The occurrence of unanticipated serious adverse reactions or other safety problems could cause the governing agencies to impose significant restrictions on the indicated uses for which the product may be marketed, impose other restrictions on the distribution or sale of the product or require potentially costly post-approval studies. In addition, post-market discovery of previously unknown safety problems or increased severity or significance of a pre-existing safety signal could result in withdrawal of the product from the market and product recalls. Compliance with extensive post-marketing record keeping and reporting requirements requires a significant commitment of time and funds, which may limit our ability to successfully commercialize approved products.

25

Table of Contents

In addition, manufacturing of approved drug products must comply with extensive regulations governing current good manufacturing practices. Manufacturers and their facilities are subject to continual review and periodic inspections. Failure to comply with good manufacturing practices requirements could result in a suspension of manufacturing, product recalls or even withdrawals from the market. As we will be dependent on third parties for manufacturing, we will have limited ability to ensure that any entity manufacturing products on our behalf is doing so in compliance with applicable good manufacturing practices requirements. Failure or delay by any manufacturer of our products to comply with good manufacturing practices regulations or to satisfy regulatory inspections could have a material adverse effect on us, including potentially preventing us from being able to supply products for clinical trials or commercial sales. In addition, manufacturers may need to obtain approval from regulatory authorities for product, manufacturing, or labelling changes, which requires time and money to obtain and can cause delays in product availability. We are also required to comply with good distribution practices such as maintenance of storage and shipping conditions, as well as security of products, in order to ensure product quality determined by good manufacturing practices is maintained throughout the distribution network. Further, with the implementation of the Falsified Medicines Directive in Europe, in February 2019, all of Correvio supplies will be required to confirm to anti-tampering packaging requirements and serialization requirements. We are reliant on our secondary packagers, labelers, wholesalers and distributors to implement packaging requirements appropriately and within the requisite time period. We are further reliant on the national medicines verification organizations ("NMVOs") and the European medicines verification organization ("EMV") and pharmacies, hospitals and end-users having established compliance systems to allow for tracking of supplies, including sales and returns, in relation to the anti-tampering packaging and serialization requirements. As we will be dependent on NMVOs, the EMV and end-users having established the necessary compliance systems to allow tracking of supplies, we will have limited ability to ensure these processes are in compliance with applicable requirements of the Falsified Medicines Directive. In addition, we are subject to regulations governing the import and export of our products.

Sales and marketing of pharmaceutical products are subject to extensive federal and state laws governing on-label and off-label advertising, scientific/educational grants, gifts, consulting and pricing. Sales, marketing and pricing activities are also potentially subject to federal and state consumer protection and unfair competition laws. Compliance with extensive regulatory requirements requires training and monitoring of the sales force, which imposes a substantial cost on us and our collaborators. To the extent our products are marketed by our collaborators, our ability to ensure their compliance with applicable regulations will be limited. In addition, we are subject to regulations governing the design, testing, control, manufacturing, distribution, labelling, quality assurance, packaging, storage, shipping, import and export of our products and product candidates. Failure to comply with applicable legal and regulatory requirements may result in negative consequences to us, including but not limited to:

- issuance of warning letters by the FDA or other regulatory authorities;

- fines and other civil penalties;

- criminal prosecutions;

- injunctions, suspensions or revocations of marketing licenses;

- refusals to renew our current marketing authorizations;

- suspension of any ongoing clinical trials;

- suspension of manufacturing;

- delays in commercialization;

- refusal by the FDA or other regulators to approve pending applications or supplements to approved applications filed by us or our collaborators;

- refusals to permit products to be imported or exported to or from the United States, Europe or others;

- refusal by Qualified Person in Europe to release product to market;

- restrictions on operations, including costly new manufacturing requirements; and

- product recalls or seizures.

26

Table of Contents

In the future, the regulatory climate might change due to changes in the FDA and other regulatory authorities' staffing, policies or regulations and such changes could impose additional post-marketing obligations or restrictions and related costs. While it is impossible to predict future legislative or administrative action, if we are not able to maintain regulatory compliance, we will not be able to market our drugs and our business could suffer.

**Obtaining regulatory approval in the European Union does not ensure we will obtain regulatory approval in other countries.**

We aim to obtain regulatory approval for our drug candidates in the United States and the European Union, as well as in other countries. To obtain regulatory approval to market any FDA or EMA approved products outside of the United States or European Union, as the case may be, we must comply with numerous and varying regulatory requirements in other countries regarding safety and efficacy. Approval procedures vary among countries and can involve additional product testing and additional administrative review periods. The time required to obtain approval in other countries might differ from that required to obtain FDA or EMA approval. The regulatory approval process in other countries may include all of the risks associated with FDA or EMA approval as well as additional, presently unanticipated risks. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. Failure to obtain regulatory approval in other countries or any delay or setback in obtaining such approval could have the same adverse effects associated with regulatory approval in the United States or the European Union, including the risk that our product candidates may not be approved for all indications requested or that such approval may be subject to limitations on the indicated uses for which the product may be marketed. In addition, any approved products will be subject to post-marketing regulations related to manufacturing standards, facility and product inspections, labelling and possibly sales and marketing.

Failure to comply with applicable regulatory requirements in other countries can result in, among other things, warning letters, fines, injunctions, civil penalties, recall or seizure of products, total or partial suspension of production, refusal of the government to renew marketing applications or criminal prosecution.

**Our business depends heavily on the use of information technologies.**

Several key areas of our business depend on the use of information technologies, including sales and marketing, production, manufacturing and logistics, as well as clinical and regulatory matters. Despite our best efforts to prevent such behavior, third parties may nonetheless attempt to hack into our systems and obtain data relating to our pre-clinical studies, clinical trials, patients using our products or our proprietary information on our products. If we fail to maintain or protect our information systems and data integrity effectively, we could lose existing customers, have difficulty attracting new customers, have problems in determining product cost estimates and establishing appropriate pricing, have difficulty preventing, detecting, and controlling fraud, have disputes with customers, physicians, and other health care professionals, have regulatory sanctions or penalties imposed, have increases in operating expenses, incur expenses or lose revenues as a result of a data privacy breach, or suffer other adverse consequences. While we have invested in the protection of data and information technology, there can be no assurance that our efforts, or those of our third-party collaborators, if any, or manufacturers, to implement adequate security and quality measures for data processing would be sufficient to protect against data deterioration or loss in the event of a system malfunction, or to prevent data from being stolen or corrupted in the event of a security breach. Any such loss or breach could have a material adverse effect on our business, operating results and financial condition.

