# Exhibit 16

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 6-K

**REPORT OF FOREIGN PRIVATE ISSUER**
**PURSUANT TO RULE 13a-16 OR 15d-16 OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

For the month of **April 2020**

COMMISSION FILE NUMBER. **000-29338**

# CORREVIO PHARMA CORP.

(Translation of registrant's name into English)

**1441 Creekside Drive, 6th floor**
**Vancouver, British Columbia, V6J 4S7, CANADA**

(Address of principal executive offices)

Indicate by check mark whether the registrant files or will file annual reports under cover Form 20-F or Form 40-F

Form 20-F ☒              Form 40-F ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(1): ☐

Indicate by check mark if the registrant is submitting the Form 6-K in paper as permitted by Regulation S-T Rule 101(b)(7): ☐

## DOCUMENTS INCLUDED AS PART OF THIS REPORT

| Exhibit | Description |
| --- | --- |
| 99.1 | Notice of Meeting |
| 99.2 | Management Information Circular dated April 7, 2020 |
| 99.3 | Form of Proxy |
| 99.4 | Form of Proxy |
| 99.5 | Voting Instruction Form |
| 99.6 | Financial Statement Request Form |
| 99.7 | Letter of Transmittal |
| 99.8 | Abridgement Certificate |

Exhibits 99.1, 99.2, 99.3, 99.4, 99.5, 99.6, 99.7 and 99.8 of this report on Form 6-K are incorporated by reference into the Company's registration statement on Form F-10 (File No. 333-225852) and registration statements on Form S-8 (File No. 333-225015 and File No. 333-225014).

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

|  |  |
|---|---|
|  | ***CORREVIO PHARMA CORP.*** |
|  | (Registrant) |

| | | |
|---|---|---|
| Date: April 17, 2020 | By: | /s/ Justin Renz |
| | | Name: Justin Renz |
| | | Title: President and Chief Financial Officer |

The executive officers and directors of Correvio have interests in the Arrangement that may be different from, or in addition to, the interests of Securityholders. The Board was aware of these interests and considered them, among other matters, when recommending approval of the Arrangement Resolution. For further details of the interest of executive officers and directors of Correvio in the Arrangement, see "*The Arrangement – Share Ownership*", "*Appendix F – Statement of Executive Compensation – Equity-Based Incentives*" and "*Appendix F – Statement of Executive Compensation – Employment Contracts with Named Executive Officers*".

## CORPORATE GOVERNANCE PRACTICES

Effective June 30, 2005, National Instrument 58-101 – *Disclosure of Corporate Governance Practice* ("**NI 58 101**") and National Policy 58 201 – *Corporate Governance Guidelines* ("**NP 58-201**") were adopted in each of the provinces and territories of Canada. NI 58-101 requires issuers to disclose the corporate governance practices that they have adopted. NP 58-201 provides guidance on governance practices. The Company is also subject to National Instrument 52 110 – *Audit Committees* ("**NI 52-110**"), which has been adopted in each of the provinces and territories of Canada and which prescribes certain requirements in relation to audit committees. In addition, the disclosure required on the Audit Committee of the Company pursuant to NI 52-110 can be located in the Company's Annual Information Form dated March 27, 2020 at www.sedar.com.

Further information on the corporate governance practices of the Company can be found in Appendix "G" to this Circular.

## THE ARRANGEMENT

At the Meeting, Securityholders will be asked to consider and, if thought advisable, to pass, the Arrangement Resolution. The Arrangement, the Plan of Arrangement and the terms of the Arrangement Agreement are summarized below. This summary does not purport to be complete and is qualified in its entirety by reference to the Arrangement Agreement, which has been filed by Correvio under its profile on SEDAR at www.sedar.com, and the Plan of Arrangement, which is attached to this Circular as Appendix "B".

In order to become effective, the Arrangement must be approved by a special resolution passed by (i) at least 66⅔% of the votes cast on the Arrangement Resolution by Shareholders present online or represented by proxy at the Meeting and (ii) at least 66⅔% of the votes cast on the Arrangement Resolution by the Securityholders (on an As-Converted Basis, as applicable) present online or represented by proxy at the Meeting, voting together as a single class.

Completion of the Arrangement is also subject to the receipt of certain required regulatory approvals, including the approval of the Court, and other customary closing conditions. A copy of the Arrangement Resolution is set out in Appendix "A" of this Circular.

