UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSH FEIERSTEIN, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> CORREVIO PHARMA CORP., MARK H.N. CORRIGAN, WILLIAM HUNTER, JUSTIN A. RENZ, and SHEILA M. GRANT, <br><br> Defendants. | Case No.: 1:19-CV-11361-VEC <br><br> Honorable Valerie E. Caproni |

**DECLARATION OF SARA E. FUKS IN SUPPORT OF: (I) LEAD PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF SETTLEMENT AND PLAN OF ALLOCATION AND FINAL CERTIFICATION OF THE SETTLEMENT CLASS; AND (II) LEAD COUNSEL'S MOTION FOR AWARD OF ATTORNEYS' FEES AND <u>REIMBURSEMENT OF LITIGATION EXPENSES</u>**

## TABLE OF EXHIBITS TO DECLARATION

| EX. # | TITLE |
|-------|-------|
| 1 | Declaration of Josephine Bravata Concerning (I) The Mailing of the Postcard Notice, (II) Publication of the Summary Notice and (III) Report on Requests for Exclusion and Objections |
| 2 | Declaration of Kara Wolke in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Awards to Lead Plaintiffs Filed on Behalf of Glancy Prongay & Murray LLP |
| 3 | Declaration of Sara Fuks in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses and Awards to Lead Plaintiffs Filed on Behalf of the Rosen Law Firm, P.A. |
| 4 | Declaration of Clinton Atkinson |
| 5 | Joint Declaration of Nabil Saad and Iuliia Mironova |
| 6 | Excerpts from Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review (NERA Jan. 25, 2021) |
| 7 | Chart of Peer Billing Rates |
| 8 | Compendium of Slip Opinions |

I, Sara E. Fuks, hereby declare under the penalty of perjury, pursuant to 28 U.S.C. §1746, as follows:

1.      I am Counsel at the Rosen Law Firm. P.A. ("Rosen" or "Lead Counsel"), court-appointed lead counsel for Lead Plaintiffs Clinton Atkinson, Nabil Saad and Iuliia Mironova ("Lead Plaintiffs" or "Plaintiffs")[1] in above-captioned action (the "Action").[2]  I have personal knowledge of the facts asserted herein based on my active participation in the prosecution of this Action and settlement of the claims asserted therein.  If called upon, I could and would competently testify that the following facts are true and correct.

2.      I respectfully submit this declaration, together with the attached exhibits, in support of the Lead Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and Final Certification of the Settlement Class, and the concurrently filed memorandum in support thereof ("Final Approval Memorandum").  As set forth in the Final Approval Memorandum, Lead Plaintiffs seek final approval of the $1,750,000 Settlement for the benefit of the Settlement Class, final approval of the Proposed Plan of Allocation of the Net Settlement Fund to eligible Settlement Class Members, and final certification of the Settlement Class.[3]

3.      I also respectfully submit this declaration and its exhibits in support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses

---

[1] Ms. Mironova's legal first name is "Iuliia" but Ms. Mironova more commonly goes by the first name "Julia."

[2] All capitalized terms used herein that are not otherwise defined herein have the meanings ascribed to them in the Stipulation and Agreement of Settlement (the "Stipulation") filed with the Court on September 3, 2020.  ECF No. 55-1.

[3] Subject to certain exclusions, the Settlement Class consists of all persons and entities who or which purchased shares of Correvio stock between September 5, 2018 and December 10, 2019, inclusive.

and the concurrently filed memorandum in support thereof (the "Fee Memorandum").  As set forth in the Fee Memorandum, Lead Counsel seeks an award of attorneys' fees in the amount of 25% of the Settlement Fund, or $437,500, (which, by definition, includes interest accrued thereon), and reimbursement of Litigation Expenses in the total amount of $50,602.43.[4]  Lead Counsel also respectfully requests a total award of $3,000 to Lead Plaintiffs ($1,000 each) pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA") for their costs, including lost wages, incurred in connection with their representation of the Settlement Class.

4.      The Court preliminarily approved the Settlement by order dated November 20, 2020 ("Preliminary Approval Order") and thereby directed notice of the Settlement to be disseminated to the Settlement Class.  ECF No. 60.  Pursuant to the Preliminary Approval Order, Strategic Claim Services ("SCS"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and by publication.  *See* Sec. IV, *infra* (detailing notice program); *see also* Ex. 1 (Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections, the "Bravata Decl." ¶¶2-11).

5.      In total, 9,507 Postcard Notices (referring Settlement Class Members to the Settlement Website where the longform Notice and the Claim Form are posted) have been mailed or emailed to potential Settlement Class Members, and thus far no objections and only one purported request for exclusion has been received.  Ex. 1 (Bravata Decl. ¶¶ 8, 11-13).

---

[4] Lead Counsel's motion for attorneys' fees and reimbursement of Litigation Expenses is made on behalf of Lead Counsel and Glancy Prongay & Murray LLP ("GPM," and together with Lead Counsel, "Plaintiffs' Counsel").

## I.      INTRODUCTION

6.      This is a federal securities class action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), against defendants Correvio Pharma Corp. ("Correvio" or the "Company"), Mark H.N. Corrigan, William Hunter, Justin A. Renz and Sheila Grant (the "Individual Defendants," and together with Correvio, "Defendants").

7.      On May 1, 2020, Lead Plaintiffs filed and served the Amended Class Action Complaint for Violations of Federal Securities Laws (the "Amended Complaint" or "Complaint"). ECF No. 40.  Specifically, the Amended Complaint alleges that Defendants made materially false and misleading statements about Correvio's European post authorization safety study (called "SPECTRUM") for its drug Brinavess, for the rapid conversion of recent onset atrial fibrillation ("AFib") to sinus rhythm, and misled investors about the prospects for FDA approval of its resubmitted NDA for Brinavess based on SPECTRUM's study data.  Lead Plaintiffs allege that Defendants falsely misrepresented and/or omitted material facts relating to the SPECTRUM study that precluded the NDA's approval.

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $1,750,000 (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Lead Plaintiffs and Lead Counsel submit that the proposed Settlement represents an excellent result for the Settlement Class considering the posture of the Action, as well as the significant risks to overcome remaining in the Action.  Indeed, the Settlement provides a substantial, certain, and immediate recovery, while avoiding the significant risks and expense of continued litigation, including the risk that the Settlement Class could recover less than the Settlement Amount (or nothing) after years of additional litigation and delay.

