L5EGFEIC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

JOSH FEIERSTEIN, individually
and on behalf of all others
similarly situated,

              Plaintiffs,

                v.                     19 Civ. 11361 (VEC)

CORREVIO PHARMA CORP., et al.,

                        Telephone Conference

              Defendants.

------------------------------x

                        New York, N.Y.
                        May 14, 2021
                        2:30 p.m.

Before:

                HON. VALERIE E. CAPRONI,

                        District Judge

                     APPEARANCES

THE ROSEN LAW FIRM P.A.
    Attorneys for Plaintiffs
BY:  SARA E. FUKS

SKADDEN ARPS SLATE MEAGHER & FLOM LLP
    Attorneys for Defendants
BY:  ASHLEY P. GROLIG
    SCOTT D. MUSOFF

L5EGFEIC

(The Court and all parties present telephonically)

THE COURT:  Ms. Fuks, is there something you want to say in advance or do you want me to just launch into the questions that I have?

MS. FUKS:  I don't have anything to say in advance. I'd be happy to answer any questions.

THE COURT:  So as I read this, the claims administrator itself mailed 6,671 postcard notices, and there were another 2,800 clients who were sent a link to the website. Does that 6,000 number include bulk postcards that got sent to a brokerage firm and the brokerage firm sent out to its clients?

MS. FUKS:  No, your Honor.  That number includes -- well, actually, yes.  I'm sorry, I apologize.  It does include the bulk postcards that were sent out to the brokerage firm, and then those brokerage firms requested additional -- yes.

THE COURT:  So I guess that question is to Ms. Grolig, does this sound right?  I presume the defendant has some sense of how many shareholders it had.  Less than 10,000 shareholders, does that strike you as correct?

MS. GROLIG:  Yes, your Honor.  As far as the shares that were potentially damaged by this class that sounds about right.  I have that number here that I can pull up for you.  So we handed over the transfer records, but many of them were held in straight names, so I don't have the exact number of how many

L5EGFEIC

shares there are, but that does sound approximately correct based on the number of potentially damaged shares, which were approximately 21.9 million of approximately damaged shares. And that's not just shareholders, but shares.

THE COURT:  So it's a very small public float; is that what you're telling me?

MS. GROLIG:  Yes, it is.

THE COURT:  So back to Ms. Fuks, do you have statistics for me on how many visitors, how many unique computers visited the website?

MS. FUKS:  Your Honor, I don't have those statistics on how many people visited the website.  I do have the statistics on the claims that were received and that information.

THE COURT:  Give me the statistics on the claims.

MS. FUKS:  So to date, the claims administrator has received a total of 744 claims.  Now, of those claims, 225 are valid and 51 are deficient due to limited proof, but they are subject to cure.  468 of those 744 claims were rejected completely, either because the claimants had no recognized losses or there was no proof at all.  Now, the recognized losses for the valid claims and the claims that are subject to cure is $11,522,084.  And these claims represent 8,303,233 shares of Correvio stock.

THE COURT:  I'm sorry, just let me interrupt you for a

L5EGFEIC

second.

I neglected to write down, Ms. Grolig, when you told me what the number of shares were that you thought were subject to damage from the alleged misstatements.  What was the total float, the total number of shares that you think were damaged?

MS. GROLIG:  Approximately 21.9 million were within the potential damage.  And just to clarify as well, your Honor, Correvio has since been acquired, so there is no public float at this point.

THE COURT:  Right.  I meant at the time, what the float was at the time.

So out of approximately 21 million shares that were potentially affected, you've got claims representing about 8 million shares; is that correct, Ms. Fuks?

MS. FUKS:  Yes, that is correct, your Honor.  And that's about 38 percent.

THE COURT:  That's pretty good, actually.

According to the notice, you are allocating up to $250,000 in administrative costs.  What's your current estimate of what the administration is actually going to cost?

MS. FUKS:  Yes, your Honor, so the figure is actually going to be much lower than that.  The current notice costs to date are 69,000.  The claims administrator anticipates that future notice costs will be between 40 and 50,000, but much closer to 40,000.

L5EGFEIC

THE COURT:  That's good.

One of the expenses that's listed as a law firm expense is a cost for the press release and notice to class members.  So did the law firm send out the press release and the notice, as opposed to the claims administrator doing so?

MS. FUKS:  I believe that those press releases refer to the press releases that were sent out at the outset of the case advertising the lead plaintiff deadline.