**The United Kingdom's exit from the European Union may result in regulatory costs and challenges that could have a material adverse impact on our business.**

On June 23, 2016, the United Kingdom held a referendum on its membership in the European Union, in which United Kingdom voters approved an exit from the European Union ("Brexit"). On March 29, 2017, the United Kingdom formally notified the European Council pursuant to Article 50 of the Treaty of Lisbon of its intention to leave the European Union. On January 31, 2020, the United Kingdom ceased to be a member state of the European Union. European Union law applicable to the United Kingdom continues to apply to and in the United Kingdom for the duration of a transition period which is presently scheduled to expire on December 31, 2020 (the "Transition Period"). During the Transition Period, the European Union and the United Kingdom will negotiate the terms of their future relationship. There is no assurance that such negotiations will be successful or certainty that European Union law will continue to apply in and to the United Kingdom following the expiration of the Transition Period. Since the regulatory framework for pharmaceutical products in the United Kingdom covering quality, safety and efficacy, clinical trials, marketing authorizations, commercial sales and distribution is derived from European Union directives and regulations, Brexit could materially impact the future regulatory regime which applies to our products and the approval of our product candidates in the United Kingdom. We could face new regulatory, supply chain and operational costs and challenges that could have a material adverse effect on our business, financial condition, cash flows and results of operations. Until the expiration of the Transition Period and the future relationship between the European Union and the United Kingdom is established, it is difficult to anticipate Brexit's potential impact.

27

Table of Contents

**There can be no certainty that all conditions precedent to the Proposed Arrangement will be satisfied.**

The completion of the Proposed Arrangement is subject to a number of conditions precedent, some of which are outside of our control, including receipt of court orders. There can be no certainty, nor can we provide any assurance, that these conditions will be satisfied or, if satisfied, when they will be satisfied. If the Proposed Arrangement is not completed, the announcement of the Proposed Arrangement and the dedication of substantial resources to the completion thereof could have a negative effect on our current business relationships. In addition, the market price of our shares may decline if, for any reason, the ADVANZ Arrangement Agreement is terminated, whether or not we are required to pay a termination fee to ADVANZ PHARMA.

**We may face continuing risks if the Proposed Arrangement is not completed.**

If the Proposed Arrangement is not approved by securityholders or if the Proposed Arrangement is not completed for any other reason, it is expected that management will operate our business in a manner similar to that in which it is being operated today and securityholders will continue to be subject to the same risks to which they are currently subject. In connection with and prior to entering into the ADVANZ Arrangement Agreement, on March 12, 2020, we entered into the fourth amending agreement to the CRG Term Loan. Pursuant to such amendment, CRG has waived, for a period of

time only, certain liquidity covenants otherwise applicable to us. Such waiver period will end on the earlier to occur of June 30, 2020 and the termination of the ADVANZ Arrangement Agreement. Therefore, if the Proposed Arrangement is not completed for any reason, or is not completed prior to June 30, 2020 (the "Outside Date"), we will likely be offside of our obligations under the CRG Term Loan. CRG could thereafter take certain enforcement action against us. After the Outside Date, there can be no assurance that we will have sufficient liquidity to satisfy our obligations to CRG or otherwise.

**Management time and attention may be diverted from our existing business.**

Significant management time and attention will be diverted from our existing business in order to undertake the Proposed Arrangement, which could have an adverse impact on us. For example, if management's attention is diverted from day-to-day operations, customers and suppliers could seek to adversely modify or terminate their existing relationships with us.

**Completion of the Proposed Arrangement is subject to the condition that a material adverse effect has not occurred**

The completion of the Proposed Arrangement is subject to the condition that, among other things, there shall not have occurred a Material Adverse Effect (as defined in the ADVANZ Arrangement Agreement) on or prior to the date of the ADVANZ Arrangement Agreement which is continuing as at the effective date of the Proposed Arrangement and since the date of the ADVANZ Arrangement Agreement, there has not occurred a Material Adverse Effect. Although a Material Adverse Effect excludes certain events, including events in some cases that are beyond our control, there can be no assurance that a Material Adverse Effect will not occur prior to the effective time of the Proposed Arrangement. If such a Material Adverse Effect occurs and ADVANZ PHARMA does not waive same, the Proposed Arrangement would not proceed.

28

Table of Contents

**Failure to complete the Proposed Arrangement could negatively impact our future business, operations and the price of our common shares.**

If the Proposed Arrangement is not completed for any reason, the market price for our common shares may decline if, for any reason, the ADVANZ Arrangement Agreement is terminated, whether or not we are required to pay a termination fee to ADVANZ PHARMA. In addition, our clients and strategic partners, in response to the announcement of the Proposed Arrangement, may delay or defer decisions concerning us. Any delay or deferral in those decisions by clients and/or strategic partners could have a material adverse effect on our business and operations if the Proposed Arrangement is not completed. Similarly, current and prospective employees and registered representatives may experience uncertainty about future roles with us and this may adversely affect our ability to attract or retain key management, sales, marketing and registered personnel in the event the Proposed Arrangement is not completed.

**ITEM 4.        INFORMATION ON THE COMPANY**

**A.   History and Development of the Company**

**Corporate History**

We were incorporated on March 7, 2018, under the laws of the *Canada Business Corporations Act* (the "CBCA"), in connection with a reorganization of Cardiome Pharma Corp. ("Cardiome"), by way of a plan of arrangement, see "*Arrangement Agreement with Cipher*" below.

On March 15, 2020, we entered into an arrangement agreement (the "ADVANZ Arrangement Agreement") with ADVANZ PHARMA Corp. Limited ("ADVANZ PHARMA") and Mercury Pharma Group Limited ("Mercury"), pursuant to which ADVANZ PHARMA's wholly-owned subsidiary Mercury has agreed to acquire all of the issued and outstanding common shares of Correvio by way of a court approved plan of arrangement under the CBCA (the "Proposed Arrangement"). The total purchase price of the Proposed Arrangement is approximately $76 million, which includes the repayment of Correvio's outstanding debt of approximately $48 million. Under the terms of the Proposed Arrangement, ADVANZ PHARMA will be paying $0.42 per common share of Correvio (the "Consideration"), subject to applicable withholdings. ADVANZ PHARMA intends to pay for the acquisition of Correvio with cash on hand.