Management has agreed to vote their Shares **FOR** the Arrangement Resolution in accordance with the terms of the Correvio Voting Agreement. If you do not specify how you want your Shares voted, the persons named as proxyholders will cast the votes represented by your proxy at the Meeting **FOR** the Arrangement Resolution.

If the Arrangement is approved at the Meeting and the Final Order approving the Arrangement is issued by the Court and the applicable conditions to the completion of the Arrangement are satisfied or waived, the Arrangement will take effect commencing at the Effective Time (which will be at 12:01 a.m. (Pacific time) on the Effective Date (which is expected to be on or about May 27, 2020).

**Parties to the Arrangement**

*Correvio*

Correvio is a specialty pharmaceutical company focused on providing innovative, high-quality brands that meet the needs of acute care physicians and patients.

Correvio was incorporated on March 7, 2018, under the CBCA, in connection with the Cardiome Arrangement. On March 19, 2018, Correvio entered into a definitive arrangement agreement with Cipher and Cardiome. Under the terms of the agreement, Cipher acquired Cardiome's Canadian business portfolio in exchange for cash consideration of C$25.5 million. As a result of the Cardiome Arrangement, Correvio acquired, and currently holds, all of Cardiome's pre-transaction assets and assumed liabilities, but excluding the Canadian business portfolio. Pursuant to the Cardiome Arrangement, Cardiome shareholders received common shares, on a one-for-one ratio, of Correvio. Correvio obtained a substitution listing on the Nasdaq and TSX and has succeeded to Cardiome's reporting obligations. Correvio has a head office located at 6th Floor, 1441 Creekside Drive, Vancouver, British Columbia, Canada, V6J 4S7, and a registered office at 2600 – 595 Burrard Street, Vancouver, British Columbia, Canada, V7X 1L3.

Correvio is listed on each of the TSX and the Nasdaq with the trading symbol "CORV".

*ADVANZ and the Purchaser*

ADVANZ operates an international speciality pharmaceutical business with a diversified portfolio of more than 200 patented and off-patent products, and sales in more than 90 countries, and is focused on becoming the leading platform for niche-established medicines, with advanced commercial capabilities throughout Western Europe.

ADVANZ was incorporated pursuant to the provisions of the *Business Corporations Act* (Ontario) on January 20, 2010, under the name "Mercari Acquisition Corp." It was subsequently renamed "Concordia Healthcare Corp." then "Concordia International Corp." and then on November 29, 2018, ADVANZ changed its name to "ADVANZ PHARMA Corp." as part of a global rebrand in support of its strategy and vision. ADVANZ was continued under the CBCA on June 22, 2018. On September 6, 2018, ADVANZ amended its articles to, among other things, provide for a class of Class A special shares, a class of Class B special shares and a class of Class C special shares, and redesignate its common shares as limited voting shares. On January 1, 2020, ADVANZ completed the continuance of the company from Canada to Jersey, Channel Islands and changed its name to "ADVANZ PHARMA Corp. Limited". On March 27, 2020, ADVANZ completed a voluntary delisting of its limited voting shares from the TSX.

ADVANZ is a Jersey-registered company and its corporate head office is located in London, England. ADVANZ, through its subsidiaries, operates out of various international office locations with key offices located in: London, England; Dublin, Ireland; Sydney, Australia; Helsingborg, Sweden; Chicago, USA and Mumbai, India.

**Principal Steps to the Arrangement**

Under the Plan of Arrangement, commencing at the Effective Time, the following principal steps will occur and will be deemed to occur on the Effective Date, without any further act or formality by any of the Parties or any other Person, in the order and timing set out in the Plan of Arrangement:

*Dissent Shares*

Each Share held by a Dissenting Shareholder will be deemed to be transferred by the holder thereof, without any further act or formality on its part, free and clear of all Liens, to Correvio and Correvio will be obligated to pay the amount determined and payable in accordance with the Plan of Arrangement. The name of the holder will be removed from the central securities register of Correvio and Correvio will be recorded as the registered holder of the Shares so transferred and be deemed to be the legal owner of such Shares.

39

*Shares*

Each outstanding Share (other than the Shares held by a Dissenting Shareholder who has validly exercised and not withdrawn such holder's Dissent Rights) will, without further act or formality by or on behalf of the holder of Shares, be irrevocably assigned and transferred by the Shareholder to the Purchaser, free and clear of all Liens, in exchange for a cash payment equal to the Share Consideration less any withholdings. The Shareholder will cease to be the holder of the Shares and to have any rights as a shareholder other than the right to receive payment in accordance with the Plan of Arrangement and the Purchaser will be deemed to be the transferee and the legal and beneficial holder of each such Share.