9.      The $1,750,000 non-reversionary all-cash recovery is also well within the range of

reasonableness under the circumstances to warrant final approval of the Settlement. Lead Plaintiffs' damages expert estimates that if Lead Plaintiffs had fully prevailed on their claims at both summary judgment and after a jury trial, if the Court certified the Class, and if the Court and jury accepted Lead Plaintiffs' damages theory—*i.e.*, Plaintiffs' best-case scenario—the $1,750,000 Settlement Amount represents approximately 5.01% of the total ***maximum*** damages ***potentially*** available in this Action. Conversely, if Defendants prevailed on their liability arguments, or their anticipated loss causation arguments were accepted, damages would be eliminated or drastically reduced.

10.     A recovery that is significantly above the 1.7% median settlement for securities litigation matters is well-within the range of reasonableness. *See, e.g.*, Ex. 6 (excerpt of Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at p. 20, Fig. 16 (median recovery in securities class actions in 2020 was approximately 1.7% of estimated damages). Consequently, the amount recovered by Lead Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

11.     The proposed Settlement is the result of significant efforts by Plaintiffs' Counsel, which included, among other things detailed herein: (a) conducting an extensive investigation of the claims asserted in the Action, including a detailed review of Correvio's public filings with the Securities and Exchange Commission ("SEC"), press releases, analyst reports, news reports, FDA briefing documents, SPECTRUM study protocols, and other public information regarding the Company, interviews with numerous former Correvio employees, and consultation with experts in the fields of damages and FDA submissions; (b) researching and preparing the 96-page Amended Complaint based on Plaintiffs' Counsel's investigation; (c) reviewing and analyzing Defendants'

motion to dismiss; (d) engaging in negotiations regarding the terms of the proposed Settlement; (e) drafting the stipulation and related settlement documents; (f) working with a damages consultant to prepare the proposed Plan of Allocation; and (g) supervising a comprehensive notice program.

12.     Based on the foregoing efforts, Lead Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents a favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and that the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

13.     In addition, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Lead Plaintiffs' damages consultant.  Sec. V., *infra* (discussing Plan of Allocation).  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

14.     Finally, Lead Counsel seeks approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee Memorandum.  As discussed in detail in the Fee Memorandum, the requested 25% fee is well within the range of percentage awards granted by courts in this Circuit in comparable securities class actions.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $50,602.43 and the requested PSLRA awards of $1,000

for each of the Lead Plaintiffs are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee Memorandum and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses should be approved.

## II.    PROSECUTION OF THE ACTION

### A.    Background

15.    Lead Plaintiffs allege that between September 5, 2018 and December 10, 2019 inclusive (the "Settlement Class Period"), Defendants made materially false and misleading statements about Correvio's European post authorization safety study, SPECTRUM, and misled investors about the prospects for FDA approval of the Company's resubmitted NDA (the "Resubmitted NDA") based thereon.

16.    Specifically, the Amended Complaint alleges that during the Settlement Class Period, Defendants touted the SPECTRUM study and its safety data, and its ability to support the Resubmitted NDA.  However, Plaintiffs allege that unbeknownst to investors, the SPECTRUM study suffered from a number of glaring deficiencies that created an unreasonably high risk of jeopardizing FDA approval.  For example, Lead Plaintiffs allege that Defendants omitted that the SPECTRUM data contained a selection bias, which affected the validity of the study results.  Further, Lead Plaintiffs allege that the safety data from SPECTRUM was limited and misleading because adverse events were underreported, and basic, required information that should have been routinely collected was not, including critical information such as blood pressure and heart rate data during patients' Brinavess infusions.  Defendants' omissions of this critical information concerning SPECTRUM is alleged to have been materially misleading because they concealed or wholly omitted significant material information that, if disclosed, would have significantly altered the total mix of information available to investors.

**B.    Commencement of the Action and Appointment of Lead Plaintiffs**

17.    This Action was commenced on December 12, 2019, in the United States District court for the Southern District of New York, in the case styled *Feierstein v. Correvio Pharma Corp., et al.* 1:19-cv-11361-VEC.

18.    On February 10, 2020, Lead Plaintiffs (the "Atkinson Group") filed their motion to appoint lead plaintiffs and approval their selection of lead counsel.  ECF Nos. 12-14.

19.    Also on February 10, 2020, Nathaniel Edge, Luis Lopez, and Win Tang (the "Edge Group"), and Larry Dorman, moved for appointment as lead plaintiff.  ECF Nos. 16, 20.

20.    On February 18, 2020, the Edge Group and Larry Dorman filed notices of non-opposition to the Atkinson Group's motion.  ECF Nos. 25-26.

21.    By order dated February 25, 2020, the Court appointed Clinton Atkinson, Nabil Saad and Iuliia Mironova, *i.e.*, the Atkinson Group, as Lead Plaintiffs for the Action and appointed the Rosen Law Firm., P.A. as Lead Counsel for the putative class.  ECF No. 29.[5]

**C.    The Comprehensive Pre-Filing Investigation and Preparation of the Amended Complaint**

22.    Plaintiffs' Counsel conduced a detailed independent investigation of Correvio and the alleged violations of the law in connection with researching, preparing, and drafting the Amended Complaint.  This investigation included, among other things, a detailed review and analysis of: (i) Correvio's public SEC filings; (ii) public reports and news articles; (iii) research

---

[5] As Lead Counsel informed the Court in the preliminary approval papers, prior to their appointment as Lead Plaintiffs, Nabil Saad and Iuliia Mironova were represented by GPM.  The Court declined to appoint GPM as co-lead counsel.  Subsequent to the Court's order appointing Rosen as Lead Counsel, GPM performed work on the case under the supervision and direction of Lead Counsel.  Lead Counsel ensured that no work was duplicated.  Further, neither Lead Counsel nor GPM incurred any travel costs, and Lead Counsel ensured that no unnecessary costs were incurred.

reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of Correvio's investor calls; (vi) numerous investigative memoranda detailing information from Correvio's former employees, and (vii) other publicly available material and data.  The other publicly available information included the FDA's Good Clinical Practice Guide, the FDA's briefing documents on the Resubmitted NDA and Brinavess, Correvio's SPECTRUM study protocol, and the SPECTRUM statistical analysis plan ("SAP").  Under Plaintiffs' Counsel's direction, an investigator undertook an international investigation into Correvio and the SPECTRUM study, which was conducted throughout Europe, including in six Western European countries.  The investigator conducted interviews of numerous former Correvio employees located throughout the U.S. and Europe.  In addition, Plaintiffs' Counsel consulted with an FDA expert concerning the technical aspects of the claims from an FDA regulatory perspective.