THE COURT:  And what about the notice to class members?

MS. FUKS:  I just have to double-check on that, on whether we included the notice to class members in our expenses or whether the claims administrator paid for that.  I would have to double-check.  It may be that we just mistakenly referred to press releases under the umbrella of notice costs as well.  I apologize, I can certainly check on that.

THE COURT:  After the entry in your attorney's fees application, the total is a little over 2,500, a little of it came from the Glancy firm, most of it came from your law firm, and it's identified as "press releases/notice to class members."

MS. FUKS:  Yes, I understand, your Honor.  I don't want to guess.  So it was likely that we did pay, given that figure, it's likely that we did pay for the PR newswire cost of the notice, but I'm not certain.

L5EGFEIC

THE COURT:  I'm going to ask you to get back to me on that.

MS. FUKS:  Absolutely, your Honor.

THE COURT:  So can you explain in a nutshell your distribution plan?  The dollar amount that is the minimum or I guess the maximum that a shareholder would get in a certain tranche, it's not intuitively obvious to me why that's fair. So as one example, if I'm reading your chart right, a shareholder who bought after the first disclosure is at a 94-cents per share multiple, whereas a shareholder who bought before any disclosure and sold between the first and the second disclosure is at 87-cents per share.

MS. FUKS:  So we formulated the plan of allocation with our damages expert and based on the daily trading prices of Correvio shares, and that is the figure that they came up with.

THE COURT:  So you are unable to explain even at a high level why that's reasonable?

MS. FUKS:  Well, if I may just take a moment to look at the plan of allocation.

I'm sorry, your Honor, can you repeat the question?

THE COURT:  Yes.  So if you look at Exhibit 1, which is the declaration, I guess it's your SCF claims administrator, attached to that is the long-form notice, Page 11 of the long-form notice at Page 10, I guess.  So I was focusing, sort

L5EGFEIC

of my initial question would be on -- go the top of Page 11 --
you say, "For shares bought between December 6th and
December 10, the recognized loss will be calculated as
follows," so if they held them all the way to March 10, you get
the lesser of 94-cents a share or the difference between the
purchase price and the sale price.  But then for where the
shareholder bought before there was any disclosure -- go back
to Page 10 -- but sold between the first and the second
disclosure, then the recognized loss -- this is on Page 10,
Paragraph C -- "The recognized loss will be the lesser of
87-cents per share or the difference between purchase price and
sales price."

MS. FUKS:  So I believe that is because of the trading
prices in the interim.  I would have to look at Table A.

THE COURT:  Look at what?

MS. FUKS:  So I'm looking at Table A, at the --

THE COURT:  It seems obvious that you do not know the
answer and you cannot explain it at a high level, so you're
going to be required to do that as well.  You need to get back
to me on a high-level explanation of what the basis for your
plan of allocation is.

MS. FUKS:  Okay, your Honor.  Understood.

THE COURT:  You're also proposing that there will be a
separate order regarding an approval for the plan of
allocation.  When do you anticipate submitting that?

L5EGFEIC

MS. FUKS:  The proposed order for the plan of allocation I believe is within the proposed order and judgment, it's encompassed therein.

THE COURT:  I don't think so, but maybe it is.  Can you give me a page number?

MS. FUKS:  I see.  You're correct, your Honor. Paragraph 14 of the proposed order states that a separate order shall be entered regarding the approval of a plan of allocation.

THE COURT:  So when do you anticipate providing the order that you were unaware that you needed to provide?

MS. FUKS:  We can provide that on Monday.

THE COURT:  So you don't need the actual claims data, the file claims information from the claims administrator for that?

MS. FUKS:  No, your Honor.

THE COURT:  All right.  Monday it is.  That would be May the 17th.

You propose that your attorney's fees and expenses should be paid immediately upon award, even if there are objections, appeals, or collateral attacks on the settlement. Why should that be?  Why should the lawyers be paid before the class is paid?

MS. FUKS:  Well, your Honor, that is standard in these types of cases.  The settlement proceeds are held in escrow.

L5EGFEIC

And the reason for the delay in paying settlement class members is so that the claims administration can process and be completed.

THE COURT:  And the lawyers are sometimes called upon to do things in connection with the claims administration.