Our registered office is located at Suite 2600, 595 Burrard Street, Three Bentall Centre, Vancouver, British Columbia, Canada, V7X 1L3 and our head office and principal place of business are located at 1441 Creekside Drive, 6th Floor, Vancouver, British Columbia, Canada, V6J 4S7. Our telephone number is 1-604-677-6905.

We have appointed CT Corporation System as our agent for service of process in the United States. CT Corporation System's head office is located at 111 Eighth Avenue, New York, New York, United States, 10011.

Our common shares trade on the TSX and on the Nasdaq under the symbol "CORV."

The SEC maintains a website (http://www.sec.gov) that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC, including us. Such reports, proxy and information statements can also be found on our website, www.correvio.com.

**Corporate Overview**

We are a specialty pharmaceutical company dedicated to offering patients and healthcare providers innovative therapeutic options that effectively, safely, and conveniently manage acute medical conditions to improve health and quality of life. We strive to find innovative, differentiated medicines that provide therapeutic and economic value to patients, physicians and healthcare systems. We currently have two marketed, in-hospital cardiology products in Europe and other territories outside of the United States, AGGRASTAT and BRINAVESS. In addition, we have licensed the

marketing rights to the following products outside of the United States: a development stage drug/device combination product candidate, TREVYENT; an antibiotic, XYDALBA; and a cephalosporin antibiotic, ZEVTERA/MABELIO.

AGGRASTAT (tirofiban hydrochloride) is a reversible GP IIb/IIIa inhibitor (an intravenous anti-platelet drug) for use in patients with Acute Coronary Syndrome ("ACS"). AGGRASTAT is commercially available in markets outside of the United States and is currently registered and approved in more than 60 countries worldwide.

29

Table of Contents

BRINAVESS (vernakalant (IV)) is a novel, atrial-preferential antiarrhythmic agent, which was approved in the European Union in September 2010 and is currently registered and approved in over 40 countries (not including the United States) for the rapid conversion of recent onset atrial fibrillation ("AF") to sinus rhythm in adults, for non-surgery patients with AF of seven days or less and for use in post-cardiac surgery patients with AF of three days or less. BRINAVESS is mentioned as a first-line therapy in the European Society of Cardiology AF guidelines for the cardioversion of recent onset AF in patients with no, or minimal/moderate, structural heart disease.

Both AGGRASTAT and BRINAVESS are commercially available outside of the United States, through our own direct sales force within Europe as well as through our global distributor and partner network in the Middle East, Latin America, Asia and Africa. We have a comprehensive global distributor and partner network that allows our products to be commercialized in many countries worldwide.

XYDALBA was approved by the European Medicines Agency (the "EMA") in February 2015 as a treatment for Acute Bacterial Skin and Skin Structure Infections ("ABSSSI") in adults. Dalbavancin is commercialized under the trade name XYDALBA in certain countries outside the United States and Dalvance® in the United States. We have launched XYDALBA commercially in Germany, the United Kingdom, France, Ireland, Finland, Luxembourg, the Netherlands, Spain and Sweden.

ZEVTERA/MABELIO is a cephalosporin antibiotic for intravenous administration with rapid bactericidal activity against a wide range of Gram-positive and Gram-negative bacteria, including methicillin-susceptible and resistant Staphylococcus aureus (MSSA, MRSA) and susceptible Pseudomonas spp. ZEVTERA/MABELIO is currently approved for sale in 13 European countries and several non-European countries for the treatment of adult patients with community-acquired pneumonia (CAP) and hospital-acquired pneumonia (HAP), excluding ventilator-associated pneumonia (VAP). ZEVTERA/MABELIO is currently marketed in Germany, Italy, the United Kingdom, France, Austria, Spain and Switzerland.

TREVYENT is a development stage drug/device combination product that combines SteadyMed Ltd's ("SteadyMed") PatchPump™ technology, a drug delivery device, with treprostinil, a vasodilatory prostacyclin analogue to treat pulmonary arterial hypertension ("PAH"). PatchPump™ is a proprietary, disposable, parenteral drug administration platform that is prefilled and preprogrammed at the site of manufacture. SteadyMed was acquired by United Therapeutics on August 30, 2018. United Therapeutics controls the marketing, registration and regulatory approvals of TREVYENT in the United States.

**Recent Developments**

*Proposed Arrangement*

Further to our plans to explore strategic options to maximize stakeholder value, at the direction of our Board of Directors (the "Board"), Piper Sandler & Co. commenced their initial outreach to prospective bidders on January 7, 2020 and sent process letters to 80 potential bidders in connection with a sale process targeted at canvassing selected potential buyers about their interest in pursuing an acquisition transaction involving the Company, of which 32 executed non-disclosure agreements in order to pursue further discussions with us. Such parties were given access to the virtual data room established by us.

As part of the Proposed Arrangement, (i) each holder of an in-the-money share purchase option of Correvio that is outstanding immediately prior to the effective time of the Proposed Arrangement will be acquired for cancellation in consideration for a cash payment equal to the product obtained by multiplying the amount by which the Consideration exceeds the exercise price per share of such in-the-money option by the number of shares underlying such option, subject to applicable withholdings; (ii) each holder of a restricted share unit or phantom share unit of Correvio that is outstanding immediately prior to the effective time will be acquired for cancellation for a cash payment equal to the Consideration, subject to applicable withholdings; and (iii) all out-of-the-money share purchase options of Correvio will be cancelled for no consideration.

A meeting of Correvio securityholders will be held on May 15, 2020 for such securityholders to consider and, if deemed advisable, approve the Proposed Arrangement. Closing is subject to obtaining such securityholder approval, obtaining a final order approving the Proposed Arrangement from the Supreme Court of British Columbia, and certain other customary conditions as set out in the ADVANZ Arrangement Agreement. The Supreme Court of British Columbia granted an interim order approving the Proposed Arrangement on April 6, 2020.