*Options*

*In-the-money Options*

Each in-the-money Option outstanding immediately prior to the Effective Time, whether or not vested, without any further action on behalf of any holder of such in-the-money Option and without any payment except as provided for in the Plan of Arrangement, will be acquired for cancellation by Correvio in consideration for a cash payment from Correvio equal to the product obtained by multiplying the amount by which the Share Consideration exceeds the exercise price per Share of such in-the-money Option by the number of Shares underlying such in-the-money Option, subject to applicable withholdings. All in-the-money Options issued and outstanding immediately prior to the Effective Time will thereafter immediately be cancelled and the holder thereof will thereafter only have the right to receive the consideration to which such holder is entitled.

*Out-of-the-money Options*

Each out-of-the-money Option that is outstanding immediately prior to the Effective Time, whether or not vested, will, without any further action on behalf of the holder of such out-of-the-money Option, be cancelled without payment to any holder thereof and all option agreements related thereto will be terminated.

The Option Plan and any stock option agreement pursuant to which Options were granted will be terminated.

*RSUs*

Each RSU outstanding immediately prior to the Effective Time, whether vested or unvested, will be deemed to be unconditionally vested, and such RSU will, without any further action by or on behalf of the holder of RSUs, be deemed to be assigned and transferred by such holder to Correvio in exchange for a cash payment from Correvio of US$0.42, subject to applicable withholdings, and each RSU will be immediately cancelled.

*PSUs*

Each PSU outstanding immediately prior to the Effective Time, whether vested or unvested, will be deemed to be unconditionally vested, and such PSU will, without any further action by or on behalf of the holder of PSUs, be deemed to be assigned and transferred by such holder to Correvio in exchange for a cash payment from Correvio of US$0.42, subject to applicable withholdings, and each PSU will be immediately cancelled.

**Background to the Arrangement**

The execution of the Arrangement Agreement on March 15, 2020 resulted from extensive arm's length negotiations among representatives of the Company and Board, on the one hand, and the Purchaser and ADVANZ on the other, and their respective financial and legal advisors. The following is a summary of the material events, meetings, negotiations and discussions that preceded the execution and public announcement of the Arrangement Agreement.

The Board regularly evaluates the strategic direction of the Company, and in recent years the Board has considered the future direction and strategic alternatives available to the Company in light of relevant factors including, without limitation, its size, growth, access to capital, ability to expand its business, key supplier and customer relationships, and ability to compete in the longer term against increasingly larger and better capitalized competitors.

During the first half of 2018, the Company was exploring the potential regulatory path forward for Brinavess in the U.S., and had engaged in various discussions with the U.S. Food and Drug Administration ("**FDA**") in connection with this effort.

On June 11, 2018, the Company announced that the FDA had informed the Company that it would be permissible for it to resubmit the New Drug Application ("**NDA**") for Brinavess and agreed that the Company could schedule a pre-NDA meeting with the FDA, which at such time the Company expected to take place in the fourth quarter of 2018.

In October 2018, the Company met with the FDA to discuss the content and format of the NDA resubmission. On October 23, 2018, the Company announced that based on productive pre-NDA discussions with the FDA, the Company planned to resubmit the Brinavess NDA to the FDA during the second quarter of 2019.

In the event the Company were to receive FDA approval of Brinavess, the commercialization of Brinavess in the U.S. was anticipated to require a substantial sales force in the U.S. that the Company did not have. As such, the Company had to consider its options for how to proceed with its business, including how to develop and fund, as needed, any such activities.

On November 8, 2018, the Company engaged Piper Sandler & Co. to assist it in evaluating potential value maximizing transactions. In December 2018, Piper Sandler & Co. initiated broad outreach to assess interest in several strategic alternatives for the Company including a sale of the entire Company, partnership for the commercialization of Brinavess in the U.S. or a sale of its European business among other potential strategic transactions. Piper Sandler & Co. reached out to 26 parties to solicit this initial feedback on the potential strategic alternatives. As part of that initial outreach effort, management of the Company met with members of ADVANZ's management team on January 9, 2019.