23.     On May 1, 2020, Lead Plaintiffs filed the 96-page Amended Complaint based on their thorough investigation.  ECF No. 40.  As set forth above, the Amended Complaint alleges that Defendants made materially false and misleading statements about SPECTRUM, and misled investors about the Company's prospects for FDA approval of the Resubmitted NDA based on SPECTRUM's safety data.

24.     Following the Amended Complaint's filing, Lead Plaintiffs obtained a waiver of service for Defendant Grant, who was added to the Amended Complaint as a named defendant. ECF No. 44.

**D.     Defendants' Motion to Dismiss**

25.     On June 30, 2020, following an order granting leave to file excess pages (ECF No. 46), Defendants filed a 40-page motion to dismiss the Amended Complaint, as well as supporting evidence.  ECF Nos. 48-50.  Defendants argued that the Amended Complaint should be dismissed because: (i) Plaintiffs failed to allege (a) any actionable misrepresentations or omissions, or (b)

scienter; (ii) the Court lacked jurisdiction over Individual Defendant Grant; and (iii) Plaintiffs failed to plead control person claims.

### E. Settlement Negotiations and the Settlement's Preliminary Approval

26.     Shortly after Defendants filed the motion to dismiss, the Parties began informal settlement discussions, including several rounds of telephonic and written discussions, which ultimately culminated in the Parties reaching an agreement in principle to settle the Action.  That agreement was memorialized in a term sheet (the "Term Sheet") executed on July 13, 2020.

27.     The Parties informed the Court that they had reached an agreement in principle to settle the Action, but out of an abundance of caution, requested additional time to complete briefing on the motion to dismiss, if necessary.  On July 17, 2020, the Court entered an order modifying the motion to dismiss briefing schedule, setting Lead Plaintiffs' deadline for any response as September 4, 2020, and Defendants' reply deadline, if any, as October 15, 2020.  ECF No. 51.

28.     Following additional negotiations, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated September 3, 2020.

29.     On September 4, 2020, Lead Plaintiffs filed their Unopposed Motion for Preliminary Approval of Settlement and Approval of Dissemination of Notice to the Settlement Class (the "Preliminary Approval Motion"), and accompanying documents.  ECF Nos. 53-55.

30.     On November 9, 2020, the Court entered an order setting the date for the settlement fairness hearing, requesting revised preliminary approval documents, and denying Defendants' motion to dismiss (ECF No. 48) as moot.  ECF No. 56.

31.     On November 16, 2020, Lead Counsel submitted a letter with revised preliminary approval documents to the Court.  ECF No. 57.

32.     On November 19, 2020, the Court entered the Preliminary Approval Order, which preliminary approved the Settlement, certified the Settlement Class for settlement purposes only,

appointed Lead Plaintiffs as class representatives, and appointed Lead Counsel as class counsel.

ECF 60.  The Preliminary Approval Order also appointed SCS as Claims Administrator, approved

the form and content of the Notice, the Claim Form, the Summary Notice, and Postcard Notice,

and directed dissemination of the Postcard Notice.  *Id.*

33.     The certified Settlement Class is defined as follows:

All persons or entities who or which purchased shares of Correvio common stock
between September 5, 2018 and December 10, 2019, inclusive, and were damaged
thereby.

Stipulation ¶ 1 (ss); Preliminary Approval Order ¶ 1.

34.     The Court scheduled the Settlement Hearing for September May 14, 2021, at 2:30

p.m.  ECF No. 60.

35.     Defendants have paid $1,750,000 into the Escrow Account for the benefit of the

Settlement Class.

## III.   THE RISKS OF CONTINUED LITIGATION

36.     The Settlement provides an immediate and certain benefit to the Class in the form

of a non-reversionary cash payment of $1,750,000.  As explained more fully below, although Lead

Plaintiffs and Lead Counsel strongly believe that the claims asserted in this Action are meritorious

and that the evidence developed to date supports them, they recognize and acknowledge the

substantial expense and duration of continued proceedings that would be necessary to prosecute

the Action.  Lead Plaintiffs and Lead Counsel are also mindful of the inherent difficulty of proving

claims under the federal securities laws and the possible defenses to the claims asserted in this

Action, as well as the uncertainties presented by complex litigation.  Prior to trial and appeal, the

most immediate risks faced by the Settlement Class related to Defendants' pending motion to

dismiss.  Thus, there was no guarantee that Plaintiffs and the Class would later achieve any

recovery, let alone one greater than $1,750,000.

10

### A.    Risks Defendants' Motion to Dismiss Posed

37.    At the time the Settlement was reached, Defendants' motion to dismiss was in the briefing process.  Defendants raised a number of arguments, which, if accepted by the Court, would have resulted in their dismissal from the case or dismissal of the Action entirely.  For example, Defendants argued that many of the challenged statements are forward-looking under 15 U.S.C. §§78u-5(c)(2) & (3) and were accompanied by meaningful cautionary language warning investors of the risks involved with seeking FDA approval.  Defendants also argued that all of the statements regarding the likelihood of FDA approval were inactionable corporate optimism, and that the challenged statements interpreting the SPECTRUM study data are statements of inactionable opinion under the Supreme Court's decision in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension* Fund, 575 U.S. 175 (2015).  Further, Defendants' vehemently disputed, among other things, that any of the alleged misstatements were materially false or misleading and that any of the Defendants acted with scienter.  Defendants also contested the Court's jurisdiction over Defendant Grant, who Lead Plaintiffs alleged was a critical and important executive in charge of Correvio's Resubmitted NDA.  Whether Lead Plaintiffs would have prevailed in response to these, and other, arguments at the pleading stage was far from certain. There was a very real risk that the Court could have granted the Defendants' motion, especially in light of the strict pleading standards of the PSLRA.

### B.    Risks Faced in Obtaining and Maintaining Class Action Status

38.    Even assuming that Lead Plaintiffs successfully defeated Defendants' motion to dismiss, Defendants would have also argued against class certification.  While Lead Counsel researched and analyzed the class question and are confident that all of the Rule 23 requirements would have been met, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised arguments challenging the propriety of class certification.