MS. FUKS:  Yes, your Honor.  So the work that we're going to put forth in connection with the claims administration and distribution is not work that we include in our lodestar calculation.  It's not work that we, if you will, charge for. So when you request the percentage, we take into account the fact that we will be doing additional work, as is the case in these settlements.

THE COURT:  It's not a question of how you calculate the lodestar.  It's an issue of whether you should be paid before everything is done.  So your answer to why that should be -- again, in this case, there's no objections, there's no appeal, there's no further heavy lifting, legal work that has to be done, but of course I didn't know that when this first came in -- so again, the question remains of why do the plaintiffs' lawyer think they should be paid before the primary work in the case is done?

MS. FUKS:  Well, your Honor, the primary work in the case is done.  We've litigated this case since 2019 with no compensation whatsoever and advancing all of the expenses.  And we have already essentially waited to receive our fees until

L5EGFEIC

the resolution of the case.  And the case is essentially resolved but for the distributions.

THE COURT:  So let me just tell you.  Again, it's something of a moot point in this case because there are no objections, but the notion that I would ever sign off on payment to plaintiffs' firm when there are objections, appeals, or potential collateral attacks before the work is done is not going to happen.  Make sure your firm knows that.

MS. FUKS:  Understood, your Honor.

THE COURT:  Let's talk about the money that you want allocated to the lead plaintiffs.  In your papers and as well as I think even their declaration characterize it generally as reimbursement for costs and expenses including lost wages.  Did any of the three lead plaintiffs have any expenses?

MS. FUKS:  They did not have out-of-pocket expenses, aside from perhaps printing costs of printing out the documents, which they haven't documented.  So our request is really based on their lost wages.

THE COURT:  Well, what wages did they lose?

MS. FUKS:  So they're all employed.  Mr. Atkinson works as a hazardous waste manager.  Mr. Saad and Ms. Mironova, they're actually a couple, he is a financial advisor and she is a hairdresser.  As for Mr. Atkinson, he spent 65 hours on the case.  So if you look at the request for his $1,000 award, that comes out to, I think, $15.58 an hour, which is slightly over

L5EGFEIC

minimum wage.

THE COURT:  Well, we'll get to his claim that he spent 65 hours devoted to this case.  But what I'm hearing you say is there were no actual lost wages.  No one took time off of work to be -- obviously, they didn't take time off of work to be deposed -- but they didn't take time off of work to review documents or to meet with plaintiffs' lawyers so that they lost wages?

MS. FUKS:  No, I mean, I'm not aware that they took any time off of work.  I'm sure they didn't take time off of work to participate in the case.

THE COURT:  My recommendation to you is to look at these declarations before you submit them to the plaintiffs to have them sign.  Because they talk about lost wages, and it's clear that none of these people had lost wages.

Mr. Atkinson estimates that he spent 65 hours on tasks associated with this lawsuit, a statistic that you just repeated.  Let me just mention that Rosen of your law firm billed only 61 hours to this case.  You billed 120 hours to this case.  That means Mr. Atkinson is saying he spent 50 percent as much time on this case as you did.  Is that possible?

MS. FUKS:  Your Honor, I have spoken with Mr. Atkinson on a number of occasions, and he lost about $211,000 and he lives in North Carolina and he has a family of five.  And he

L5EGFEIC

recently lost his job.

THE COURT:  None of that has anything to do with how many hours he devoted to this case.  That may make him a sympathetic character, but it doesn't mean that he spent 65 hours on this case.  Mr. Rosen did not spent 65 hours on this case.

MS. FUKS:  I understand.  My point, your Honor, is that for a layman to read through the amended complaint, which is 96 pages, and I'm sure he checked the stock and read every news article out there.  I understand that it does seem like a lot of hours, but I don't think that it is out of the realm of what's reasonable or possible, your Honor.

THE COURT:  So I take it this award to the named plaintiffs is intended to be in addition to their claim under the settlement?

MS. FUKS:  Yes, this is in addition to their pro rata share.

THE COURT:  I'll give them all $500.  This case settled very early on.  The notion of a $1,000 award to the named plaintiffs just seems out of proportion, given the fact that the case settled almost immediately.

That brings us to the attorney's fees.  So your law firm I named as lead counsel in this case.  You have in your declaration in support of your request for attorney's fees no explanation for why it was appropriate to bring on the Glancy

L5EGFEIC

firm as, quote, "additional plaintiffs counsel," when I specifically refused to appoint them in this case, specifically because this case should not have required two law firms. Would you like to explain?