30

Table of Contents

Each of Correvio, Mercury and ADVANZ have provided representations and warranties customary for a transaction of this nature and Correvio has provided customary interim period covenants regarding the operation of its business in the ordinary course during such period. In addition, Correvio has agreed to certain non-solicitation covenants and has agreed to pay a termination fee of $3.5 million in the event that it accepts a superior proposal, changes its recommendation that Correvio securityholders vote in favor of the Proposed Arrangement or in certain other circumstances,

subject to certain customary exceptions.

In connection with the Proposed Arrangement and subject to closing, Correvio will apply to have its shares delisted from the TSX and the Nasdaq and Correvio will cease to be a reporting issuer under Canadian and U.S. securities law.

The Board unanimously approved the Proposed Arrangement, which remains subject to approval by Correvio securityholders. The Board received an opinion from its financial advisor, Piper Sandler & Co., that subject to the assumptions and limitations contained therein, the Proposed Arrangement is fair, from a financial point of view, to the shareholders.

The foregoing description of the Proposed Arrangement is qualified in all respects by the full text of the ADVANZ Arrangement Agreement.

*Amended Term Loan Agreement with CRG Servicing LLC*

On May 11, 2017, we amended the terms of our term loan agreement (the "first amendment") with CRG managed funds (the "CRG Term Loan"). Under the terms of the amended agreement, up to $50.0 million is available to us consisting of four tranches bearing interest at 13% per annum. The first tranche of $20.0 million was drawn on June 13, 2016, when we entered into the original term loan agreement and was used to extinguish existing long-term debt and for general corporate purposes. A second tranche of $10.0 million was drawn on the date of the first amendment. A third tranche of $10.0 million was drawn on August 8, 2017. The fourth tranche was never drawn. The loan matures on March 31, 2022. Under the terms of the amended agreement, an interest-only period is provided such that principal repayment begins in June 2020.

Under the first amendment, interest is payable on a quarterly basis through the full term of the loan. Interest payments may be split, at our option, between 9% per annum cash interest and 4% per annum paid in-kind interest in the form of additional term loans until March 31, 2020. Subsequent to March 31, 2020, interest shall be payable entirely in cash. On the maturity date, a back-end facility fee of 8% of the aggregate amount of the term loan, including any paid in-kind interest, will be payable to CRG. During the year ended December 31, 2019, we accrued in-kind interest of $1.7 million.

In consideration for entering into the first amendment, 700,000 warrants with a strike price of $4.00 per common share were issued to CRG as of the date of the first amendment. The warrants may also be exercised on a "net" or "cashless" basis and have a term of five (5) years.

We are required to meet certain annual revenue covenants, starting with the year ending December 31, 2016. If the revenue covenants are not met, we may exercise a cure right within 90 days of year-end by issuing additional common shares in exchange for cash or by borrowing subordinated debt in an amount equal to two times the difference between the minimum required revenue and our revenue. The cash received from the cure right would be used to repay the principal.

On March 27, 2018, we entered into an agreement with CRG to amend the terms of the loan to adjust the annual revenue covenants (the "second amendment") under the CRG Term Loan. In consideration for the second amendment, we issued 800,000 warrants with a strike price of $2.50 per common share to CRG as of the date of the second amendment. The warrants may also be exercised on a "net" or "cashless" basis and have a term of five (5) years.

On May 15, 2018, the CRG Term Loan was amended in connection with the Cipher Arrangement; the borrower named in the CRG Term Loan was amended from Cardiome to Correvio.

31

**Table of Contents**

On March 11, 2019, we announced that CRG provided us with an additional credit facility of $10.0 million, to be drawn at our discretion, in increments of $2.5 million through September 30, 2019, subject to the achievement of certain revenue and market capitalization requirements. The facility bore interest at 13% per annum and carried the same terms and conditions as the CRG Term Loan. No funds were drawn under the additional credit facility.

On December 17, 2019, we further amended the CRG Term Loan, such that certain product rights could be sold. Upon receiving proceeds from the sale of these product rights, on March 9, 2020, we made a repayment of $2.0 million to CRG, of which $1.8 million related to a prepayment of principal, $0.1 million related to the back-end facility fee of 8% applicable to the prepayment, and $0.1 million related to interest expense and prepayment fees.

On March 12, 2020, we entered into an agreement with CRG to amend certain covenants related to the CRG Term Loan, including lowering the annual revenue covenant threshold for 2019 from US$36.0 million to US$32.0 million. As a result of the retrospective amendment to the annual revenue covenant, we were in compliance with all covenants for the year ended December 31, 2019.

We are also required to meet an ongoing minimum liquidity covenant. As part of the amendment in the first quarter of 2020 described above, the minimum liquidity covenant was also waived for a certain period of time Such waiver period will end on the earlier of June 30, 2020 and the termination of the ADVANZ Arrangement Agreement (as defined herein). As of the date of this Annual Report, we are in compliance with the amended minimum liquidity covenant.

*Nasdaq Notification Regarding Deficiencies in Minimum Bid Price and Market Value of Listed Securities*

On January 24, 2020, the Nasdaq sent us a notification letter stating that we were not in compliance with the minimum bid price per share for our ordinary shares. Nasdaq Listing Rule 5550(a)(2) requires listed securities to maintain a minimum bid price of US$1.00 per share, and Nasdaq Listing

Rule 5810(c)(3)(A) provides that a failure to meet the minimum bid price requirement exists if the deficiency continues for a period of 30 consecutive business days. Based on the closing bid price of our common shares for the 30 consecutive business days from December 10, 2019, we no longer meet the minimum bid price requirement. In accordance with Nasdaq Listing Rule 5810(c)(3)(A), we have been provided 180 calendar days, or until July 22, 2020, to regain compliance with Nasdaq Listing Rule 5550(a)(2). To regain compliance, our common shares must have a closing bid price of at least US$1.00 for a minimum of 10 consecutive business days. In the event that we do not regain compliance by July 22, 2020, we may be eligible for additional time to regain compliance or may face delisting.