On April 18, 2019, the Board met and, after receiving an update from management (which included an overview of the results of Piper Sandler & Co.'s initial outreach efforts) and considering the interests of the Company's stakeholders, including its shareholders, decided to explore the potential for a sale of the Company's European business to maximize the value of the Company through a non-dilutive fund-raising process. That sale would focus the Company on the potential commercialization of Brinavess in the U.S. Since that potential commercialization was anticipated to require a substantial U.S.-based sales force that the Company did not have, the Company would then have additional resources to pursue strategic alternatives around the Brinavess opportunity if it received FDA approval. The Board advised management that they should attempt to complete any such transaction, if available on satisfactory terms, before the date for any FDA determination for Brinavess. The Board had determined that it would be preferable to have such transaction consummated, and such additional resources in place, prior to such FDA determination. The Board further determined that, in any event, it was prudent to avoid intertwining the transaction and FDA action date timelines, given the complexity and risks associated with overlapping a pending strategic transaction with a pending regulatory determination. The FDA determination date for Brinavess was not known at that time, but was anticipated to occur in the fourth quarter of 2019.

Based on the feedback provided by Piper Sandler & Co., nine parties had expressed an interest in a transaction of that nature, although the scope of transactions under consideration varied widely between counterparties that were contacted in the outreach process. The Board also considered other alternatives that might have been available to it, including pursuing a sale of the entire Company or a merger with a company of similar size but no actionable proposals had been received. The Board therefore instructed management and Piper Sandler & Co. to reach out to the nine parties that had expressed an interest in a transaction during the initial outreach. As part of that process, on April 25, 2019, Piper Sandler & Co. and management of the Company approached ADVANZ to explore whether a sale of the European business could be completed on favourable terms with them.

Piper Sandler & Co. formally commenced marketing with respect to a sale of the Company's European business on April 29, 2019. On May 16, 2019, the Company instructed Piper Sandler & Co. to send formal process letters to the five parties out of the nine that remained interested in discussing a potential transaction, including ADVANZ. Diligence sessions were offered to the five interested parties after they executed confidentiality agreements. Three of those parties chose to conduct due diligence and of those three, two requested meetings with management. At ADVANZ's request, Management of the Company and Piper Sandler & Co. met with representatives of ADVANZ on May 28, 2019 to discuss financial modelling.

41

June 11, 2019 was the deadline for non-binding letters of intent and only ADVANZ submitted a non-binding letter of intent on time. The other four parties to the process did not formalize an offer with a letter of intent and further discussions with such parties did not lead to other offers. Management of the Company met with Piper Sandler & Co. on June 14, 2019 to consider the result of the process and management presented the results to the Board on June 18, 2019. After consideration, the Board determined that the non-binding proposal that was received did not represent sufficient value for the European business as it was less than the Board's internal estimate of value, which was determined based on advice of management and Piper Sandler & Co. as to the market value of the assets. However, given ADVANZ's interest, the Board authorized the Company to continue negotiations with ADVANZ in the hope of receiving an improved non-binding proposal.

On June 24, 2019, the Company resubmitted the Brinavess NDA to the FDA, and on July 25, 2019, the FDA accepted the resubmitted Brinavess NDA for review and set the date for a determination to be on or prior to December 24, 2019 (the "**PDUFA Date**").

The Company and ADVANZ continued discussions in June and July of 2019. On July 16, 2019, the Board created a transaction committee composed of Mark Corrigan, Jim O'Shea and William Hunter and gave them a mandate to focus on negotiating the best terms for the sale of the European business.

On July 19, 2019, ADVANZ provided the Company with a revised non-binding letter of intent that proposed a transaction with a proposed purchase price for the European business of US$110 million. Management presented the revised non-binding letter of intent to the Board on July 22, 2019. The Board considered the revised non-binding letter of intent. The transaction that was proposed would require the consent of the Company's lenders and repayment of all amounts owing to them (approximately US$48 million). After taking into account the effect of that required payment, the Board determined that the non-binding letter of intent proposed a transaction with a value that was adequate, however it remained subject to diligence and negotiation of definitive agreements. Discussions continued between ADVANZ and the Company regarding a potential transaction. In August and September, ADVANZ conducted extensive due diligence on the Company's European business. Outside counsel to the Company were instructed to commence drafting a share purchase agreement for that transaction on August 28, 2019. The Company engaged Blake, Cassels & Graydon LLP ("**Blakes**") as its lead legal counsel for the transaction and to advise on Canadian legal matters, and Skadden Arps Slate Meagher & Flom LLP ("**Skadden**") to advise on certain U.S. legal matters.