11

39.     Moreover, even if Lead Plaintiffs successfully obtained class certification, Defendants could have sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f)'s interlocutory appeal provision, further delaying or precluding any potential recovery in the Action.  Indeed, Plaintiffs' Counsel had a class certified in a securities class action (*see Bing Li v. Aeterna Zentaris, Inc.*, 324 F.R.D. 331 (D.N.J. 2018)) in February 2018, only to have the Third Circuit grant defendants' 23(f) petition. Although, plaintiffs prevailed before the Third Circuit, the case was on appeal for approximately 15 months.  *See Vizirgianakis v. Aeterna Zentaris, Inc.*, 775 Fed.Appx. 51 (3d Cir. May 30, 2019). Class certification of the instant Action was certainly not a forgone conclusion, and it could well have resulted in severe delays to any potential resolution of the case.

40.     In addition, the class certification standard applied by the Second Circuit is currently under review by the United States Supreme Court in the case of *Goldman Sachs Grp. v. AR Teacher Ret.*, 2020 WL 7296815, at *1 (U.S. Dec. 11, 2020).  In *Goldman Sachs*, the Supreme Court will review application of the *Halliburton* standard, which permits defendants to defeat class certification by breaking the link between alleged misrepresentations and a drop in the defendant's stock price.  *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).  On appeal, Goldman asks the Supreme Court to review whether the *Halliburton* standard permits the lower courts to take evidence on materiality and price impact into account during class certification litigation.  The Department of Justice ("DOJ") and the SEC have filed amicus briefs in the appeal. While the DOJ generally sides with the plaintiffs-appellees' positions, the DOJ does argue that the Second Circuit erred in its view of Goldman's evidence, and that the Supreme Court should adopt Goldman's position that defendants should be permitted to rebut the presumption of reliance by arguing generic statements did not impact share price.  If the Supreme Court were to adopt

Goldman's position, or the DOJ's, obtaining class certification could be even more uncertain and challenging for Plaintiffs in cases under the federal securities laws.

### C.   Risks to Proving Liability

41.    In addition to the hurdle of obtaining discovery and class action status, Lead Plaintiffs and Lead Counsel faced numerous additional risks at summary judgment and trial, including establishing Defendants' liability.  Defendants forcefully argued in their motion to dismiss—and undoubtedly would have continued to argue at summary judgment and/or trial—that Lead Plaintiffs could not establish the elements of their Exchange Act claims.

42.    For instance, Defendants strenuously argued, and would continue to argue, that their statements concerning the Resubmitted NDA were opinions and statements of corporate optimism that were based on genuinely held beliefs.  Although Lead Plaintiffs believe they could prove otherwise, especially in light of statements by former Correvio employees that the Company's CEO only gave the Resubmitted NDA a 50/50 chance of FDA approval during the Settlement Class Period, discovery may have revealed that Defendants had a basis to believe that the FDA would approve the Resubmitted NDA based on SPECTRUM's safety data.   As Defendants pointed out in the motion to dismiss, Brinavess is approved and used in over 40 countries and had been deemed safe for use in Canada and the EU.  ECF No. 49 at 2.

43.    Defendants undoubtedly would have also continued to firmly contest their scienter. While Lead Plaintiffs had a good faith basis to allege that Defendants were knowledgeable of SPECTRUM's deficiencies[6] (as Correvio's CRO provided the Company's executives with, *inter alia*, weekly progress reports on the study including on the study's protocols), and ran the

---

[6] The Amended Complaint alleged SPECTRUM's failures included, among other things, the bias in the registry, under-reported adverse events, and the failure of the study's quality controls and quality control team.

unreasonably high risk those undisclosed issues would negatively impact FDA approval, discovery on this issue may have established negligence, and fallen short of establishing extreme recklessness.  In other words, discovery may have revealed that Defendants lacked the requisite scienter, *i.e.*, that they were unaware of SPECTRUM's protocol failures or the inadequacy of the Resubmitted NDA's proposed risk mitigation plan ("REM").

44.     Although Lead Plaintiffs believe they had strong arguments in response to Defendants' arguments, Defendants' contentions nevertheless posed significant risks to establishing liability had the litigation continued.  Indeed, despite believing that this Action is meritorious, Lead Plaintiffs and Lead Counsel were well aware of the high hurdles they would have to surmount in order to successfully prove that Defendants actually violated the Exchange Act.

### D.     Risks to Proving Damages

45.     Even assuming that Lead Plaintiffs successfully defeated Defendants' motion to dismiss and surmounted all the other legal and factual obstacles to successfully establish liability, Lead Plaintiffs would still face considerable risks in establishing loss causation and damages.  Lead Plaintiffs' damages expert advises that it is likely that Defendants would argue that confounding information entered the market on December 6 and 10, 2019, the corrective disclosure dates alleged in the Amended Complaint.  Consequently, Defendants would claim that Lead Plaintiffs and the class's losses were attributable, in whole or in part, to information that was unrelated to the alleged fraud.

46.     It is Plaintiffs' burden to establish loss causation, and Plaintiffs must distinguish the alleged fraud from the tangle of other factors that affect a stock's price.  Both sides would have used experts to support their respective positions regarding damages—especially with respect to the disaggregation issue.  The inevitable "battle of the experts" at class certification, summary

judgment, and trial creates substantial litigation risk because there can be no assurance as to which party's expert the trier of fact will find more persuasive.  Lead Counsel recognized the possibility that the jury could have been swayed by Defendants' experts and awarded little to no damages.  In short, this case was far from a "slam dunk."

### E.    Other Risks, Including Trial and Appeals

47.    Lead Plaintiffs would also have had to prevail at several stages of litigation, each of which would have presented significant risks in complex class actions such as this one.  Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

48.    Even if Lead Plaintiffs had succeeded in proving all elements of their case at trial and obtained a jury verdict, Defendants would almost certainly have appealed.  An appeal not only would have renewed all the risks faced by Lead Plaintiffs—as Defendants would have reasserted all their arguments summarized above—but also would have resulted in significant additional delay.  Given these significant litigation risks, Lead Plaintiffs and Lead Counsel believe that the Settlement represents an excellent result for the Class.