MS. FUKS:  Yes, your Honor.  So the Glancy firm represented Mr. Saad and Ms. Mironova prior to appointment.

THE COURT:  I knew that.

MS. FUKS:  Yes.  And so we did not duplicate any work. Mr. Saad and Ms. Mironova had the pre-existing relationship with the Glancy firm.  We disclosed in our preliminary approval brief the involvement of the Glancy firm.  We agreed with them to share the work.  They contributed a lot to the drafting of the amended complaint.  I understand that your Honor did not appoint them as lead counsel, but we did not believe that it was inappropriate, given their pre-existing relationship with two of the lead plaintiffs, for them to be additional plaintiffs counsel and share in the work on the case. Particularly, this was a complex case at the outset and --

THE COURT:  No, it wasn't.  Come on.  How is it complex?

MS. FUKS:  Well, respectfully, your Honor, the cases involving FDA approval are particularly difficult to plead, in addition to the fact that PSLRA cases are of course difficult to plead.  We had to do very intricate work with an FDA expert, which was extremely technical.  We looked at a lot of FDA

L5EGFEIC

briefing documents.  In addition, there was an investigation. We worked with an investigator very, very closely.  He conducted an investigation in several countries in Europe.  And the bulk of the time that we spent was in drafting the amended complaint.  It is a lengthy amended complaint.  We do think it's somewhat complex.  I think that it's evidenced by the fact that in opposing the motion to dismiss, defendants did seek additional pages and they weren't given those additional pages, so I think the fact that the motion to dismiss required one and a half times the pages of the normal motion to dismiss speaks to the complexity of the case.

THE COURT:  Well, I'm not so sure about that.  I would warrant that almost all motions to dismiss on securities fraud cases involve more than a 25-page brief, largely because plaintiffs tend to write 100-page complaints.  So there tends to be a lot to deal with, even if it's not actually what is necessary to state a claim.

Look, here is my issue.  You asked to have two firms on this case.  I was aware when you made that request that there was a pre-existing relationship between two of the lead plaintiffs and the firm in California.  And I said no.  You did not ask for that decision to be revisited.  You didn't explain why the Rosen firm was incapable of doing this case on its own. Nothing in the declarations from the lead plaintiffs indicate that you discussed with the lead plaintiffs the fact that the

Case 1:19-cv-11361-VEC    Document 73    Filed 05/28/21    Page 15 of 20

L5EGFEIC

Court had declined your request to appoint two firms, but you were going to go forward and do so anyway.

I look at the hours that are spent on this case, and what I see is that each firm spent about equal amounts of time, giving rise to a total amount of time spent on the case that is not reasonable given the fact that the case settled after -- essentially an amended complaint was filed and the case settled. So the notion that that required -- what is this total?

MS. FUKS: It's 392 hours, your Honor.

THE COURT: 392 hours of attorney time to accomplish that is just not reasonable. It reflects that there was duplication of effort, which is exactly what I was trying to avoid. So tell me why it is not appropriate to look solely at the hours of the Rosen firm and deal with that as the lodestar?

MS. FUKS: Because, your Honor, quite frankly, we did not duplicate work. And I just want to point out that in Ms. Wolke's declaration, she states that when she reviewed her firm's time, she cut hours, and she reviewed the time to confirm the accuracy of the records and the necessity for it and reasonableness of the time and made reductions. The tasks were not duplicated.

For example, my firm worked on the final settlement papers, whereas the Glancy firm drafted the stipulation and the preliminary approval papers. And even though those are, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L5EGFEIC

your Honor's view, somewhat boilerplate papers, they do take time, your Honor.  They do take some time.

THE COURT:  They don't take this much time.

MS. FUKS:  The Glancy firm also worked on the amended complaint.  And we really did go through the time.  And we really were mindful of your Honor's lead plaintiff order and mindful of the fact that your Honor did not want duplication of work.  And I don't think the number of hours spent is atypical of cases that have settled early on.  And if you look at some of the cases that are in Exhibit 8, I think that reflects the fact that there have been cases that have settled very early on, either before the motion to dismiss was even filed or after the filing of the motion to dismiss, where similar hours were spent.  And our lodestar, even if you take into account Glancy's work, the multiplier is 1.44, which is modest, I think.  And I think it is reflective of the hard work that we have put into the case.