On January 27, 2020, Nasdaq sent us a notification letter stating that we were not in compliance with the minimum market value requirements set forth in the Nasdaq Listing Rules. Nasdaq Listing Rule 5550(b)(2) requires companies to maintain a minimum market value of US$35 million, and Nasdaq Listing Rule 5810(c)(3)(C) provides that a failure to meet the market value requirement exists if the deficiency continues for a period of 30 consecutive business days. Based on our market value for the 30 consecutive business days from December 10, 2019 to January 24, 2020, we no longer meet the minimum market value requirement. In accordance with Nasdaq Listing Rule 5810(c)(3)(C), we have been provided 180 calendar days, or until July 27, 2020, to regain compliance with Nasdaq Listing Rule 5550(b)(2). To regain compliance, our market value must exceed US$35 million for a minimum of 10 consecutive business days. In the event that we do not regain compliance by July 27, 2020, we may be eligible for additional time to regain compliance or may face delisting.

The notification letters do not impact our listing on the Nasdaq at this time. Due to the impact of the COVID-19 pandemic on the economy, on April 17, 2020, the Nasdaq extended the foregoing time period to regain compliance to October 5, 2020. We intend to monitor the closing bid price between now and October 5, 2020 and intend to cure the deficiencies within the prescribed compliance periods. We expect that our common shares will continue to be listed and trade on the Nasdaq during these compliance periods. Our business operations are not affected by the receipt of the notification letters. We are also listed on the TSX and the notification letters do not affect our compliance status with such listing.

**Capital Expenditures and Divestitures**

Our business is not capital intensive. Our main focus is actively seeking to acquire the commercial rights to acute care, in-hospital products outside of North America.

32

Table of Contents

As discussed above, we entered into the ADVANZ Arrangement Agreement to sell all our issued and outstanding common shares to Mercury, a wholly-owned subsidiary of ADVANZ PHARMA, see "*Proposed Arrangement*." We also previously entered into the Arrangement Agreement (the "Cipher Arrangement Agreement") to divest our Canadian pharmaceutical business to Cipher Pharmaceuticals Inc. ("Cipher") in exchange for Cdn.$25.5 million (the "Cipher Arrangement"), see "*Arrangement Agreement with Cipher*."

**B.   Business Overview**

**Introduction**

We are a specialty pharmaceutical company dedicated to offering patients and healthcare providers innovative therapeutic options that effectively, safely, and conveniently manage acute medical conditions to improve health and quality of life. We strive to find innovative, differentiated medicines that provide therapeutic and economic value to patients, physicians and healthcare systems. We currently have two marketed, in-hospital cardiology products in Europe and other territories outside of the United States, AGGRASTAT and BRINAVESS. In addition, we have licensed the marketing rights to the following products outside of the United States: a development stage drug/device combination product candidate, TREVYENT; an antibiotic, XYDALBA; and a cephalosporin antibiotic, ZEVTERA/MABELIO.

**Our Strategy**

Our core strategy is to offer patients and healthcare providers innovative therapeutic options that effectively, safely, and conveniently manage acute medical conditions to improve health and quality of life. We strive to find innovative, differentiated medicines that provide therapeutic and economic value to patients, physicians and healthcare systems. Key elements of our strategy include:

- *Successfully commercializing XYDALBA in currently approved countries and seeking approvals in additional countries.* We intend to launch XYDALBA in countries where we have received approval to sell. We have launched XYDALBA commercially in Germany, the United Kingdom, France, Ireland, Finland, Luxembourg, the Netherlands, Spain and Sweden.

- *Successfully commercializing ZEVTERA/MABELIO in currently approved countries and seeking approvals in additional countries.* We intend to launch ZEVTERA/MABELIO in countries where we have received approval to sell. Initially, we intend to focus our sales efforts on launching ZEVTERA/MABELIO in Germany, Italy, the United Kingdom, France, Austria, Spain and Switzerland through our direct sales force.

- *Continuing to support the marketing of AGGRASTAT.* We intend to continue to sell AGGRASTAT in countries where it is presently approved, marketed and reimbursed for as long as these markets are economically viable. Further, we are seeking the approval of governmental authorities to expand the indications for which we may market AGGRASTAT through extension of the indication statement for AGGRASTAT to include "the reduction of major cardiovascular events in patients with acute myocardial infarction (ST-elevated myocardial infarction) intended for primary percutaneous coronary intervention." AGGRASTAT has already been granted this expanded label in some countries.

- *Attaining Approval to Commercialize TREVYENT in Europe and the Middle East.* We licensed TREVYENT from SteadyMed for marketing outside the United States, and are re-evaluating timing of European regulatory filings based on United Therapeutics US NDA plans.

- *Successfully commercializing BRINAVESS in currently approved countries.* We intend to continue to sell BRINAVESS in countries where it is presently approved, marketed and reimbursed. We intend to focus our sales efforts on promoting BRINAVESS product sales in Europe via a fully dedicated direct sales force. We also intend to seek reimbursement in countries where the product has regulatory approval but has not launched in order to broaden the commercial opportunities for BRINAVESS.

33

Table of Contents

- *Exploring strategic opportunities to expand our product offering and product pipeline through in-licensing and/or acquisitions or opportunities to advance our products or realize value through dispositions or fundamental transactions.* We continuously evaluate in-licensing and acquisition opportunities that complement our product and operational capabilities. As well, from time to time, we may evaluate potential partnerships, strategic collaborations, out-licensing or dispositions to realize value or generate resources to advance certain of our products. At any given time, we may have entered into confidentiality agreements, non-binding letters of intent or may be in the process of conducting or being subject to due diligence with respect to potential strategic opportunities. Priority for in-licensing or acquisitions will be given to later-stage or approved product opportunities that could be sold through our existing European in-hospital acute care sales force. Priority for strategic collaborations or out-licensing or dispositions would be given to parties with experience in, and resources for, the late-stage development and/or marketing of drugs in our therapeutic areas, and priority for dispositions or fundamental transactions would be given to parties with adequate resources and acceptable completion risk.

- *Leveraging external resources.* We focus our internal resources on those activities that we believe add or create the most value. We maintain a core team of professionals, consultants and staff with the necessary skill base for our operations, and contract out the specialized work required, such as pharmacovigilance, regulatory matters, medical information systems, commercial manufacturing and distribution to external organizations.