On September 19, 2019, the Board met again to consider the transaction and the non-binding proposal from ADVANZ dated July 19, 2019 and to receive an update on negotiations of the definitive agreements and the progress of ADVANZ's diligence investigations. The Board remained of the view that the value represented by the non-binding letter of intent remained adequate and that a negotiated transaction was possible provided that the transaction could be expeditiously completed in advance of the PDUFA Date. The Board instructed the transaction committee and the Company to continue to engage with ADVANZ. After that meeting but on the same day, ADVANZ provided the Company with a list of legal and business issues they wished to address. Management, Piper Sandler & Co. and Blakes continued negotiations with ADVANZ and its representatives. On September 24, 2019, ADVANZ presented a revised list of outstanding material issues they saw as remaining to be negotiated or addressed before a binding agreement could be entered into. The Company and its representatives offered discussions with ADVANZ and its team to attempt to resolve those issues.

On October 7, 2019, Dr. Corrigan spoke with the chief executive officer of ADVANZ who indicated that a revised non-binding proposal could be forthcoming and that ADVANZ was pursuing other corporate initiatives, which would take priority over the completion of any transaction with the Company.

On October 10, 2019, ADVANZ made a revised non-binding proposal that lowered the proposed purchase price for the Company's European business from US$110 million, as set out in the July 19, 2019, non-binding letter of intent, down to US$85 million in cash and US$15 million in a contingent value right. In addition to being non-binding and for lower value than had previously been discussed, it remained subject to due diligence, required all working capital and accounts receivables in Europe, which averaged US$12 million, to be sold with the business, proposed a 10% break fee, required the Company to pay for representation and warranty insurance coverage for the buyer, and the contingent value right was of uncertain value due to it being tired to Trevyent satisfying undefined targets.

42

On October 11, 2019, management of the Company met with two of the three transaction committee members to discuss the revised offer and the adequacy of the consideration that was proposed in light of the Company's financing needs taking into account, among other considerations, the requirement that the CRG Loan be repaid from the cash portion of the consideration and the requirement that substantially all of the Company's working capital be transferred with the European business. The transaction committee members also considered other relevant factors related to the proposed transaction including, among other things, the proximity of the then anticipated transaction timeline with the PDUFA Date, which made it unlikely that such transaction could be consummated prior to such date. The transaction committee members agreed on how Dr. Corrigan should respond, and Dr. Corrigan confirmed by e-mail and telephone that the third committee member agreed with that response. Later on October 11, 2019, Dr. Corrigan, acting on the transaction committee's instructions, communicated to ADVANZ that the non-binding proposal was rejected by the transaction committee because the delay had resulted in increased deal uncertainty and the lowered consideration was inadequate as it no longer met the Board's internal estimate of adequate value for the European business. Dr. Corrigan expressed in that discussion that the Company remained open to continuing discussion if ADVANZ would reconsider the valuation it had proposed and with respect to a transaction that would be entered into after the target action date for Brinavess. No revised offer was received from ADVANZ.

The Company announced on November 4, 2019, that the FDA's Cardiovascular and Renal Drugs Advisory Committee ("**CRDAC**") was scheduled to review the data supporting Correvio's NDA for Brinavess on December 10, 2019.

As the Company announced on December 10, 2019, CRDAC jointly voted that day that the benefit-risk profile for Brinavess was not adequate to support approval by a vote of two in favour and eleven opposed and while the FDA is not required to follow CRDAC's vote, the agency considers the committee's recommendations informative when making its decision.

On the night of December 10, 2019, management and the Board met to discuss the CRDAC decision and the financing needs of the Company, given the anticipated impact of the decision on the Company's ability to refinance the CRG Loan and fund its continuing operations. As part of such discussions, the Board determined that it would be in the best interest of the Company and its shareholders to explore strategic alternatives that may be available to the Company. On December 11, 2019, the Company announced that it would expand the corporate developments efforts that the Company had undertaken to that point and it would be formally evaluating its strategic alternatives and had reengaged Piper Sandler & Co. in connection with that process, which included the possible sale of the Company. In connection with this second engagement, Piper Sandler & Co. provided advice regarding, and, after due consideration, the Board approved, a process (the "**Sale Process**") targeted at canvassing selected potential buyers about their interest in pursuing an acquisition transaction involving the whole Company (including the parties that had previously participated in the process to sell the European business, including ADVANZ).