### F.    The Settlement is Reasonable in Light of Potential Recovery in the Action

49.    In contrast to the foregoing, the Settlement provides an immediate and certain benefit to the Settlement Class in the form a non-revisionary cash payment of $1,750,000.  Lead Plaintiffs' damages expert estimates, that if Lead Plaintiffs had fully prevailed on their claims at both summary judgment and after a jury trial, if the Court certified the same class period as the Settlement Class Period, and if the Court and jury accepted Plaintiffs' damages theory—*i.e.*, Lead Plaintiffs' ***best-case scenario***—the total ***maximum*** damages ***potentially*** available in this Action would be approximately $34,900,000.  Thus, the $1,750,000 Settlement Amount represents approximately 5.01% of the total ***maximum*** damages ***potentially*** available in this Action.

However, Defendants could have raised credible arguments with respect to confounding information on each of the Amended Complaint's alleged disclosure dates. Assuming, *arguendo*, this information accounted for 50% of the December 6, 1019 corrective disclosure, and 70% of December 10, 2019 corrective disclosure, maximum provable damages would have been reduced to $21.5 million, in which case the settlement equates to an 8.14% recovery.

50.     A recovery of 5.01% - 8.14% of maximum recoverable damages is well-within the range of reasonableness. *See* Ex. 6 Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at p. 20 (Fig. 16) ("For 2020, the median ratio of settlement to Investor Losses was 1.7% … ."). Notably, the recovery for the Settlement Class is approximately three times greater than the 1.7% median percentage return for securities class action settlements in 2020. Consequently, the amount recovered by Lead Plaintiffs, when balanced against the risks of continued litigation, weighs strongly in favor of final approval.

51.     Having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and considering the very real risks presented by Defendants' motion to dismiss, class certification, summary judgment, trial, and any eventual appeals that would have arisen, it is my belief, based upon all of the proceedings to date and my extensive experience in litigating class actions under the federal securities laws, that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

## IV.    LEAD PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING DISSEMINATION OF NOTICE

52.     The Court's Preliminary Approval Order directed that the Postcard Notice be disseminated to the Settlement Class and set a final fairness hearing date of May 14, 2021 (the "Settlement Hearing"). The Preliminary Approval Order also set a deadline of April 23, 2021 for:

(a) filing objections to the Settlement, Plan of Allocation and/or the application for attorneys' fees and expenses; or (b) requesting exclusion from the Settlement Class.

53.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed SCS, the Court-approved Claims Administrator, to begin disseminating copies of the Postcard Notice and to publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed SCS to post downloadable copies of the Notice, Stipulation, Preliminary Approval Order and Claim Form online at strategicclaims.net/correvio (the "Settlement Website"). Upon request, SCS mailed copies of the Notice and/or Claim Form to Settlement Class Members and will continue to do so until the deadline to submit a Claim Form has passed.

54.     The Postcard Notice provides a limited description of the Settlement and directs potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online on the Settlement Website.  The Notice contains, among other things, a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' right to participate in the Settlement, object to the Settlement, the Plan of Allocation and/or the application for attorneys' fees and expenses, or to exclude themselves from the Settlement Class.  The Notice also informs Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 25% of the Settlement Fund, and for reimbursement of Litigation Expenses in an amount not to exceed $60,000, which may include an application for reimbursement of the reasonable costs and expenses incurred by Lead Plaintiffs, not to exceed $1,000 each, directly related to their representation of the Settlement Class.

55.     To disseminate the Postcard Notice, SCS obtained from Defendants' Counsel, the names and addresses of record holders of Correvio common stock that are potential Settlement

Class Members.  SCS disseminated 8 copies of the Postcard Notice to each of these potential Settlement Class Members by first-class mail on December 21, 2020.  *See* Bravata Decl. ¶3.

56.     In addition, SCS maintains a proprietary database with the names and addresses of the largest and most common banks, brokers, and other nominees.  *See id.* at ¶4.  At the time of the initial mailing, SCS's proprietary master mailing list consisted of 686 banks and brokerage companies, as well as 592 mutual funds, insurance companies, pension funds, and money managers.  *Id.*  On December 10, 2020, SCS caused a letter to be sent by First-Class Mail or e-mailed to the 1,278 nominees contained in the SCS master mailing list.  *Id.*  The letter notified the nominees of the Settlement and requested that, within 7 calendar days from the date of the letter, they either send a Postcard Notice to their customers who may be beneficial purchasers/owners, or provide SCS with a list of names, mailing addresses and email addresses of such beneficial owners so that SCS could promptly mail the Postcard Notice to them.  *Id.*; Ex. B (nominee letter).

57.     As of April 8, 2021, SCS has caused 9,507 copies of the Postcard Notice to be sent to potential Settlement Class Members (6,671 by mail and 2,828 via email with direct link from the webpage for the Notice and Claim Form).  Out of the 6,671 Postcard Notices mailed, SCS received 14 requests from the Potential Settlement Class Members to mail them the Notice and Claim Form.  *See id.* at ¶6, fn. 2.

58.     On January 4, 2021, in accordance with the Preliminary Approval Order, SCS caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted once over the *PR Newswire*.  *See id.* at ¶9; Ex .D.

59.     Lead Counsel also caused SCS to establish the dedicated Settlement Website, which became operational on December 9, 2020 to provide potential Settlement Class Members with information concerning the Settlement, submit a claim online, download copies of the Notice

and Claim Form, as well as copies of the Stipulation, Preliminary Approval Order, and Postcard Notice. *Id.* at ¶10.

60.     The deadline for Settlement Class Members to object to the Settlement, Plan of Allocation, and/or to the application for attorneys' fees and expenses, or to request exclusion from the Settlement Class is April 23, 2021.  To date, SCS has received one purported request for exclusion. The individual requesting exclusion purchased Correvio shares on December 6, 2019 and sold them on December 10, 2019, for a gain.  Because there are no recognized losses associated with these shares the individual requesting exclusion is not a Settlement Class Member pursuant to the definition of "Settlement Class" set forth in the preliminary approval order.  *Id.* at ¶12.  SCS will file a supplemental affidavit after the deadline addressing whether any requests for exclusion have been received.  To date, no objection to the Settlement, the Plan of Allocation, or the application for attorneys' fees and expenses has been entered on this Court's docket, or has otherwise been received by Lead Counsel.  Lead Counsel will file reply papers by May 7, 2021 that will address any objections that may be received.  *Id.* at ¶13.