THE COURT:  Well, let me make this clear.  When I rule, I expect my rulings to be followed.  I don't expect them to be ignored.  So I'm prepared to rule on this issue, unless you want to say something more about the issue of attorney's fees.

MS. FUKS:  I mean, we did request 25 percent, and I know your Honor doesn't consider comparable cases to be of that much weight.  I've read your Honor's other opinions.  But this

L5EGFEIC

25 percent is on, I think, the lower end of what courts have awarded. As the settlement values go up -- and this is a small settlement -- and as the settlement values go up, the percentages go down. So particularly when cases settle for amounts like this, fees are on a percentage basis closer to one-third or, I'd say, 28 percent.

THE COURT: I'm prepared to rule. The Court cannot count counsel's decision to unilaterally ignore the Court's decision to appoint a single law firm to represent in this case. If the Rosen firm believed its resources and talent were insufficient to adequately handle the case, it could have moved for reconsideration. It failed to do so, instead choosing to thumb its nose at the Court's ruling. As you no doubt know, one of my colleagues recently denied class certification when lead counsel did the exact same thing. Upsetting this settlement does not make sense, however. I believe the settlement was a fair resolution of this case. But even putting aside the impropriety of counsel seeking fees for two law firms when one was appointed, the lodestar is loaded beyond reason. The sole work done was an amended complaint and a settlement. The settlement is about 98 percent boilerplate. It cannot require that many hours. And as I have noted, the declarations you submitted on behalf of the lead plaintiffs reflect no work, because they reflect statements that are simply untrue. With all of the hours plaintiffs claims counsel

L5EGFEIC

asserts that the requested fee represents a 1.4 multiplier of the lodestar.  That multiplier, they argue, is reasonable.  I agree that a 1.4 multiplier is reasonable.  But I will only consider the Rosen firm's hours in doing the cross-check.  The Court finds that is appropriate, both because it only appointed Rosen as counsel and because Rosen's aggregate 200.9 hours is about right for this case.  Accordingly, using the formula of $175,216.80 times a 1.4 multiplier equals $243,902.40.  That seems like an appropriate fee in this case that translates into approximately 13 percent of the common fund, and that's what I'm going to grant.  Furthermore, I would note that my basic questions that I have asked, you did not know the answer for, which is further reason why it seems appropriate to cut the fees.

So you are going to get back to me on the expenses and you are going to get back to me on a high-level explanation for how the plan of allocation was determined.  You're giving me the order for the plan allocation on Monday.  Can you get me the rest of this information as well on Monday?

MS. FUKS:  Yes, your Honor.

THE COURT:  Everything is due on Monday, then.

Anything further, Ms. Fuks?

MS. FUKS:  Just one question.  May I ask for until perhaps Wednesday, given the additional information.  I did not even realize today was Friday.

THE COURT:  Yes.

MS. FUKS:  Thank you.

THE COURT:  So everything is due on the 19th.

MS. FUKS:  Thank you, your Honor.

THE COURT:  You're welcome.

Anything further from the defendant?

MS. GROLIG:  Your Honor, we would ask simply that the proposed order for the approval of the settlement be entered today, despite the plan of allocation being due on Wednesday.

THE COURT:  Why?  What's important about entering the order today?  Ms. Grolig?

MS. GROLIG:  My apologies, I was on mute.  We would like to put this to rest.  The defendants would like to settle this and put this behind us, so we would like to have the settlement.  But obviously, we can wait until Wednesday as well.

THE COURT:  Well, I can't promise you that if I get the information that I request on Wednesday I'm going to sign the order on Wednesday.  Is there something that makes it different?  That is, is there some giant penalty that's coming? Is there some huge tax reason why it makes a big difference whether it's signed today or a week from today?  If you just want to put it behind you and close the case, trust me, I want to put it behind me and close the case too.  But I do want to understand the allocation plan, and that actually affects

L5EGFEIC

whether I'm going to approve the settlement or not.  So I can't do it until I get the information that Ms. Fuks has promised me.

          MS. GROLIG:  Understood, your Honor.  No, there is no pressing reason for today.

          THE COURT:  I don't have any reason to believe I'm not going to approve it, but I do want to understand how they came up with what is essentially multiples based on when the person bought and sold.  So that's what I'm looking for.

          MS. GROLIG:  That's fine.  Thank you so much, your Honor.

          THE COURT:  Thanks everybody.  Have a nice weekend.

          (Adjourned)