## Our Products and Product Candidates

### AGGRASTAT for Acute Coronary Syndrome

AGGRASTAT contains tirofiban hydrochloride, which is a reversible GP IIb/IIIa inhibitor for use in indicated ACS patients. AGGRASTAT is used to help assist the blood flow to the heart and to prevent chest pain and/or heart attacks (both STEMI – ST-elevation myocardial infarction, and NSTE-ACS – non-ST-elevation acute myocardial infarction). It works by preventing platelets, cells found in the blood, from forming into blood clots within the coronary arteries and obstructing blood flow to the heart muscle which can result in a heart attack. The medicine may also be used in patients whose heart vessels are dilated with a balloon (percutaneous coronary intervention), a procedure used to open up blocked or obstructed arteries in the heart in order to improve the blood flow to the heart muscle (myocardium) with or without the placement of a coronary stent. AGGRASTAT is administered intravenously and has been on the market for many years.

We have exclusive global marketing rights to AGGRASTAT outside of the United States. Tirofiban hydrochloride was first approved in the United States in 1998, and to date is authorized in more than 70 countries worldwide, including almost all European Union and European Economic Area ("EEA") member states.

The original indication approved for AGGRASTAT was for the management of patients with unstable angina or non-Q-wave myocardial infarction, including patients who may subsequently undergo percutaneous transluminal coronary angioplasty, to decrease the rate of refractory ischemic conditions, new myocardial infarction and death.

### Extension of Indication

Since the original approvals of tirofiban hydrochloride, evidence emerged as result of a number of independent studies indicating that a higher degree of platelet inhibition was beneficial for patients in need of an urgent PCI and thus at a high risk for ischaemic events. When PCI is performed urgently, as in high risk non-ST elevation acute coronary syndrome ("NSTE-ACS") or STEMI patients, platelet inhibition must be achieved rapidly and to a high degree. Consequently, a number of investigator-initiated studies demonstrated the clinical benefit of tirofiban hydrochloride using a high dose bolus ("HDB") regimen employing a bolus of 25 mcg/kg administered over three minutes followed by a maintenance infusion of 0.15 mcg/kg/min in patients with ACS who undergo PCI early.

The original indication terminology was no longer in common use and described a population of ACS patients including those with unstable angina and NONSTEMI, but not STEMI. Therefore, in the interest of aligning the current label for tirofiban hydrochloride with the most recent evidence and actual clinical use, Correvio extended the therapeutic indication to include treatment of patients with STEMI intended for primary PCI and to add HDB as the appropriate dosing regimen.

34

Table of Contents

In the European Union, a variation for the introduction of the HDB tirofiban hydrochloride regimen and concomitant use of oral antiplatelet drugs was approved in September 2010. The data for the approval of the HDB regimen was derived from independent investigator-initiated studies including patients with UA/NONSTEMI and STEMI. The European Union approval of the indication for patients suffering from STEMI with the intention to undergo primary PCI was granted in October 2013. In Switzerland, a combined variation extending the indication to STEMI patients and recommending the HDB regimen for NSTE-ACS patients undergoing PCI within four hours and STEMI primary PCI patients, was approved by Swiss regulatory authorities in December 2014.

In October 2013, the United States AGGRASTAT label was updated to include the HDB posology. At the same time, the indication statement was refined to "AGGRASTAT is indicated to reduce the rate of thrombotic cardiovascular events (combined endpoint of death, myocardial infarction, or refractory ischemia/repeat cardiac procedure) in patients with NSTE-ACS."

In December 2017, we announced the signing of a license and distribution agreement with ZAO Firma Euroservice that will advance AGGRASTAT towards registration and commercialization in Russia.

Applications for the extension of the indication statement for AGGRASTAT are continuing worldwide. In January 2018, we announced a label expansion for AGGRASTAT in China to include patients with STEMI. In addition, a high dose bolus regimen for AGGRASTAT was approved in China.

On March 10, 2020, we announced that we entered into an exclusive agreement with Hong Kong Teson Pharma Limited ("Teson") for the commercialization of AGGRASTAT. The agreement covers the territories of mainland China (excluding Taiwan and Hong Kong) and Macau. Under the terms of the agreement, we received a one-time upfront payment of $3.0 million from Teson. We are eligible to receive up to an additional $0.5 million upon Teson's first receipt of product, which is anticipated to occur in 2020. In exchange, Teson will receive exclusive rights to commercialize AGGRASTAT in the agreed to territories, at its own cost and expense.

*BRINAVESS for Atrial Fibrillation*

BRINAVESS contains vernakalant hydrochloride, which is an antiarrhythmic medicine that acts preferentially in the atria to prolong atrial refractoriness and to rate-dependently slow impulse conduction and has been approved for the conversion of atrial fibrillation to sinus rhythm.

AF is the most common cardiac arrhythmia (abnormal heart rhythm). It is characterized by an erratic and often rapid heart rate where the electrical activity of the heart's two small upper chambers (the atria) are not coordinated, resulting in inefficient pumping of blood and an increased risk of developing a blood clot in the heart, which could lead to embolic stroke. If a blood clot in the atria leaves the heart, enters the circulation, and becomes lodged in an artery in the brain, a stroke may result. Approximately 15% of all strokes occur in people with AF.

The risk of developing AF increases with age. The lifetime risk of developing AF at age 55 has been estimated at 24% in men and 22% in women. In addition, during the past 20 years, there has been a 60% increase in hospital admissions for atrial fibrillation independent of changes in known risk factors. Third-party research estimates that 5.5 million patients are treated for atrial fibrillation in the seven leading industrialized nations each year.

*North America*

In December 2006, our former partner, Astellas Pharma US, Inc. ("Astellas"), filed a New Drug Application ("NDA") for vernakalant with the FDA. In August 2008, Astellas received an action letter from the FDA, informing Astellas that the FDA had completed its review of the NDA for vernakalant (IV) and that the application was approvable. The letter requested additional information associated with the risk of previously identified events experienced by a subset of patients during the clinical trials as well as a safety update from ongoing or completed studies of vernakalant (IV), regardless of indication, dosage form or dose level. The action letter further indicated that if the response to their requests was not satisfactory, additional clinical studies may be required.

In August 2009, we, together with our former partner Astellas, announced that Astellas would undertake a single confirmatory additional Phase 3 clinical trial ("ACT 5") under a Special Protocol Assessment. The decision to conduct another trial was reached following extended discussions between Astellas and the FDA to define the best regulatory path forward for vernakalant (IV). ACT 5 began enrollment of recent onset AF patients without a history of heart failure in October 2009.