On December 24, 2019, the Company announced that the FDA released its complete response letter for Brinavess which stated, among other things, that the FDA determined it could not approve the Brinavess NDA in its present form (the "**FDA Decision**").

At the direction of the Board, Piper Sandler & Co. commenced their initial outreach to the most likely prospective bidders on January 7, 2020 and sent process letters to 80 potential bidders in connection with the Sale Process, of which 32 executed non-disclosure agreements in order to pursue further discussions with the Company. Such parties were given access to the virtual data room established by the Company.

From January 2020 to March 2020, management held weekly calls with representatives of Piper Sandler & Co. to receive updates on the Sale Process and to provide direction to Piper Sandler & Co. On January 8, 2020, Piper Sandler & Co. began to distribute process letters to 25 parties offering each party a call or meeting with management and requesting non-binding expressions of interest by January 30, 2020. Piper Sandler & Co. arranged for management of the Company to meet with 13 prospective counterparties on January 13, 14 and 15, 2020 during a healthcare conference held in San Francisco, including ADVANZ, with which Mr. Renz and Mr. Dean met on January 15, 2020. On January 17, 2020, management held a conference call with a 14th prospective bidder, and with a 15th on January 21, 2020.

On January 31, 2020, three bidders (including ADVANZ) submitted initial non-binding expressions of interest and two more were received on February 1 and February 11, 2020, respectively. The Board reviewed all five non-binding expressions and, following discussions regarding the non-binding expressions of interest received with Piper Sandler & Co., management, Blakes and Skadden, determined that four of the proposals offered sufficient consideration to merit continued dialogue. The Board subsequently directed Piper Sandler & Co. to send a final process letter on February 16, 2020 to four of the interested counterparties, including ADVANZ, with final offers requested for March 5, 2020. The fifth interested party that submitted a non-binding expression of interest was deemed not to be competitive with the other bidders because it offered consideration that was substantially lower than any other bidder and thus was excluded from the next stage of the process. The fourth prospective bidder to which Piper Sandler & Co. sent a final process letter determined not to proceed in the process.

Management, Piper Sandler and Blakes held commercial, financial, legal, tax and operational diligence calls with three of the counterparties, including ADVANZ, and their representatives between February 18 and March 3, 2020. The bidders were also provided with a draft of the proposed form of Arrangement Agreement on February 18, 2020 and were asked to submit a mark-up of the proposed form of Arrangement Agreement with such final offers. Each of those parties was also offered an opportunity to conduct additional due diligence.

Three prospective bidders submitted revised final offers between March 6 and March 10, 2020, which included updated indicative pricing (subject to various qualifications and assumptions) and certain other terms and conditions. ADVANZ also submitted a mark-up of the proposed form of Arrangement Agreement. The ADVANZ offer, which contemplated a total purchase price of approximately US$76 million (inclusive of the repayment of the CRG Loan), provided more consideration to shareholders than any of the offers received from the other bidders.

On March 10, 2020, the Board, following discussions with Piper Sandler & Co., Blakes and Skadden, met to carefully review and consider the merits of the three non-binding expressions of interest. The Board's deliberations took into account a number of considerations, including, among others, indicative pricing, the specific terms and conditions to each offer, the change in the Company's circumstances following the FDA Decision, including the impact of such decision on the Company, its prospects and its value, and the likelihood that, in the absence of a transaction, the Company would be offside of its obligations under the CRG Loan with respect to its liquidity covenant due to the risk that funds from operations of the Company would be insufficient to meet those liquidity requirements, in addition to, among other things, the challenges that the Company would face in connection with pursuing any equity offerings at such time and in the coming months. After due deliberations, the Board determined that ADVANZ's offer represented the most favourable alternative available to the Company and provided the highest consideration per share to shareholders. The Board thereafter directed Piper Sandler & Co. and outside counsel to continue negotiating the terms of the potential transaction with ADVANZ.

Negotiations between the Parties and their respective advisors to finalize the Arrangement Agreement, the Plan of Arrangement and other ancillary documents were held during the period from March 11, 2020 to March 15, 2020. During this period, the Board met regularly with representatives of management, Piper Sandler & Co., Blakes and Skadden to monitor the progress of discussions and due diligence and to review and consider key transactional issues and updated drafts of the Arrangement Agreement and other key documents, as needed.