## V.     THE PLAN OF ALLOCATION SHOULD BE APPROVED AS FAIR AND REASONABLE

61.     Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the $1.75 million Settlement Amount plus any and all interest earned thereon less: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiffs for their costs and expenses incurred in representing the Settlement Class); and (iv) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information submitted online or postmarked no later than April 20, 2021.  *See* Bravata Decl. Ex. C (Notice ¶¶ 20, 35, 41); ECF No. 60 at ¶10.  The Net

Settlement Fund will be distributed among Authorized Claimants according to the proposed Plan of Allocation, subject to approval by the Court.

62.     The Plan of Allocation is detailed in the long-form Notice.  Bravata Decl. Ex. C (Notice, pp. 9-13).   The Notice is posted online at https://www.strategicclaims.net/wp-content/uploads/2020/12/Correvio-Notice.pdf, is downloadable, and upon request, will be mailed to any potential Settlement Class Members.  The Plan of Allocation's objective is to equitably distribute the Net Settlement Fund to those Settlement Class Members who suffered economic losses as a proximate result of the alleged violations of the Exchange Act, as opposed to losses caused by market, industry, or Company-specific factors or factors unrelated to the alleged violations of law.  The Plan of Allocation takes into consideration when each Authorized Claimant purchased and/or sold Correvio common stock, the prices at which they purchased or sold, and whether they held over a disclosure date.  *See* Bravata Decl. Ex. C (Notice at ¶¶48-50).  As described in the Notice, calculations under the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial or estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement.  Instead, the calculations under the Plan of Allocation are a method to weigh the claims of Settlement Class Members against one another for the purposes of making an equitable allocation of the Net Settlement Fund.  *Id.*

63.     The proposed Plan of Allocation is based on an out-of-pocket theory of damages consistent with Section 10(b) of the Exchange Act and reflects an assessment of the damages that Lead Plaintiffs contend could have been recovered under the theories of liability and damages asserted in the Action.  More specifically, the Plan of Allocation reflects, and is based on, Plaintiffs' allegation that the price of Correvio common stock was artificially inflated during the

Settlement Class Period due to Defendants' alleged materially false and misleading statements and omissions.  The Plan of Allocation also incorporates the premise that the decrease in the price or value of Correvio common stock following the alleged corrective disclosures may be used to measure the alleged artificial inflation in the price of Correvio common stock prior to these disclosures.  *See id.*

64.     Under the proposed Plan of Allocation, each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund.  Specifically, an Authorized Claimant's *pro rata* share shall be the Authorized Claimant's Recognized Claim divided by the total of Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund.  *Id.* at ¶53.

65.     An individual Claimant's recovery under the Plan of Allocation will depend on a number of factors, including the number of valid claims filed by other Claimants and how many shares of Correvio common stock the Claimant purchased or sold during the Settlement Class Period and when that Claimant bought or sold the shares.  If a Claimant has an overall market *gain* with respect to his, her, or its overall transactions in Correvio common stock during the Settlement Class Period, or did not hold any shares of Correvio common stock through at least one of the alleged corrective disclosures, the Claimant's recovery under the Plan of Allocation will be zero, as any loss suffered would not have been caused by the revelation of the alleged fraud.  *Id.* at ¶¶49, 57.  Lead Counsel believe that the Plan of Allocation will result in a fair and equitable distribution of the Net Settlement Fund among Settlement Class Members who submit valid claims.

66.     In sum, the Plan of Allocation was designed to allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in Correvio common stock that were attributable to the conduct alleged in the

Amended Complaint.  Accordingly, Lead Counsel respectfully submit that the Plan of Allocation is fair and reasonable and should be approved by the Court.

67.     As noted above, as of April 6, 2021, approximately 9,507 copies of the Postcard Notice, which directs Settlement Class Members to the Settlement Website containing the Plan of Allocation and advises Settlement Class Members of their right to object to the proposed Plan of Allocation, have been sent to potential Settlement Class Members.  *See* Bravata Decl. at ¶¶2, 9; Ex. A (Postcard Notice).  To date, no objections to the proposed Plan of Allocation have been received or filed on the Court's docket.

## VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

68.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying to the Court for an award of attorneys' fees of 25% of the Settlement Fund (or $437,500, plus interest earned at the same rate as the Settlement Fund).  Plaintiffs' Counsel also request reimbursement of expenses incurred in connection with the prosecution of the Action from the Settlement Fund in the amount of $50,602.43.  Lead Counsel further request an award to Lead Plaintiffs in the total amount of $3,000 for costs and expenses they incurred directly related to their representation of the Settlement Class pursuant to the PSLRA, 15 U.S.C. § 78u-4(a)(4).  The total Litigation Expenses amount of $50,602.43 is below the maximum expense amount of $60,000 set forth in the Notices.  The legal authorities supporting the requested fees and expenses are set forth in the accompanying Fee Memorandum.  The primary factual bases for the requested fees and expenses are summarized below.

### A.     The Fee Application

69.     Plaintiffs' Counsel have represented the Settlement Class on a wholly contingent, not receiving any payment for their service or the expenses incurred in prosecuting this Action

against Defendants and negotiating the Settlement without any guarantee of success.  For their efforts on behalf of the Settlement Class, Lead Counsel is applying for a fee award to be paid from the Settlement Fund on a percentage basis.  The Postcard Notice and Notice informed Settlement Class Members that Lead Counsel would apply for attorneys' fees in an amount up to twenty five percent (25%) of the Settlement Fund, plus reimbursement of expenses up to $60,000, which may include awards to Lead Plaintiffs in an amount not to exceed $3,000 in total.

70.     As discussed in the Fee Memorandum filed concurrently herewith, the trend in the Second Circuit is to use the percentage-of-fund method in determining the appropriate fee recovery as it directly aligns the interests of the class and counsel, incentivizing efficient prosecution and early resolution of litigation.  It is also supported by the Supreme Court and the PSLRA.

71.     The requested fee is within the range of reasonable fees awarded in common-fund cases in the Second Circuit.  Based on the time and labor expended by Plaintiffs' Counsel, the risks and complexities of the litigation, the quality of representation, the results achieved, and the contingent nature of the representation, I respectfully submit that the requested fee award is fair and reasonable and should be approved by the Court.