Table of Contents

In October 2010, a clinical hold was placed on the ACT 5 study by the FDA following a single unexpected serious adverse event of cardiogenic shock experienced by a patient with AF who received vernakalant (IV). The ACT 5 study was terminated. The FDA-mandated clinical hold on the vernakalant (IV) program remains in effect in the United States.

In 2013, when sponsorship of the U.S. Investigational New Drugs ("INDs") for vernakalant (IV) and vernakalant (oral) and the NDA for vernakalant (IV) were transferred to us from Merck, we initiated discussions with the FDA to determine the next steps for the development of vernakalant (IV) in the United States.

Following completion of additional nonclinical studies in 2017, we proposed resubmission of the NDA based on six years of accumulated safety data from sales of BRINAVESS in 33 countries, augmented by interim results from over 1,100 patients enrolled in the PASS being conducted in Europe, *SPECTRUM (PASS)*. In August 2017, we received the FDA's Cardiovascular and Renal Products Division response indicating that they did not agree that the data supported NDA resubmission.

In April 2018, we announced the completion of enrollment of the 2,000-patient PASS. This 2,000-patient observational study has collected information about patients receiving BRINAVESS, to characterize the normal use and dosing of the product, and to provide better estimates of the incidence of medically significant health outcomes of interest.

In September 2018, we reported preliminary results of the study. Zero deaths were reported and safety outcomes of interest were observed in 0.8% (95% confidence interval: 0.5% - 1.4%) of cases. Over 70% (95% confidence interval: 68.1% - 72.2%) of AF episodes were successfully converted

to sinus rhythm in a median time to conversion of 11 minutes. The full clinical study report has been completed. We plan to publish the data in 2020.

Following a request for a Type A meeting with the FDA, in June 2018, we received a written response from the FDA regarding the regulatory path forward. The FDA informed us that it would be permissible to resubmit the BRINAVESS NDA and agreed that we may schedule a Pre-NDA meeting. In October 2018, we met with the FDA to discuss the content and format of the NDA resubmission.

On October 29, 2018, we announced that, pending approval of BRINAVESS by the FDA, BRINAVESS may qualify for up to a five-year patent extension from the U.S. Patent and Trademark Office.

On June 24, 2019, we announced that we resubmitted an NDA to the FDA. On July 25, 2019, we announced that the FDA accepted for review our resubmitted NDA. The FDA assigned a target action date of December 24, 2019 under the Prescription Drug User-Fee Act ("PDUFA"). In its acceptance letter, the FDA stated that it planned to hold an advisory committee meeting to discuss the application.

On December 10, 2019, the FDA Cardiovascular and Renal Drugs Advisory Committee ("CRDAC") met to review our resubmitted NDA and jointly voted that the benefit-risk profile was not adequate to support approval (Vote: 2 Yes to 11 No). While the FDA is not required to follow the CRDAC's vote, the FDA considers the committee's recommendations when making its decision. As a result of the vote, on December 11, 2019, we announced plans to explore strategic options to maximize stakeholder value. Potential strategic alternatives that were evaluated included an acquisition, merger, business combination or other strategic transaction involving the Company or our assets.

On December 24, 2019, we announced that we received a Complete Response Letter ("CRL") from the FDA regarding our resubmitted NDA. The CRL stated that the FDA determined it cannot approve the BRINAVESS NDA in its present form and provided recommendations needed for resubmission. In the CRL, the FDA stated that while the submitted data provides substantial evidence of BRINAVESS' effectiveness, the data do not provide reassuring evidence of BRINAVESS' safety. The FDA indicated that we will need to develop an approach to select patients who are at low risk of adverse cardiovascular reactions and that data from an additional, potentially uncontrolled, clinical study will be needed to assess BRINAVESS' cardiovascular risk in the selected patient population and to support an NDA resubmission. The FDA also stated that the risk of serious cardiovascular adverse reactions will need to be much less than 1% in the selected patient population. We requested a meeting with the FDA on March 18, 2020 in order for us to further our understanding of the recommendations outlined in the CRL and to reach agreement with the FDA on a suitable clinical trial for BRINAVESS. On April 15, 2020, we received preliminary comments from the FDA regarding our submission of such request for a meeting on March 18, 2020. Although the FDA offered us the opportunity to meet about such matters should we need further feedback, based on our review of the comments from the FDA, we determined that we had sufficient information in the written responses and therefore did not need to pursue such a meeting. We are in the process of considering next steps.

36

**Table of Contents**

*Rest of World (Outside North America)*

In April 2009, we entered into two collaboration and license agreements (the "Collaboration Agreements") with Merck for the development and commercialization of vernakalant. The Collaboration Agreements provided an affiliate of Merck with exclusive rights outside of North America to vernakalant (IV).

Under the terms of the Collaboration Agreements, Merck paid us an initial fee of $60 million. In addition, we were eligible to receive up to an additional $200 million in payments, of which we received $45 million. In July 2009, Merck submitted a Marketing Authorization Application ("MAA") to the EMA seeking marketing approval for vernakalant (IV) in the European Union. In September 2010, vernakalant (IV) received marketing approval under the trade name BRINAVESS in the European Union, Iceland and Norway. After receipt of marketing approval, Merck began its commercial launch of BRINAVESS in a number of European countries.

In September 2012, Merck gave notice to us of its termination of the Collaboration Agreements. In April 2013 we assumed responsibility for worldwide sales, marketing, and promotion of vernakalant (IV) and in September 2013 we completed the transfer of commercialization responsibility for BRINAVESS in the European Union and of the responsibility to complete the post-marketing study for BRINAVESS. Since this date, we have been supplying BRINAVESS under our own trade dress.

In September 2013, we entered into an agreement with Merck for the continued transfer of marketing authorizations. On a per country basis, regulatory and commercialization responsibilities were transferred to us upon agencies' approvals of marketing authorization transfers. However, as a result of routine regulatory requirements, the transfers were delayed in certain jurisdictions.