On March 15, 2020, the Board met formally to (i) receive a complete update on the status of documents and issues concerning the Arrangement from Blakes, (ii) receive a presentation from Piper Sandler & Co. on the methodologies and analysis underlying its Fairness Opinion, and (iii) receive a presentation from management on other alternatives available to the Company aside from the Arrangement. The Board members were joined by representatives of Piper Sandler & Co., Blakes, Skadden and, for a portion of the meeting, members of management. During the course of the Board meeting, representatives of Blakes provided an overview of the specific terms and conditions of the Arrangement Agreement and other ancillary documents and answered questions from the Board. Piper Sandler & Co. presented an analysis of the Arrangement and delivered the verbal fairness opinion (which was subsequently confirmed by the delivery of the written Fairness Opinion), to the effect that, subject to the assumptions, limitations and qualifications contained therein, the Share Consideration to be received by the Shareholders pursuant to the Arrangement is fair, from a financial point of view, to the Shareholders.

In particular, the Board considered the alternative of continuing to pursue the Company's long-term business plan as a public company and not undertaking a strategic transaction at this time, taking into account the Company's historical performance, current financial position and prospects, the Company's obligations under the CRG Loan, access to capital, growth plans and ability to expand its business, key supplier and customer relationships and the ability of the Company to maintain and build on such relationships in the future. After duly considering the financial aspects and other considerations relating to the Arrangement (including those discussed immediately above), the potential impact on the Securityholders and other stakeholders, legal and financial advice, and other matters considered relevant, including without limitation, matters relating to timing of the transaction, the likelihood of completing a transaction on terms acceptable to the Board, and the challenges of continuing to operate as a standalone company including meeting the liquidity covenant under the CRG Loan, the Board, after receiving advice from its legal counsel with respect to its fiduciary duties and other matters, the impact of the Arrangement on the Securityholders and other stakeholders, financial advice from Piper Sandler & Co. and other matters considered relevant, consideration and review of the Arrangement Agreement and other ancillary documents, and after full consideration of the Fairness Opinion, as well as other relevant factors, unanimously (i) determined that the Arrangement is in the best interests of the Company; (ii) determined that the consideration payable to the Securityholders under the Arrangement is fair, from a financial point of view, to the Securityholders; (iii) resolved to approve the Arrangement, the Arrangement Agreement and the Company's performance of its obligations thereunder; and (iv) resolved to recommend that Securityholders vote FOR the Arrangement Resolution. The Board also authorized management to finalize the form of and execute the Arrangement Agreement and applicable ancillary documents on behalf of the Company.

After the conclusion of these presentations and discussions, the Board met in camera without management present and confirmed its decision. The Board then adjourned its meeting. Following the meeting of the Board, the Arrangement Agreement and other ancillary documents were finalized by the Parties. The Company also secured an executed Correvio Voting Support Agreement from all Correvio Supporting Shareholders.

The Arrangement Agreement and other transaction documents were executed during the evening of March 15, 2020, and a press release announcing the transaction was issued on the morning of March 16, 2020.

On April 7, 2020, the Board approved this Circular and certain other procedural matters related thereto and to the Arrangement.

**Recommendation of the Board**

The Board has unanimously determined, after consultation with its financial and legal advisors and after consideration of, among other things, the Fairness Opinion, the text of which is attached as Appendix "C" to this Circular, and its own deliberations, that the Arrangement is fair and reasonable to the Securityholders and the Arrangement is in the best interests of Correvio, and the Board recommends that the Securityholders vote in favour of the Arrangement Resolution (the "**Board Recommendation**"). **Accordingly, the Board unanimously recommends that Securityholders vote FOR the Arrangement Resolution.**

All of the directors and senior officers of Correvio have agreed to vote all of their Securities in favour of the Arrangement Resolution, pursuant and subject to the terms of the Correvio Voting Agreement.

**Reasons for the Arrangement**

In evaluating the Arrangement and the transactions contemplated in the Arrangement Agreement, the Board has reviewed and considered information it considered relevant to its decision and considered a number of factors relating to the Arrangement with the benefit of advice from Correvio's senior management and its financial and legal advisors. The following is a summary of the principal reasons for the recommendation of the Board that Securityholders vote **FOR** the Arrangement Resolution (which reasons are not necessarily presented in order of relative importance):

(a) *All Cash Consideration*. The fact that the Arrangement Consideration under the Arrangement is cash will provide Securityholders with certainty of value and liquidity while eliminating the uncertainties of long-term business and execution risk to Securityholders.

45