### 1.     The Excellent Outcome Achieved is the Result of the Significant Time and Labor that Plaintiffs' Counsel Devoted to the Action

72.     Plaintiffs' Counsel have expended substantial time and effort pursuing this litigation and achieving the Settlement.  Prior to reaching the agreement in principle to settle the Action, Plaintiffs' Counsel conducted an extensive investigation and analysis of the allegations in preparing the Amended Complaint, which included, *inter alia*: (a) a detailed review and analysis of Correvio's SEC filings, press releases, conference call transcripts, analyst reports, news reports, and other public information; (b) working with a private investigator to identify and conduct numerous interviews with former employees and other potential witnesses with relevant

information and overseeing that international investigation; (c) reviewing FDA briefing documents, SPECTRUM study trial protocols and other trial-related documents; (d) consulting an FDA expert on industry specific issues and FDA regulatory procedure and practice; and (e) consulting with damages experts.  Plaintiffs' Counsel also conducted legal research and analysis with respect to Defendants' motion to dismiss the Amended Complaint.  Lead Counsel expended considerable time engaging in the extensive, good faith, arm's-length negotiations leading to the Settlement, which included damages analyses and negotiations via telephone and email relating to the initial settlement terms.

73.     Subsequent to the settlement Term Sheet, Lead Counsel negotiated the final settlement terms and drafted and finalized the settlement documents.  Lead Counsel also consulted with an expert regarding the Plan the Allocation and prepared the documents required for preliminary and final approval of the Settlement.  Plaintiffs' Counsel will continue to expend necessary time and resources in ensuring the finalization of the claims process.

74.     In total, Plaintiffs' Counsel expended a combined 392.2 hours prosecuting this Action, equating to a combined total lodestar of $304,016.80, as summarized in the chart below:

| LAW FIRM: | LODESTAR |
| --- | --- |
| Rosen | $174,216.80 |
| GPM | $129,800.00 |
| TOTAL LODESTAR | $304,016.80 |

75.     Attached hereto as Exhibits 2 and 3, respectively, are declarations from Rosen and GPM setting forth each firm's lodestar and expenses incurred in connection with the litigation of this Action.[7]   Summary charts submitted by both firms contain the hours expended and

---

[7] *See* Ex. 3 (Declaration of Sara Fuks of Rosen); Ex. 2 (Declaration of Kara M. Wolke of GPM).

corresponding lodestar amounts from the inception of the case through and including April 8, 2021, as well as a summary of litigation expenses by category.   Time spent preparing the application for fees and reimbursement of expenses has not been included.

76.      The requested fee of 25% of the Settlement Fund equals $437,500 (plus interest), and therefore represents a multiplier of 1.44 to Plaintiffs' Counsel's collective lodestar.   As discussed in further detail in the Fee Memorandum, the multiplier on counsel's lodestar is well within the range of fee multipliers typically awarded in comparable securities class actions and in other class actions involving significant contingency fee risk.   Plaintiffs' Counsel's rates range from $850 to $1,100 for partners, and $525 to $625 for associates, and are comparable to peer plaintiffs and defense-side law firms litigating matters of similar magnitude.   Ex. 7 (chart of rates charged by peer plaintiff and defense counsel in complex litigation).

77.      The expertise and experience of counsel is an important factor to be weighed in assessing a fair fee.   As demonstrated by Plaintiffs' Counsel's firm resumes (Exs. 2A and 3A), Lead Plaintiffs and the Settlement Class are being represented by experienced and skilled practitioners in the securities litigation field.

78.      Plaintiffs' Counsel's extensive efforts in the face of substantial risks and uncertainties have resulted in a significant recovery for the benefit of the Settlement Class.   In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

## 2.      The Magnitude and Complexity of the Action

79.      As detailed in the Fee Memorandum, securities class action cases are known for their notorious complexity.   This case was no different.   As detailed above, this Action presented numerous complex issues, including the need for Plaintiffs' Counsel to understand and research matters of, among other things: FDA policy and procedure, trial protocol for post-authorization

safety studies, the interplay between contract research organizations ("CROs") and pharmaceutical companies, the innerworkings of quality control teams, and the interim review of data in pharmaceutical studies. This required working closely with an FDA expert on these industry-specific practices and translating that knowledge into the allegations of the 96-page Amended Complaint. In addition, Lead Counsel worked with an investigator to locate and interview numerous Correvio former employees in both the U.S. and Europe. Despite the Amended Complaint's extensive detailed and particularized allegations, Defendants' 40-page motion to dismiss attacked the foundation of these allegations, and if the Action had not settled, the litigation would have undoubtedly continued in a hotly contested motion to dismiss battle.

80. Moreover, the settlement process in this Action was hard-fought. Both Parties zealously advocated their positions before the Parties agreed on the terms set forth in the Term Sheet.

### 3. The Significant Risks Borne By Plaintiffs' Counsel

81. Plaintiffs' Counsel undertook representation of Lead Plaintiffs and the Settlement Class on a wholly contingent basis. Counsel knew from the outset that they would expend a substantial amount of time prosecuting this Action yet receive no compensation if the Action ultimately proved unsuccessful. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate attorneys and staff and that the considerable litigation costs required by a case like this one were covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action, and incurred $50,602.43 in out-of-pocket litigation-related expenses in prosecuting the Action.

82.     Plaintiffs' Counsel also bore the risk that no recovery would be achieved.   As described above, this Action involved serious legal and practical hurdles that could have resulted in no recovery at all.   Continued litigation would have entailed significant risks to the Settlement Class, as the Action could be derailed in any number of ways before a final judgment in Lead Plaintiffs' favor was entered (and withstood possible appeal).

83.     Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement.   To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.   As a result of consistent and persistent efforts in the face of substantial risks and uncertainties, Plaintiffs' Counsel achieved a significant recovery for the benefit of the Settlement Class.

> **4.     The Quality of Representation, Including the Result Obtained, The Experience and Expertise of Plaintiffs' Counsel, and the Standing and Caliber of Defendants' Counsel**

84.     As demonstrated by the Plaintiffs' Counsel's firm resumes (attached hereto as Exhibits 2A and 3A), Plaintiffs' Counsel are highly experienced and skilled law firms that focus their practices on securities class action litigation.   Indeed, Plaintiffs' Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements that have been approved by courts throughout the country.   Plaintiffs' Counsel enjoy a well-deserved reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters.   I believe Plaintiffs' Counsel's experience added valuable leverage in the settlement negotiations.

85.     Plaintiffs' Counsel also obtained an excellent result for the Class, as the Settlement is approximately four times greater than the 1.7% median percentage return for securities class

action settlements in 2020.  *See* Ex. 6 Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* (NERA Jan. 25, 2021) at p. 20 (Fig. 16).