In December 2014, Eddingpharm (Asia) Macao Commercial Offshore Limited ("Eddingpharm") acquired rights to develop and commercialize BRINAVESS in China, Taiwan, and Macau and to re-launch BRINAVESS in Hong Kong. Eddingpharm will be responsible for any clinical trials and regulatory approvals required to commercialize BRINAVESS in the countries covered by the agreement. In May 2018, Eddingpharm enrolled its first patient in a Phase 3 clinical study evaluating BRINAVESS. Approximately 240 patients were expected to be enrolled at an estimated 30 clinical trial sites in China. Eddingpharm has placed this trial on hold pending discussion of path forward with the China Food and Drug Administration's Center for Drug Evaluation. In August 2018, BRINAVESS was selected by the China Food and Drug Administration's Center for Drug Evaluation as one of 48 therapies assessed as "clinically urgently needed new drugs" and consequently, potentially eligible for priority review.

In January and March 2016, we filed MAAs with the Kingdom of Saudi Arabia's Saudi Food and Drug Authority and the United Arab Emirates' ("UAE") Ministry of Health, respectively, seeking approval of BRINAVESS. In 2018, the MAA was approved in the UAE.

In November 2017, we announced the launch of BRINAVESS in South Africa.

In February 2018, our partner, ATCO Laboratories Ltd., filed an MAA in Pakistan seeking approval of BRINAVESS.

In August 2018, we announced results from a clinical survey assessing patients with acute AF in Belgian hospitals demonstrating reduced hospitalization in patients treated with BRINAVESS. As a result of these data, BRINAVESS received reimbursement approval from the National Institute for Health and Disability Insurance in Belgium.

37

Table of Contents

*XYDALBA*

In May 2016, we announced the execution of an exclusive license agreement with Allergan, for the rights to commercialize dalbavancin (branded DALVANCE in the United States, where it is marketed by Allergan, and XYDALBA in the rest of the world) in the United Kingdom, Germany, France, Denmark, Iceland, Finland, Malta, Norway, Sweden, Belgium, the Netherlands, Luxembourg, Ireland, Switzerland, Canada and certain countries in the Middle East. XYDALBA fits Correvio's commercial footprint as a differentiated specialty pharmaceutical company focused on commercializing proprietary growth pharmaceuticals in Europe and Canada. In December 2016, we initiated the launch of XYDALBA in the United Kingdom and Germany and in February 2017, we initiated the launch of XYDALBA in France. In June 2017, we announced that we entered into a license and distribution agreement with Tzamal Medical Ltd. to advance the commercialization of XYDALBA in Israel. In October 2017, we initiated the launch of XYDALBA in Sweden, Finland and the Republic of Ireland. As consideration for the rights and licenses granted, we made non-refundable payments to Allergan of US$13.0 million, along with incurring other transaction costs during the year ended December 31, 2016.

XYDALBA is a second generation, semi-synthetic lipoglycopeptide. XYDALBA is the first and only IV antibiotic approved in Europe for the treatment of ABSSSI with a single dose regimen of 1500 mg administered over 30 minutes or a two-dose regimen of 1000 mg followed one week later by 500 mg, each administered over 30 minutes. This dosing regimen makes it possible to treat patients with ABSSSI in an outpatient setting, avoiding hospitalization or potentially allowing earlier discharge, without compromising efficacy. XYDALBA demonstrates bactericidal activity in vitro against a range of Gram-positive bacteria, such as Staphylococcus aureus (including methicillin-resistant, also known as MRSA, strains) and Streptococcus pyogenes, as well as certain other streptococcal species.

*ZEVTERA/MABELIO*

In September 2017, we entered into a distribution and license agreement with Basilea Pharmaceutica International Ltd. ("Basilea"), for the rights to commercialize ZEVTERA/MABELIO (ceftobiprole medocaril sodium) in 34 European countries and Israel. ZEVTERA/MABELIO is a cephalosporin antibiotic for intravenous administration with rapid bactericidal activity against a wide range of gram-positive and gram-negative bacteria, including methicillin-susceptible and resistant Staphylococcus aureus (MSSA, MRSA) and susceptible Pseudomonas spp. ZEVTERA/MABELIO is currently approved for sale in 13 European countries and several non-European countries for the treatment of adult patients with community-acquired pneumonia (CAP) and hospital-acquired pneumonia (HAP), excluding ventilator-associated pneumonia (VAP). As consideration for the rights and licenses granted, we made an upfront payment of CHF 5.0 million (US$5.2 million) to Basilea. Additional payments may be due to Basilea upon the achievement of various milestones. Royalty payments may also be due to Basilea based on achievement of pre-determined levels of annual net sales.

*TREVYENT*

In June 2015, we entered into an exclusive license and supply agreement (the "License Agreement") with SteadyMed to commercialize the development-stage product TREVYENT (treprostinil) in Europe and the Middle East.

Pursuant to the License Agreement, SteadyMed granted us an exclusive royalty-bearing license to commercialize TREVYENT in Europe, Canada and the Middle East if TREVYENT is approved for the treatment of PAH in such regions. Under the License Agreement, SteadyMed will receive up to $12.3 million in connection with regulatory and sales milestones, including an upfront payment of $3 million. We have agreed to pay to SteadyMed a transfer price on finished goods and a scaling double-digit royalty on future TREVYENT sales.

PAH is a type of high blood pressure that occurs in the right side of the heart and in the arteries that supply blood to the lungs. PAH worsens over time and is life-threatening because the pressure in a patient's pulmonary arteries rises to dangerously high levels, putting a strain on the heart. There is no cure for PAH, but several medications are available to treat symptoms, such as REMODULIN® (treprostinil sodium), the market-leading prostacyclin PAH therapy produced by United Therapeutics.

TREVYENT is a development stage drug/device combination product that combines SteadyMed's PatchPump technology with treprostinil, a vasodilatory prostacyclin analogue to treat PAH. PatchPump is a proprietary, disposable, parenteral drug administration platform that is prefilled and preprogrammed at the site of manufacture.

38

Table of Contents

In January 2016, we announced that the EMA approved our request to review TREVYENT under the Centralized Authorization Procedure drug review process. This procedure results in a single marketing authorization that is valid in all 28 European Union countries and three European Economic Area countries.

In April 2017, we announced that SteadyMed completed a successful clinical study of TREVYENT. The study enrolled 60 healthy adult