87.    The quality of the work performed by counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition.  Defendants were represented by experienced and qualified attorneys well-versed in securities litigation at Skadden, Arps, Slate, Meagher & Flom LLP.  In the face of this knowledgeable and formidable opposition, Plaintiffs' Counsel was nevertheless able to develop a case that was sufficiently strong to persuade Defendants to settle the Action on terms that are favorable to the Settlement Class.

### 5.    The Requested Fee In Relation to the Settlement

87.    The amount of the fee requested (25%) in relation to the Settlement Amount ($1.75 million) is fair and reasonable.  Courts routinely award fees of 25% in securities class action settlements.  *See* Fee Memorandum at III C. 1.

### 6.    Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

88.    Courts have consistently recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors, particularly large investors, take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, courts need to award fees that adequately compensate plaintiffs' counsel, taking into account the risks undertaken in prosecuting a securities class action.  Relatedly, it is long-recognized public policy that settlement is to be encouraged, including the resolution of fee applications that fairly and adequately compensate the counsel who

bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7.    The Reaction of the Settlement Class Supports Lead Counsel's Fee Request

89.    As discussed above, Postcard Notice has been mailed to 6,671 potential Settlement Class Members containing information regarding the 25% fee award requested by Lead Counsel. Bravata Decl. ¶5; Ex. A (Postcard Notice).  In addition, the Court-approved Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*.  Bravata Decl. at ¶9; Ex. D (confirmation of Summary Notice publication).  As of the date of this filing, there have been no objections to the proposed fee award.  Any objection received after the date of this filing will be addressed in Lead Counsel's reply papers, which are to be filed by May 7, 2021.

### 8.    Lead Plaintiffs Support Lead Counsel's Fee Request

90.    As set forth in the declarations submitted by Lead Plaintiffs Atkinson, Saad and Mironova, Lead Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Class, and the risks of the Action.  *See* Ex. 4, Atkinson Decl. ¶8; Ex. 5, Saad/Mironova Decl. ¶9.  Lead Plaintiffs have been intimately involved in this case, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

91.    In sum, Lead Counsel accepted this case on a contingency basis, committed significant resources to it, and prosecuted it without any compensation or guarantee of success. Based on the favorable result obtained, the quality of the work performed, the risks of the Action, and the contingent nature of the representation, Lead Counsel respectfully submits that a fee award

of 25%, equal to a multiplier of 1.44, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

        **B.**      **Reimbursement of the Requested Litigation Expenses is Fair and Reasonable**

      92.     Lead Counsel also seeks reimbursement from the Settlement Fund of $50,602.43 in Litigation Expenses that were reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing, litigating, and settling the claims asserted in the Action.   The expenses are summarized in charts set forth in Exhibits 2 and 3, which identify each category of expense, including expert fees, investigator fees online research, photocopying, and postage expenses, and the amount incurred for each category.

      93.     From the beginning of the case, Plaintiffs' Counsel were aware that they might not recover their out-of-pocket expenses.  Plaintiffs' Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute this Action.  Accordingly, Plaintiffs' Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

      94.     As reflected in each firm's attached declaration, Exs. 2-3, the expenses requested for reimbursement are reflected on the respective books and records maintained by both Plaintiffs' Counsel firms, which are prepared from expense vouchers, check records, invoices and other source materials, and which accurately record the expenses incurred.  The expenses requested for reimbursement were incurred separately by both firms and are not duplicative.

      95.     The following is a combined breakdown by category of all expenses incurred by Plaintiffs' Counsel:

| ITEM | AMOUNT |
|---|---|
| COURIER, POSTAGE & FEDEX | $85.09 |
| COURT FILING FEES | $400.00 |
| EXPERTS (FDA/DAMAGES) | $23,050.00 |
| INVESTIGATIONS | $22,198.12 |
| ONLINE RESEARCH | $2,211.59 |
| PRESS RELEASES/NOTICE TO CLASS MEMBERS | $2,520.83 |
| SERVICE OF PROCESS | $136.80 |
| | |
| GRAND TOTAL | $50,602.43 |

96.     The Postcard Notice informed potential Settlement Class Members that Plaintiffs' Counsel would be seeking reimbursement of litigation expenses in an amount not to exceed $60,000.  The Postcard Notice and Notice further advised Settlement Class Members that the Lead Plaintiffs would seek an award of no greater than $1,000 each ($3,000 total).  The total amount requested, $50,602.43 is below the maximum amount that Settlement Class Members were advised could be sought and, to date, no objection has been raised as to the maximum amount of the expenses, or the Lead Plaintiff PSLRA awards, as set forth in the Postcard Notice and Notice.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

97.     Lead Plaintiffs seek a collective award in the amount $3,000, or $1,000 each.  These awards are justified in light of their efforts in this Action.  Lead Plaintiffs: (a) regularly communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) reviewed and/or discussed all pleadings filed in the Action; (c) provided counsel with information concerning their transactions in Correvio securities; (d) consulted with Plaintiffs' Counsel regarding settlement negotiations; and (f) evaluated and approved the proposed

Settlement of this case.  Each of the Lead Plaintiffs has submitted a declaration detailing their respective contributions to the case and the amount of time they spent dedicated to the Action. (*See* Exs. 4-5 hereto).[8]  Given the important contributions and the time and effort expended by the Lead Plaintiffs, the requested awards are warranted and should be approved.

98.    In my opinion, the Litigation Expenses incurred by Plaintiffs' Counsel and Plaintiffs were reasonable and necessary to represent the Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

99.    In view of the significant recovery to the Settlement Class, the substantial risks of this litigation, the substantial efforts of Plaintiffs' Counsel, the quality of the work performed, the contingent nature of the fee, and the standing and experience of Plaintiffs' Counsel, Lead Counsel respectfully submits that the Settlement should be approved as fair, reasonable, and adequate; the Plan of Allocation should be approved as fair and reasonable; a fee in the amount of 25% of the $1,750,000 Settlement Fund, plus any accrued interest, should be awarded to Lead Counsel; litigation expenses in the amount of $50.602.43 should be reimbursed in full; and Lead Plaintiffs should each be awarded $1,000 ($3,000 in the aggregate).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 9, 2021 in New York, New York.

*/s/ Sara E. Fuks*
Sara E. Fuks

---

[8] *See* Exhibit 4:  Declaration of Clinton Atkinson; Exhibit 5: Joint Declaration of Nabil Saad and Iuliia Mironova.